**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

Charyn F. Selig                                                    :
                                                                   :
      and                           :
                                                                   :
JS, a Minor, by His Next Friend                                    :
Charyn F. Selig                                                    :
                                                                   :
      and                           :
                                                                   :
DS, a Minor, by Her Next Friend                                    :     **COMPLAINT**
Charyn F. Selig                                                    :
                                                                   :
      and                           :
                                                                   :
Estate of Glenn L. Selig,                                          :
by Charyn F. Selig, Administrator                                  :
                                                                   :
      and                           :
                                                                   :
Alya Waheed                                                        :
                                                                   :
      and                           :
                                                                   :
Mina Waheed                                                        :
                                                                   :
      and                           :
                                                                   :
MW, a Minor, by His Next Friend                                    :
Alya Waheed                                                        :
                                                                   :
Amanullah Waheed                                                   :
                                                                   :
      and                           :
                                                                   :
the Estate of Abdullah Waheed,                                     :
by Alya Waheed, Administrator                                      :
                                                                   :
      and                           :
                                                                   :
Anthony C. Kantor                                                  :
                                                                   :
      and                           :
                                                                   :

1

| | |
|---|---|
| Barbara B. Kantor | : |
| | : |
| and | : |
| | : |
| Anthony J. Kantor | : |
| | : |
| and | : |
| | : |
| Laura L. Styrlund | : |
| | : |
| and | : |
| | : |
| Estate of Paula L. Kantor, | : |
| by Anthony C. Kantor, Administrator | : |
| | : |
| Plaintiffs, | : |
| | : |
| v. | : |
| | : |
| | : |
| THE ISLAMIC REPUBLIC OF IRAN | : |
| c/o Ministry of Foreign Affairs | : |
| Khomeini Avenue | : |
| United Nations Street | : |
| Tehran, Iran | : |
| | : |
| and | : |
| | : |
| THE ISLAMIC REVOLUTIONARY GUARD | : |
| CORPS | : |
| Armed Forces Heaquarters Iran | : |
| Tehran – Zone 7 - Shariati | : |
| Ghoddoosi Square (Ghaar) | : |
| Tehran, Iran | : |
| | : |
| Defendants. | : |

## <u>COMPLAINT</u>

### NATURE OF THE CASE

1.     Plaintiffs bring this action, by and through their counsel Meridian 361 International Law Group, PLLC and Heideman Nudelman & Kalik PC, pursuant to the

provisions of the Foreign Sovereign Immunities Act, 28 U.S.C. § 1602, *et seq*. (hereinafter the "FSIA"), and state in support of their Complaint and allege the following:

2.     This action arises out of the wrongful death and personal injuries of three American citizens murdered in prolonged terrorist attacks on two different hotels in Kabul, Afghanistan.   Plaintiffs Glenn L. Selig and Abdullah Waheed, United States citizens, were murdered in a prolonged terrorist attack on the Intercontinental Hotel in Kabul, Afghanistan, on January 20 and January 21, 2018 (the "Intercontinental Hotel Attack").   Plaintiff Paula L. Kantor, a United States citizen, was murdered in a prolonged terrorist attack on the Park Palace Hotel in Kabul, Afghanistan on May 13 and May 14, 2015 (the "Park Palace Hotel Attack").

3.     Both of these hotel sieges were carried out by the Afghan Taliban, through its militant terrorist arm the Haqqani Network (together, the Afghan Taliban and the Haqqani Network are referred to hereinafter as the "Taliban"). Since 2002, the Afghan Taliban has been designated as a Specially Designated Global Terrorist Entity ("SDGTE") under Executive Order (E.O) 13224, which imposes sanctions and penalties on terrorists and those providing support to terrorists or acts of terrorism.   On September 19, 2012, the U.S. Department of State designated the Haqqani Network as a Foreign Terrorist Organization ("FTO") under s. 219 of the Immigration and Nationality Act of 1965.   These designations have never been lifted.

4.     The Taliban operate with material support and resources provided by the Islamic Republic of Iran ("Iran") and the Islamic Revolutionary Guard Corps.   In 1984, the U.S. Department of State designated Iran as a State Sponsor of Terrorism under s. 6(j) of the Export Administration Act, s. 40 of the Arms Export Control Act, and s. 620A of the Foreign Assistance Act.   In 2007, the U.S. Department of the Treasury designated the Qods Force, an elite special operations unit within the Islamic Revolutionary Guard Corps, as an SDGTE under E.O. 13224.

In 2017, the U.S. Department of the Treasury designated the Islamic Revolutionary Guard Corps as an SDGTE under E.O. 13224.  On April 15, 2019, the U.S. Department of State designated the Islamic Revolutionary Guard Corps in its entirety, including its Qods Force (the Islamic Revolutionary Guard Corps and its Qods Force being referred to hereinafter collectively as the "IRGC"), as an FTO under s. 219 of the Immigration and Nationality Act.  These designations have never been lifted.

5.    These terrorists committed, and Glenn L. Selig, Abdullah Waheed and Paula L. Kantor were the victims of, acts of "torture" and "extrajudicial killing" as defined in the Torture Victim Protection Act ("TVPA"), 28 U.S.C. § 1350, and "personal injury" and "death" as required by 28 U.S.C. § 1605A, thereby entitling the Plaintiffs, and each of them, as American victims of Iranian sponsored terrorism, to bring this action and recover damages pursuant to applicable law.

## JURISDICTION, VENUE, AND CHOICE OF LAW

6.    This Court exercises subject matter jurisdiction in accordance with the provisions of 28 U.S.C. §§ 1330(a), 1331, 1332(a)(2), and 1605A, which create subject matter and personal jurisdiction for civil actions for personal injury and wrongful death against State Sponsors of Terrorism and their officials, employees and agents,

7.    Defendant Iran was designated as a State Sponsor of Terrorism by the United States Department of State in 1984, and has remained so designated, without interruption, ever since.

8.    Defendant IRGC is an agency or instrumentality of Iran.

9.    Venue lies in this Court pursuant to 28 U.S.C. § 1391(f)(4), which provides, in pertinent part, that a civil action against a foreign state or a political subdivision thereof may be

brought in the United States District Court for the District of Columbia.

10.     Defendants Iran and the IRGC are subject to suit in the courts of the United States pursuant to 28 U.S.C. § 1605A.

11.     28 U.S.C. § 1605A(c) provides a federal private right of action against a foreign state that is or was a State Sponsor of Terrorism, and also against any official, employee or agent of that foreign state while acting within the scope of his or her office, employment or agency, for wrongful death, personal injury and related torts caused by an act of torture or extrajudicial killing or the provision of material support or resources for such acts.  This right of action is controlled by federal law.

## THE PARTIES

### A.  <u>The Plaintiffs</u>

12.     This action is brought by the Plaintiffs, each in their individual capacity and on their own behalf, and also, where appropriate, as representative on behalf of a minor, or as administrator or personal representative on behalf of an estate, and on behalf of all those legally entitled to assert a claim under the FSIA as the survivor, family member and/or heir of United States citizens Glenn L. Selig, Abdullah Waheed and Paula L. Kantor.

### <u>The Selig Family</u>

13.     Plaintiff Estate of Glenn L. Selig is represented in this action by its duly appointed Administrator, Charyn F. Selig.  Glenn L. Selig was murdered in the Intercontinental Hotel Attack.   At the time of the acts alleged, and at all other times relevant hereto, Glenn L. Selig was a citizen of the United States and further, at all times relevant hereto, a victim of "torture" as defined in the TVPA and "personal injury" and "death" as required by 28 U.S.C. § 1605A.  Plaintiff Estate of Glenn L. Selig can sue and be sued in this Court.

14.     Plaintiff Charyn F. Selig is, and at all times relevant hereto was, the lawful wife of Glenn L. Selig, and a citizen of the United States. Plaintiff Charyn F. Selig can sue and be sued in this Court.

15.     Plaintiff JS, a minor, is, and at all times relevant hereto was, the biological son of Glenn L. Selig and Charyn F. Selig, and a citizen of the United States. Plaintiff JS can sue and be sued in this Court.

16.     Plaintiff DS, a minor, is, and at all times relevant hereto was, the biological daughter of Glenn L. Selig and Charyn F. Selig, and a citizen of the United States. Plaintiff DS can sue and be sued in this Court.

## The Waheed Family

17.     Plaintiff Estate of Abdullah Waheed is represented in this action by its duly appointed Administrator, Alya Waheed.  Abdullah Waheed was murdered in the Intercontinental Hotel Attack.   At the time of the acts alleged, and at all other times relevant hereto, Abdullah Waheed was a citizen of the United States and further, at all times relevant hereto, a victim of "torture" as defined in the TVPA and "personal injury" and "death" as required by 28 U.S.C. § 1605A.  Plaintiff Estate of Abdullah Waheed can sue and be sued in this Court.

18.     Plaintiff Alya Waheed is, and at all times relevant hereto was, the lawful wife of Abdullah Waheed, and a citizen of the United States. Plaintiff Alya Waheed can sue and be sued in this Court.

19.     Plaintiff Mina Waheed is, and at all times relevant hereto was, the biological daughter of Abdullah Waheed and Alya Waheed, and a citizen of the United States. Plaintiff Mina Waheed can sue and be sued in this Court.

20.     Plaintiff MW, a minor, is, and at all times relevant hereto was, the biological son

of Abdullah Waheed and Alya Waheed, and a citizen of the United States. Plaintiff MW can sue and be sued in this Court.

21.    Plaintiff Amanullah Waheed is, and at all times relevant hereto was, the biological son of Abdullah Waheed and Alya Waheed, and a citizen of the United States. Plaintiff Amanullah Waheed can sue and be sued in this Court.

### The Kantor Family

22.    Plaintiff Estate of Paula L. Kantor is represented in this action by its duly appointed Administrator, Anthony C. Kantor.  Paula L. Kantor was murdered in the Park Palace Hotel Attack.   At the time of the acts alleged, and at all other times relevant hereto, Paula L. Kantor was a citizen of the United States and further, at all times relevant hereto, a victim of "torture" as defined in the TVPA and "personal injury" and "death" as required by 28 U.S.C. § 1605A.  Plaintiff Estate of Paula L. Kantor can sue and be sued in this Court.

23.    Plaintiff Anthony C. Kantor is, and at all times relevant hereto was, the biological father of Paula L. Kantor, and a citizen of the United States. Plaintiff Anthony C. Kantor can sue and be sued in this Court.

24.    Plaintiff Barbara B. Kantor is, and at all times relevant hereto was, the biological mother of Paula L. Kantor, and a citizen of the United States. Plaintiff Barbara B. Kantor can sue and be sued in this Court.

25.    Plaintiff Anthony J. Kantor is, and at all times relevant hereto was, the biological brother of Paula L. Kantor, and a citizen of the United States. Plaintiff Anthony J. Kantor can sue and be sued in this Court.

26.    Plaintiff Laura L. Styrlund is, and at all times relevant hereto was, the biological sister of Paula L. Kantor, and a citizen of the United States. Plaintiff Laura L. Styrlund can sue

and be sued in this Court.

**B.  The Defendants**

27.    Defendants Iran and the IRGC are jointly and severally liable to Plaintiffs for all of their damages to the fullest extent of the law.

**The Islamic Republic of Iran**

28.    Defendant the Islamic Republic of Iran is a foreign state that was designated as a State Sponsor of Terrorism on January 19, 1984, pursuant to § 6 of the Export Administration Act of 1979, 50 U.S.C. App. § 2405, and § 620(A) of the Foreign Assistance Act of 1961, 22 U.S.C. § 2371, and ever since has remained so designated without interruption.

29.    Iran, at all times pertinent to this action, provided, and it continues to provide, material support and resources to the Taliban, in pursuit of Iran's strategic objectives in south-central Asia.  Iran shares an eastern border with Afghanistan, and a western border with Iraq. The U.S. armed forces maintain a substantial presence in both Iraq and Afghanistan, and Iran is sandwiched between them. An overriding Iranian objective has been to eject the U.S. from these countries on its borders.  Persistent Taliban attacks within Afghanistan, targeting U.S. armed forces, U.S. civilians, Afghan security forces and symbolic civilian targets like hotels frequented by American armed forces personnel, civilian businessmen and diplomats, raise the cost to the U.S. of its intervention in Afghanistan, and pressure it to scale down or withdraw its forces.

30.    Iran, through its actions, caused the death and injuries described herein, within the meaning of 28 U.S.C. § 1605A, by providing the Taliban with critical arms, funding, training, direction, material support, resources, safe passage and safe haven for its terrorist activities.

31.    Defendant Iran is liable for the actions of the Taliban and its agents.

**The Islamic Revolutionary Guard Corps**

32.    Defendant the Islamic Revolutionary Guard Corps is a special forces branch of the Iranian armed forces, founded by order of the Ayatollah Sayyid Ruhollah Musavi Khomeini immediately following the Iranian Revolution in 1979, with a mission to protect the clerical elites and preserve their new fundamentalist Islamic regime.  The Supreme Leader is also the commander-in-chief of the Islamic Revolutionary Guard Corps. The Islamic Revolutionary Guard Corps is the core of the Iranian national security and foreign policy establishment.

33.    The Islamic Revolutionary Guard Corps employs terrorism to pursue Iran's strategic objectives worldwide, through the Qods Force, its elite special operations unit, which arms, funds, trains and directs terror proxies, including the Taliban.

34.    The U.S. Department of the Treasury formally designated the Qods Force as an SDGTE under E.O. 13224 for its support of a number of terrorist groups, thereby blocking its assets, on October 25, 2007.  The Qods Force remains so designated today.  In making this designation, the Treasury Department specifically cited to Qods Force support of the Taliban:

> The Qods Force is the Iranian regime's primary instrument for providing lethal support to the Taliban. The Qods Force provides weapons and financial support to the Taliban to support anti-U.S. and anti-Coalition activity in Afghanistan. Since at least 2006, Iran has arranged frequent shipments of small arms and associated ammunition, rocket propelled grenades, mortar rounds, 107mm rockets, plastic explosives, and probably man-portable defense systems to the Taliban.  This support contravenes Chapter VII UN Security Council obligations. UN Security Council resolution 1267 established sanctions against the Taliban and UN Security Council resolutions 1333 and 1735 imposed arms embargoes against the Taliban. Through Qods Force material support to the Taliban, we believe Iran is seeking to inflict casualties on U.S. and NATO forces.[1]

35.    The U.S. Department of the Treasury formally designated the Islamic Revolutionary Guard Corps as an SDGTE under E.O. 13224 on October 13, 2017.

36.    The U.S. Department of State formally designated the IRGC as an FTO under s.

---

[1] U.S. Treasury Dept. Press Release hp-644, Designation of Iranian Entities and Individuals for Proliferation Activities and Support of Terrorism (Oct. 25, 2007), http://www.treasury.gov/press-center/press-releases/Pages/hp644.aspx.

219 of the Immigration and Nationality Act of 1965 on April 15, 2019.

37.     Defendant IRGC is liable for the actions of the Taliban and its agents.

38.     Defendants Iran and IRGC are jointly and severally liable for the actions of the Taliban and its agents.

## STATEMENT OF FACTS

### The Taliban

39.     The Soviet Union invaded Afghanistan in 1979, and occupied it until 1989. It managed the country through the puppet regime of Dr. Najibullah Ahmadzai until 1992.  During its occupation, the Soviet Union and Najibullah's regime were forced to defend against a guerilla war mounted by Maoist and mujahideen insurgent groups.  Najibullah's regime collapsed in 1992. An alliance of mujahideen factions formed a coalition government that collapsed after a short time.  Civil war ensued.

40.     The Afghan Taliban was founded by Mullah Mohammad Omar, its supreme commander and spiritual leader, in September 1994, in Kandahar, in this vacuum.  It attracted thousands of fighters from extremist madrassas. It announced its intention to form a pure Islamic state.  By January 1995 it controlled 12 Afghan provinces.  It captured Kabul in September 1996. In October 1997 Mullah Omar declared the Islamic Emirate of Afghanistan, the name by which the Taliban still refer to themselves, and by 1998 it controlled more than 90% of Afghanistan.

41.     In 1996, Osama bin Laden moved from Saudi Arabia to Sudan, and then to Afghanistan, where he was protected by the Afghan Taliban, and permitted to recruit militants, run training camps and plan terrorist attacks.  The United Nations responded by passing Security Council Resolutions 1267 and 1333, establishing a sanctions regime applicable to the Afghan Taliban, and demanding that the Afghan Taliban end its support of terrorism and turn over bin

Laden.  The Afghan Taliban refused, and continued to harbor bin Laden.

42.     Following bin Laden's bombings of the U.S. embassies in Kenya and Tanzania in 1998, the attack on the USS Cole in 2000, and the attacks on the World Trade Center and the Pentagon in 2001, the United States demanded that the Afghan Taliban surrender bin Laden and close all terrorist training camps.  The Afghan Taliban refused. On October 7, 2001 the United States and its allies commenced Operation Enduring Freedom, a military intervention in Afghanistan to remove the Afghan Taliban from power, and prevent the use of Afghanistan as a terrorist base of operations.

43.     The Afghan Taliban had been removed from power by December 9, 2001.  The United Nations Security Council passed Resolution 1386 on December 20, 2001, authorizing the establishing of the International Security Assistance Force ("ISAF"), a NATO-led security mission to train Afghan National Security Forces, and assist Afghanistan to rebuild key government institutions. Later, ISAF would lead the fight against the Afghan Taliban.  U.S. troops comprised more than half of ISAF. The U.S.-led coalition created conditions that allowed Afghanis to form a democratically elected government, which has governed ever since and has its seat in Kabul.  Foreign embassies and the ISAF headquarters are also located in Kabul.

44.     Dislodging the United States from Afghanistan has remained the primary objective of the Afghan Taliban since its defeat in 2001, throughout its various leadership transitions.  In 2003, the Afghan Taliban declared that it had regrouped under the leadership of Mullah Omar, and was ready to commence attacks to expel the United States and ISAF from Afghanistan.  In 2004, the then hidden Mullah Omar announced an insurgency against "America and its puppets" to "regain the sovereignty of our country."  Mullah Omar remained the supreme commander of the Afghan Taliban until his death in 2013.

45.     Mullah Akhtar Mansour succeeded Mullah Omar as supreme commander and Emir of the Taliban in 2015.  Mullah Mansour was targeted and killed by a U.S. drone strike authorized by President Obama in May 2016, as he returned from a visit with top Iranian security officials in Tehran. The purposes of the visit included securing funding and weapons brokered by Iran, and tactical coordination prior to a widespread Taliban offensive in Afghanistan.  The Taliban is now led by Mullah Mawlawi Hibatullah Akhundzada, who maintains and derives his power from direct and close ties to Iran.  Under Mullah Akhundzada, the Taliban objective of dislodging the United States from Afghanistan has not changed.  In April 2018, the Taliban rejected Afghan government proposals for negotiations and stated that its forthcoming terrorist attacks would be "mainly focusing on crushing, killing and capturing American invaders and their supporters."

46.     The Afghan Taliban is organized into "shuras," or councils. The Quetta Shura is the senior leadership council. It controls the Afghan province that includes Kabul, and the provinces that surround it.  One of the Afghan Taliban shuras, the Mashhad Shura, is based in Iran.

47.     The total manpower of the Afghan Taliban, including combatants and support elements, is said to exceed 200,000.  The fighters are said to number 150,000, of whom 60,000 are in full time, mobile units and the rest are local militia.  The mobile units are based in Iran and Pakistan for logistical reasons, and because the fighters have family in those countries.

48.     The Afghan Taliban has waged a continuous campaign of terror that continues today, targeting U.S. armed forces, U.S. civilians, Afghan security forces and symbolic civilian targets like hotels frequented by American armed forces personnel, civilian businessmen and diplomats.  The Taliban have claimed responsibility for countless terror attacks in Afghanistan,

including by way of example:

    a. the January 14, 2008 attack on the Serena Hotel in Kabul, which at the time was hosting the Norwegian foreign minister and his delegation;

    b. the February 11, 2009 attacks on the Ministry of Justice, the Ministry of Education and the Directorate of Prisons in Kabul, timed the day before the arrival of the new American envoy to Afghanistan, Richard Holbrooke, to the region;

    c. the August 15, 2009 suicide bombing of the NATO headquarters in Kabul;

    d. the May 2010 suicide bombing of a NATO convoy in Kabul, timed to occur as President Hamid Karzai returned from the United States with a U.S.-backed plan to negotiate peace terms with tribal elders;

    e. the June 28, 2011 attack on the Intercontinental Hotel in Kabul, then hosting thirty provincial government officials staying at the hotel to discuss sharing of security responsibilities between the U.S. military and Afghan security forces;

    f. the September 13, 2011 attack on the U.S. Embassy and NATO headquarters in Kabul;

    g. the April 15, 2012 attacks on the U.S., German and British embassies in Kabul;

    h. the June 11, 2013 suicide bombing of the Supreme Court of Afghanistan, declared to be a blow to judges that obey Western powers;

    i. the January 17, 2014 suicide bombing of the Taverna du Liban in Kabul, a restaurant popular with foreign diplomats, aid workers and journalists;

    j. the March 20, 2014 attack on the Serena Hotel in Kabul;

    k. the December 11, 2014 attack on a French high school auditorium;

    l. the May 13 and 14, 2015 attack on the Park Palace Hotel in Kabul;

    m. the August 10, 2015 suicide bombing of the International Airport in Kabul;

    n. the August 1, 2016 suicide bombing of the Northgate Hotel in Kabul, housing foreign military contractors;

    o. the January 20 and 21, 2018 attack on the Intercontinental Hotel in Kabul.

49.    The United States treats the Afghan Taliban as a terrorist organization.  In June

2014, White House National Security Council officials stated that the Afghan Taliban had been added to the list of SDGTEs by executive order in 2002.  In May, 2017, State Department officials stated: "Since 2002, the Afghan Taliban has been designated as a Specially Designated Global Terrorist Entity under Executive Order (E.O) 13224, which imposes sanctions and penalties on terrorists and those providing support to terrorists or acts of terrorism.  In addition to the Taliban's designation under E.O. 13224, section 691(d) of the Consolidated Appropriations Act of 2008 mandates that the Taliban is considered a terrorist organization for immigration purposes."  Those designations have never been withdrawn.  While he was alive, the U.S. offered $10 million for information leading to the capture of Mullah Omar, the Emir of the Afghan Taliban, through the State Department's Rewards for Justice Program, an effort designed to "fight against international terrorism."  The National Counterterrorism Center also lists "Taliban Presence in Afghanistan" on its global map of "Terrorist Groups."

50.    Numerous individual Afghan Taliban terrorists have been designated.  The State Department designated Qari Saifullah, an Afghan Taliban operational commander and shadow governor, as a Specially Designated Global Terrorist ("SDGT") in January 2014, stating: "As an operational commander, Qari Saifullah has used Taliban fighters to organize terrorist activities against the Government of Afghanistan and Coalition Forces…"  On January 25, 2018, the Treasury Department's Office of Foreign Assets Control ("OFAC") designated four Afghan Taliban terrorists as SDGTs, citing their links to Iranian military training, financing and weapons. On October 23, 2018, OFAC, acting jointly with fellow member states of the Terrorist Financing Targeting Center ("TFTC"), designated nine Afghan Taliban leaders and their IRGC officer sponsors as SDGTs.

51.    The Afghan Taliban orchestrate many of their terror attacks through the so-called

"Haqqani Network." The U.S. Department of State designated the Haqqani Network as an FTO, and as an SDGTE under E.O. 13224, on September 7, 2012. The designations have never been withdrawn. The Haqqani Network is an integral part of the Afghan Taliban and not a separate faction. Both Afghan Taliban and Haqqani leadership confirm they are a unified organization, and not separate entities. A defected Afghan Taliban commander stated to the New York Times: "The Taliban and the Haqqani are the same." In a recent statement posted on its Voice of Jihad website denying responsibility for a certain attack, the Afghan Taliban acknowledged that the Haqqani Network is a part of its organization: "We once again reject all allegations about involvement of Mujahideen of Islamic Emirate in the Kabul incident. None of our Mujahideen including those of Haqqani Sahib had any role in the event…"

52.     Haqqani Network founder Jalaluddin Haqqani, was a member of the Quetta Shura, the Afghan Taliban's executive council. He is survived by his son Sirajuddin Haqqani. The Treasury Department designated Sirajuddin as a SDGT under E.O. 13224 on March 11, 2008. Sirajuddin serves simultaneously as the Operational Commander of the Haqqani Network, and the Deputy Emir and Military Commander of the Afghan Taliban. He is also head of one of the two subordinate Taliban shuras directly controlled by the Quetta Shura, the Miran Shah Shura. He installed his brother Khalil as head of the other subordinate Taliban shura directly controlled by the Quetta Shura, the Peshawar Shura. The Peshawar Shura includes Kabul. Thus, Sirajuddin and his brother Khalil have control of Kabul, subject to Quetta Shura oversight.

53.     As Deputy Emir of the Afghan Taliban, Sirajuddin Haqqani is responsible for operational planning for the Taliban, which he undertakes on behalf of the Emir Mullah Akhundzada. He stated in the September 2012 edition of Al Samoud, an official Taliban magazine: "We are one of the fronts of the Islamic Emirate, and we do jihad in the cause of

Allah under its banner, and we are proud of our pledge to its Emir [then Mullah Omar] and we carry out its orders and all its regulations." He continued: "All formations and the employment figures with us are by the Islamic Emirate, and we obey completely in good deeds the Emir of the Believers Mullah Muhammad Omar…"

54. The Afghan Taliban repeatedly demand the release of imprisoned Haqqani terrorists. Sirajuddin Haqqani's younger brother Anas Haqqani was captured in Qatar by U.S. forces while he was meeting with Taliban leaders following their release from Guantanamo, then extradited to Afghanistan and imprisoned at Bagram Airfield. An Afghan court condemned him to death in 2016 for his involvement in Taliban terrorist attacks. The Afghan Taliban responded to the sentence by threatening: "A lot of blood will be spilled, and the government will be responsible for all of it." The Afghan Taliban have repeatedly demanded the release of Anas Haqqani. In June 2017, President Ashraf Ghani signed orders to execute Haqqani terrorists on death row. The Afghan Taliban responded by threatening "harsh exemplary attacks" if the government harmed any of the prisoners.

55. The Afghan Taliban regularly claim responsibility for attacks said to be implemented by the Haqqani Network. For instance, Sirajuddin Haqqani has a $10 million bounty on his head and is wanted by the FBI for planning the January 14, 2008 terror attack on the Serena Hotel and other terror attacks, for which the Afghan Taliban has claimed responsibility. The State Department designated Qari Zakir, the Chief of Suicide Operations and training in small arms, heavy weapons and improvised explosive devices for the Haqqani Network, and its operational commander in Kabul, as an SDGT on November 5, 2012. In making this designation, it stated that Zakir and Haqqani fighters he trained carried out the June 28, 2011 attack on the Intercontinental Hotel in Kabul, and the September 13, 2011 attack on the

U.S. Embassy and NATO Headquarters in Kabul.  The Taliban claimed responsibility for all of these attacks, without objection from the Haqqani Network.

### The January 2018 Taliban Attack on the Intercontinental Hotel, and the Murders of Glenn Selig and Abdullah Waheed

56.     The Intercontinental Hotel is a 5-star, government owned hotel located in a residential area in western Kabul, near a former royal palace.  It is Afghanistan's first luxury hotel.  It has six floors, 200 rooms, a swimming pool, gym, internet cafe and four different restaurants.  The hotel frequently hosts Afghan politicians and other VIPs, and is a platform for foreign, especially Western, diplomats, businessmen, journalists and tourists visiting Kabul, who use it as a venue for meetings.  It is a highly symbolic landmark, and a recurring soft target for the Taliban.

57.     On June 28, 2011, at 22:00 local time, nine Taliban terrorists commenced a 5-hour siege of the Intercontinental Hotel in Kabul.  At the time, thirty provincial government officials were meeting at the hotel to discuss the allocation of security responsibilities between the U.S. military and Afghan security forces. The hotel was also hosting an information technology conference.  The terrorists were armed with suicide vests, AK-47 assault rifles, hand grenades and rocket-propelled grenade launchers. The attack resulted in 21 dead and 18 wounded.  The State Department determined and publicly stated in an official notice that Qari Zakir, the Chief of Suicide Operations and training in small arms, heavy weapons and improvised explosive devices for the Haqqani Network, had planned and implemented the attack. The Afghan Taliban claimed responsibility for the attack in an official statement issued by its spokesman Zabiullah Mujahid.

58.     Shortly after his election, President Trump dropped a GBU-43/B Massive Ordnance Blast Bomb (MOAB), the so-called "mother of all bombs", on terrorists in Afghan

caves in April 2017.  Then, on August 21, 2017, in a public speech delivered at Fort Meyer, Virginia, President Trump confirmed that his administration had made a major shift in U.S. policy on Afghanistan. He announced that he was lifting restrictions in the rules of engagement applicable in the theatre that had inhibited U.S. forces in their fight against the Taliban. He stated they now had a "clear mission to defeat the enemy."  He stated that he would "expand authority for American armed forces to target the terrorist and criminal networks that sow violence and chaos throughout Afghanistan."  He promised the U.S. military would remain in Afghanistan in order to "continue its support for the Afghan government and the Afghan military as they confront the Taliban."  He repudiated the Obama Administration's Afghanistan's strategy based on a fixed troop drawdown schedule, focusing instead on the "conditions" on the ground. "We are not nation-building again," he said, "we are killing terrorists." The Taliban responded by escalating its terror attacks.

59.    On January 20, 2018, at 21:00 local time, five Taliban terrorists commenced a second siege on the Intercontinental Hotel, this one lasting 17 hours.  The terrorists wore suicide vests, and used AK-47 assault rifles, hand grenades and rocket-propelled grenade launchers. They carried portable sound systems playing Taliban war songs.  The terrorists sought out and specifically targeted foreigners. One of the terrorists shouted "Where are the foreigners?"  The terrorists went room-to-room, hunting foreigners. After a protracted standoff, a combination of Afghan Special Forces, Afghan Army and Norwegian Special Forces stormed the hotel and killed some of the terrorists.  Other terrorists died when they detonated their suicide vests.  Many guests were killed or injured jumping or attempting to climb from their room windows.  Guests spent terrifying hours overnight hiding in their rooms.  Over 160 guests were rescued.  The attack resulted in 42 dead, including 4 American citizens, and 14 wounded, including 2

American citizens.

60.     The Afghan Ministry of Interior Affairs and intelligence services released an official statement that the assault had been organized and carried out by terrorists dispatched by the Haqqani Network.   The Afghan Taliban immediately claimed responsibility for the attack in an official statement issued by its spokesman Zabiullah Mujahid on January 20, 2018 saying that it had "killed tens of foreign invaders and their puppets."   Before the death count had been completed, Mujahid also told Arabic news channel Al Jazeera, "Our five fighters, Bilal, Ayubi, Khalil, Bashar and Abid entered the building and conducted the operation that resulted in the death of 10 foreigners and Afghan government officials."   On January 22, 2018, then Secretary of State Rex Tillerson stated "We have seen the Taliban's claim of responsibility and condemn terrorist groups for their violent campaign against Afghan and foreign personnel working to improve Afghanistan."

61.     Glenn Selig was a devoted and loving husband and father. At the time of the Intercontinental Hotel Attack, he was 50 years old, had been married to Charyn Selig for 17 years, and they had two cherished minor children, a daughter DS and a son JS.  He served on various boards in his local community.  He worked as an award-winning investigative reporter, broadcast journalist and television news anchor for twenty years. He was also an entrepreneur, and founded his own public relations firm, Selig Multimedia, Inc., which specialized in handling crisis management and national publicity campaigns for high profile political clients.

62.     Glenn was in Kabul working on a project to construct a democracy forum event for Afghani women and highlight the work of the democratically elected President Ashraf Ghani. He was present in the Intercontinental Hotel when the attack commenced, and murdered by the Taliban terrorists.

63.     Glenn's body was flown to the Armed Forces Medical Examiner ("AFME") at Dover Air Force Base.  The AFME performed a full autopsy examination on his remains on January 28, 2018.  The report places Glenn at the Intercontinental Hotel at the time of the attack. It concludes that multiple gunshot wounds caused his death, and that the manner of death is homicide.  Glenn suffered two gunshot wounds to the right side of his head, one gunshot wound to his right upper arm, one gunshot wound to the right hip, one gunshot wound to the right groin, two gunshot wounds to the right thigh and one gunshot wound to the left thigh.  Additionally, Glenn suffered fractures to his nasal bones, upper jaws, and lower left jaw.  Additionally, he suffered ballistic flesh wounds to his forehead, face, left eye, chest, abdomen, back, right arm, right elbow, right forearm, right hand, left arm, left hand, right knee, right foot, left thigh and left knee.

64.     Like Glenn Selig, Dr. Abdullah Waheed was a devoted and loving family man. At the time of the Intercontinental Hotel Attack, he was 52 years old, had been married to Alya Waheed for 24 years, and they had three beloved children, a daughter Mina, a son Amanullah and a minor daughter MW.

65.     Dr. Waheed was a public figure in Aghanistan.  He was the grandson of the late Mohammad Gul Khan Mohmand, an Afghani literary figure and well known politician who served as Afghanistan's Home Minister and as a governor of three provinces.  Dr. Waheed was well-known as a respected academic and political analyst.  During the Afghan War and internal hostilities, he escaped with his family to the United States, and lived in the United States full time for over a decade.  He became a U.S. citizen by naturalization in 2008.  He continued to work for the betterment of Afghanistan even after relocating to the United States. He joined Afghanistan's diplomatic corps at the request of President Ashraf Ghani in 2015.  Dr. Waheed

served as Afghanistan's Consul General to Peshawar, Pakistan from 2015 to 2017, and then as Consul General to Karachi, Pakistan from 2017 until his murder by Taliban terrorists. He was noted for his tenacious diplomatic efforts to forge peace between Afghanistan and Pakistan.

66.     Dr. Waheed was in Kabul on official business, and staying in the Intercontinental Hotel at the time of the attack.  His murder in the attack was reported in the international press. His Afghan death certificate, issued by the Ministry of Public Health, certifies his death on January 21, 2018, and lists his U.S. passport number. The U.S. Department of State has issued a Report of Death of U.S. Citizen Abroad that identifies the place and time of his death as the Intercontinental Hotel in Kabul, on January 21, 2018.  Afghan intelligence reported to Fox News that Dr. Waheed was killed in the terrorist attack, was disliked by the Taliban, and that the Taliban may have obtained a hotel guest list and used it to identify his name and room number on the list in a targeted killing.

### The May 2015 Taliban Attack on the Park Palace Hotel

67.     The Park Palace Hotel is a mid-range hotel located in Kabul, and caters to foreign researchers, journalists, businessmen and aid workers.  The hotel has both guest rooms for short-term visitors, and a residential area for those living full time in Kabul, including foreign aid workers.  On the evening of May 13, 2015, the hotel was hosting a concert by a well-known Afghani classical musician in support of international aid organizations.  Hotel guests were expected to include the Turkish and Indian ambassadors, and the children of Afghanistan's last monarch Mohammed Zahir Shah, hated by the Taliban.

68.     On May 13, 2015, at 20:30, just as the concert was scheduled to commence, a Taliban terrorist who had previously entered the hotel as a guest, commenced a siege that lasted approximately 5 hours using a suicide vest, an AK-47 rifle, hand grenades and pistols.  The

massacre started in the hotel restaurant, then the terrorist went room-to-room looking for foreigners. Norwegian Special Forces and Afghan security forces responded to the attack and retook the building.  The attack resulted in 15 dead and 6 wounded.  54 hostages were rescued.

69.    Afghanistan's intelligence service arrested two Taliban terrorists for planning the Park Palace Hotel Attack.  Both confessed to being members of the Haqqani Network.  The Afghan Taliban claimed responsibility for the attack in a statement released by its spokesman Zabihullah Mujahid.  Mujahid said the attack was aimed at "invaders" and specifically an "important meeting" of "important people from many invading countries especially Americans." He also condemned the "promiscuity and indulgence" of the "night-time parties" hosted at the hotel.

70.    Dr. Kantor served as Senior Researcher and then Director of the Afghanistan Research and Evaluation Unit, the premier policy think tank in Afghanistan, from 2005-2010. At the time of the attack, she was employed as Senior Scientist by the International Maize and Wheat Improvement Centre, the world's leader in corn and wheat research and development. Paula was in Afghanistan to start a new project focusing on the role of Afghani women in wheat-growing.  The overriding theme in her work was uplifting the poorest and most vulnerable.  She was present in the Park Palace Hotel Attack, and murdered by Taliban terrorists.

71.    Paula was shot several times, fighting for her life, and trapped in the lobby of the hotel.  She used her cell phone to call outside the hotel, to another hotel guest. The guest handed the phone to a Norwegian Special Forces soldier.  The soldier kept Paula on the phone as the team prepared to enter the blacked out hotel using night vision goggles. Once inside the lobby, a Norwegian medic administered first aid to Paula, who had been shot in her face, and in two other places. The medic accompanied Paula in an ambulance to a nearby hospital, before she died.

72.    The Norwegian Special Forces soldier who spoke with Paula on the phone has said: "Despite her extremely serious gunshot wounds, she had the presence of mind and willpower enough to pick up her cell phone and to call out. Her call made it possible for us to go in earlier and get more civilians out before the terrorists would find them. It hurts to know that we couldn't save her, but what Paula did, was of enormous significance to many other people that night."

### Iranian and IRGC Sponsorship of, and Provision of Material Support and Resources to, the Taliban

73.    Iran has used and continues to use terror as a means of attempting to accomplish its foreign policy goals, and uses terror organizations, such as the Afghan Taliban, the Haqqani Network and other terror organizations as its tools to commit terror attacks in pursuit of those goals.

74.    The Islamic Republic of Iran is a republic in name only. In reality, it is a theocracy headed by a single cleric holding the title of Supreme Leader who has nearly complete control of the country's policies and actions. Externally it appears to be a democratic regime with regular elections, but the truth is that the Supreme Leader is a dictator.

75.    The constitution gives the Supreme Leader the responsibility to set the general policies of Iran, including domestic and foreign policies.

76.    The Supreme Leader also is commander-in-chief of the armed forces, controls the intelligence and security operations, appoints leaders of the judiciary, state radio, and state television networks, and is supreme commander of the IRGC. The IRGC employs terrorism to pursue Iran's strategic objectives worldwide, through the Qods Force, its elite special operations unit. The Qods Force is charged with cultivating and supporting willing proxies in foreign countries with arms, funds, training and direction. The Qods Force coordinates with its proxies

to conduct terror attacks. The commander of the Qods Force reports directly to the Supreme Leader.

77.    According to the U.S. Department of the Treasury, the Qods Force has supported militant groups including the Taliban, Hamas, Hezbollah and Iraqi Shia militant groups. Iran has sought to achieve its goals outside its borders using terrorism committed by its proxies, while simultaneously denying responsibility for their actions.

78.    The Supreme Leader appoints half of the Council of Guardians, the body that oversees the Parliament, ensures laws are in compliance with Sharia Law, and determines which candidates are qualified to run for public office.

79.    The Supreme Leader, by and through his independent appointments, effectively controls what laws are passed and who is allowed to run for office.

80.    The first Supreme Leader, Ayatollah Ruhollah Khomeini, assumed power in 1979 after a violent coup overthrowing the Iranian monarchy. He instituted clerical rule and established the modern Iranian constitution that establishes a Supreme Leader as the real head of the state.  Khomeini ruled until his death on June 4, 1989.

81.    Seyyed Ali Khamenei was selected by the Assembly of Experts, an 86-cleric assembly, to be the second, and current, Supreme Leader in August 1989.

82.    Since his ascension to Supreme Leader, Khamenei has continued and expanded Iran's use of terrorism as an important tool of foreign policy.

83.    Iran and the IRGC provide material support and resources to the Taliban, in furtherance of Iranian foreign policy goals and strategic objectives in south-central Asia.

84.    Iran has been sandwiched between large numbers of U.S. forces stationed in Iraq on its western border, and in Afghanistan on its eastern border.  As early as 2002, Iran identified

and began to pursue its geostrategic interest in ejecting the U.S. from its borders.  Former CIA Director George Tenet stated in early 2002 that Iran's determination to counter the U.S. presence in Afghanistan "reflects deep-seated suspicions among Tehran's clerics that the U.S. is committed to encircling and overthrowing them." Commentary in IRGC outlets indicates that Iran's support of the Taliban is aimed at expelling U.S. and NATO forces from Afghanistan.

85.    The buildup of U.S. forces in Afghanistan under the Trump Administration's tough new Afghan policy, coupled with the Administration's stated intention to withdraw from the nuclear agreement brokered by President Obama, raises for Iran the specter that the U.S. will use Afghanistan as a platform for striking Iran militarily.  By supporting the Taliban insurgency against the U.S.-backed government and attacks on U.S. forces in Afghanistan, Iran prevents the U.S. from using Afghanistan as a forward base for striking Iran and its nuclear facilities.

86.    Iran is concerned by the rise of the aggressive Sunni terrorist group the Islamic State of Iraq and Syria ("ISIS") in Afghanistan.  ISIS is hostile to Shia Islam.  ISIS occupies and recruits fighters to Iran's west in Iraq, and to its east in Afghanistan.   Unlike the Taliban ideology which is geographically limited to Afghanistan and focused on retaking control of Kabul, ISIS ideology is transnational and can be used to foment unrest among the restive Sunni population in Iran. The Taliban is one of ISIS' primary enemies in Afghanistan, and the two groups regularly clash. By supporting the Taliban, Iran contains ISIS.

87.    Iran is aware that the U.S. and other western governments have called on the Taliban to cease its terrorist attacks, in exchange for a voice in peace negotiations.  By supporting the Taliban, Iran hopes to acquire some influence that it can hold over the group in the event such negotiations occur, or it plays some role in a future Afghan government.

88.    The provision of material support and resources by Iran and the IRGC to the

Taliban is persistent, spans years, and has included arms, finance, training, equipment, safe passage and safe harbor.

89.    In June 2007, U.S. Director of National Intelligence Michael McConnell told the Council on Foreign Relations that there is "compelling" evidence that Iran arms the Taliban in Afghanistan.  In September 2007, U.S. Army General Daniel K. McNeill, then NATO's senior commander in Afghanistan, stated coalition forces had intercepted a convoy of Iranian manufactured weapons including advanced technology improvised explosive devices en route to the Taliban.

90.    In 2008, United Kingdom special forces operating on the Iran-Afghan border announced "documented proof that Iran is supplying the Taliban with devastating roadside bomb-making equipment."  NATO spokesman James Appathurai stated: "Weapons of Iranian origin have turned up in Afghanistan in significant numbers."

91.    In March 2010, Chairman of the Joint Chiefs of Staff Admiral Mike Mullen, speaking in Kabul, said Iran was supplying weapons to the Taliban.  Military officials said that numerous attacks since 2001 on U.S. and NATO troops in Afghanistan were attributable to Iranian made weapons.  Afghan intelligence reported that 10 tons of Iranian manufactured weapons had been seized over the previous year, and estimated that as much as 60% of the weaponry came from the Iranian government rather than through the black market.

92.    In August 2010, the U.S. Department of the Treasury designated two IRGC commanders as terrorists for providing "financial and material support to the Taliban."  One of the designated commanders, General Hossein Musavi, led the IRGC's Ansar Corps, which is responsible for planning and executing IRGC missions in Afghanistan.

93.    In September 2010, a Taliban treasurer disclosed that Iran pays Taliban terrorists

hundreds of dollars per month, plus a bonus of thousands of dollars for each U.S. soldier and Afghan official killed in Afghanistan, and thousands of dollars for each U.S. military vehicle destroyed in Afghanistan. He stated: "Iran will never stop funding us because Americans are dangerous for them as well. I think the hatred is the same from both us and Iran. The money we get is not dirty. It is for jihad."

94.     In February 2011, British special forces intercepted and seized from Taliban terrorists an Iranian shipment of 48 122mm rockets, which would have doubled the range of the usual Taliban weapons.  Intelligence officials stated that a high-level Taliban leader had travelled to Iran in the two weeks prior to the shipment, to ask IRGC-Qods for more powerful weapons, and that the logistics of the shipment had been arranged by a Taliban facilitator based in Iran. Britain's then Foreign Secretary publicly condemned Iran for supporting the Taliban with weapons.  General David Petraeus stated: "We did interdict a shipment, without question [from] the Revolutionary Guards Corps Quds Force, through a known Taliban facilitator...Iranians certainly view it as making life more difficult for us if Afghanistan is unstable.…I am particularly troubled by the interception of weapons coming from Iran. But we know that it's more than weapons; it's money; it's also according to some reports, training at Iranian camps as well."

95.     In 2012, Iran allowed the Taliban to open an office in Zehedan, in southeastern Iran on the Afghan border.  The U.S. Department of the Treasury designated an IRGC commander as a Specially Designated Narcotics Trafficker for running a drugs-for-weapons scheme that directly fueled Taliban terrorism.  The IRGC commander allowed Afghan narcotics traffickers to smuggle opium through Iran, in exchange for their assistance delivering Iranian weapons to the Taliban.  The U.S. Department of Defense Annual Report on the Military Power

of Iran noted that Iran supported the Taliban in order to undermine U.S. and NATO objectives in Afghanistan by fomenting violence.

96.    In 2013, Iran formally invited a Taliban delegation to participate in a conference on Islam and to meet senior Iranian officials. Iran began to train Taliban terrorists within its borders.

97.    In 2014, 90% of United States troops withdrew from Afghanistan in accordance with Obama Administration policy.  Iran allowed the Taliban to establish a base in the Iranian city Mashhad, in northeastern Iran, near the Afghan border.

98.    In Spring 2015, the Taliban's political spokesman Mohammad Tayyab Agha travelled to Iran for strategy meetings with Iranian leaders.  In June 2015, the Wall Street Journal reported that Iran sent weapons to the Taliban, including "82mm mortars, light machine guns, AK-47 rifles, rocket-propelled grenades and materials for making roadside bombs."  A Taliban commander reported to the newspaper that Iran used smugglers to deliver weapons to Taliban units across the Afghan border, provided him with weapons and paid him a monthly salary of hundreds of dollars per month.

99.    In May 2016, Taliban Emir Mullah Akhtar Mansour was targeted and killed by a U.S. drone strike ordered by President Obama, as he returned from an official visit with Iranian leaders that had lasted for over two months.  U.S. Secretary of State John Kerry stated Mansour had posed an "imminent, continuing threat" to U.S. personnel in Afghanistan.  Five months later, the Taliban appointed a new envoy to Iran as part of its increasing engagement with the country.

100.    In October 2016, Afghan forces defeated the Taliban following a three-week siege, during which they killed four Iranian commandos battling with the Taliban.

101.    In December 2016, Iran openly hosted Taliban leaders at an "Islamic Unity"

conference in Tehran.  An Afghan provincial governor, Asif Ning, stated in an interview with Radio Free Afghanistan: "At the time being, a number of senior members of the Taliban leaders are living in Iran. The bodies of Taliban fighters killed in recent clashes were delivered to their families in Iran."

102.    In January 2017, Afghan provincial officials reported that Iranian officials have held memorial services for Taliban members killed in Afghanistan. They reported that the IRGC recruited militants across Afghanistan to join the Taliban, trained them in Taliban training camps inside Iranian territory, and then deployed them in Afghanistan on Taliban terrorist operations.

103.    In February 2017, U.S. Army General John Nicholson, Jr., then top commander of U.S. forces in Afghanistan, testified to the U.S. Senate that Iran "is directly supporting the Taliban."

104.    In May 2017, Pakistani authorities under pressure from the United States moved to arrest Taliban Emir Mawlawi Hibatullah Akhundzada.  Mullah Akhundzada fled Pakistan and received safe harbor in Iran.  He returned to Pakistan from Iran in late July 2017, after protracted negotiations.

105.    In July 2017, Mohammad Arif Shahjahan, another Afghan provincial governor, told Radio Free Afghanistan that Iran provides safe haven to Taliban leaders. "Some Taliban leaders travel frequently to Iran. They have hideouts there and are being aided with a lot of material resources." He also reported that IRGC-Qods Force operatives met with and advised the Taliban.  Lawmaker Jamila Amini reported: "Iranian interference is direct. It is engaged in encouraging youth to join the insurgency in return for allowing their families to reside in Iran."

106.    In January 2018, Afghan officials throughout the country, in Kabul, Helmand, Urizgan and Herat, citing briefings by Afghan intelligence, reported that the IRGC had been

arming, training and sending fighters and advisers to join the Taliban on the battlefield.   In December 2018, the Afghan Senate opened an investigation into Iran's military ties with the Taliban. Afghan legislator Jumadin Gayanwal accused Iran of harboring Taliban officials, telling the Voice of America: "Iran not only has hosted Taliban families, it has supplied the group with weapons that could target and damage tanks and planes."

107.    In February 2018, the Chief of Afghanistan's intelligence service, Mohammed Masoom Stanekzai, told the BBC there is no doubt that Iran is providing support to the Taliban. Afghanistan's Army Chief of Staff Lt. General Mohammad Sharif Yaftali and other senior Afghan security sources had previously said that Iran is providing the Taliban with both money and weapons, and training them in camps established inside Iranian territory.

108.    In May 2018, U.S. Secretary of State Mike Pompeo stated: "Iran's support to the Taliban in the form of weapons and funding leads to further violence and hinders peace and stability for the Afghan people."

109.    On October 23, 2018, OFAC, acting jointly with its TFTC partners, designated nine Afghan Taliban leaders and their IRGC officer sponsors as SDGTs.   In making this designation, Treasury Secretary Steven Mnuchin stated:

> Iran's provision of military training, financing, and weapons to the Taliban is yet another example of Tehran's blatant regional meddling and support of terrorism. The United States and our partners will not tolerate the Iranian regime exploiting Afghanistan to further their destabilizing behavior.  Iran's support to the Taliban stands in stark violation of United Nations Security Council Resolutions and epitomizes the regime's utter disregard for fundamental international norms. …The inclusion of Iranian Revolutionary Guards Corps-Qods Force (IRGC-QF) members supporting Taliban elements in this action highlights the scope of the Iranian regime's malign activities and regionally destabilizing behavior, and furthers the U.S. maximum pressure campaign against Iran.[2]

110.    The October 2018 Treasury designation cited specifically to IRGC officers:

---

[2] U.S. Treasury Dept. Press Release, Treasury and the Terrorist Financing Targeting Center Partners Sanction Taliban Facilitators and their Iranian Supporters (October 23, 2018), https://home.treasury.gov/news/press-releases/sm532.

providing military and financial assistance to Afghan Taliban leaders in exchange for their attacking the Afghan government supported by the ISAF; operating a training center in Iran that provided training intelligence and weapons to Afghan Taliban terrorists; ordering Afghan Taliban commanders to launch attacks on strategic civil infrastructure projects such as dams and pipelines supported by the ISAF; providing anti-aircraft weapons to the Afghan Taliban; providing safe harbor in Iran to wounded Taliban terrorists and their family members.

111.    In November 2018, the U.S. Special Envoy to Iran, Brian Hook, condemned Iran's surface-to-air missile proliferation to the Taliban in Afghanistan, in violation of United Nations resolutions.  Mr. Hook exhibited an Iranian manufactured "Fajr" rocket seized from Taliban forces near Kandahar Airfield, which houses thousands of U.S. military personnel. He stated: "Iran has been providing materiel support to the Taliban since at least 2007. These same rockets have been used by Hamas in the past."  He also exhibited an Iranian manufactured "Shahed 123" unmanned aerial reconnaissance system and referred to the recovery of a crashed system in Afghanistan.

112.    Numerous U.S. Department of State, U.S. Department of Defense, U.S. Department of the Treasury, policy institute, academic and press publications and reports confirm Iran's provision of material support and resources to the Taliban.  Numerous annual State Department Country Reports on Terrorism have concluded that Iran provides the Taliban with material support and resources including 107mm rockets, and training of Taliban terrorists in small unit tactics, small arms use, explosives and indirect weapons fire.  In a June 2017 Report to Congress entitled Enhancing Security and Stability in Afghanistan, the U.S. Department of Defense confirmed that Iran provides support to the Afghan Taliban and the Haqqani Network, which it identified as "the greatest threat to Afghan, U.S. and coalition forces."

113.   In *Khairkhwa v. Obama*, 793 F. Supp. 2d 1, 2011 U.S. Dist. LEXIS 66571, this court denied a petition for *habeas corpus* filed by a Taliban terrorist detained at the United States Naval Station in Guantanamo Bay, Cuba.  The Taliban terrorist admitted that he was a member of a senior delegation of Taliban officials that met with Deputy Commander of the Iranian Ministry of Intelligence and Security ("MOIS") and the Head of the Afghan Department of the Iranian MOIS, in Iran, to discuss Iranian military assistance to the Taliban against U.S. and allied forces. He also admitted that Iranians offered to supply the Taliban with Russian anti-aircraft missiles superior to U.S.-manufactured "Stinger" missiles, and to allow Arab fighters traveling to join the Taliban to pass freely through Iranian checkpoints along the Iran-Afghanistan border. The MOIS interfaces with the IRGC-Qods.

114.   Support for the Taliban from Iranian territory or Iranian government actors, on the scale required to facilitate, support, arm, embolden and encourage the Taliban, could not have been accomplished without the explicit authorization of the Iranian government and the IRGC through Supreme Leader Khamenei.

115.   The Islamic Republic of Iran was designated by the U.S. Department of State as a State Sponsor of Terrorism on January 19, 1984, and continues to be so designated to the present day.  As such, Iran can be sued in this Court for providing material support or resources to terror organizations that commit acts of international terror against Americans abroad.  The Taliban is an international terrorist organization. It receives material support and resources from Iran, which it leverages to commit terrorist attacks.

116.   The duration, quantity, and quality of material support from Iran and the IRGC, even if not designated for specific attacks, greatly contributed to the Taliban's ability to carry out terrorist attacks.  The Taliban could not have carried out the lethal attacks described in this

Complaint without the material support and sponsorship of Iran and the IRGC. Iran and the IRGC knew and intended that the Taliban would continue to carry out further terrorist attacks, and yet continue to support the Taliban to this very day.

117. Therefore, as a direct and proximate result of the provision of material support to the Taliban by the Defendants Iran and the IRGC as described herein, hundreds of innocent civilians were killed and grievously injured by acts of terrorism committed by the Taliban. Among the civilians murdered and wounded by the Taliban's terrorist attacks committed with the material support of Iran and the IRGC were American citizens Glenn Selig, Abdullah Waheed and Paula Kantor, whose estates and immediate family members are each Plaintiffs named herein, and who are entitled to justice and an award of damages for the heinous acts of terrorist murder committed upon the deceased and each of the Plaintiffs, in amounts as shall be proven at the trial of the within action.

## COUNT I
### (Under 28 U.S.C. §1605A(c) on behalf of All Plaintiffs)

118. Plaintiffs repeat, reallege and incorporate by reference the facts and allegations set forth in all the foregoing paragraphs as if fully set forth herein.

119. On January 20 and 21, 2018, and May 13 and 14, 2016, Taliban terrorists willfully, violently and forcefully committed terrorist acts during their attacks on the Intercontinental Hotel and Park Palace Hotel respectively, with the express purpose of inflicting personal injury and death. The willful, wrongful, intentional and reckless terrorist acts of the Taliban, which were committed upon the persons of Glenn Selig, Abdullah Waheed and Paula L. Kantor, caused personal injury and death to them as set forth above, and personal injury to their surviving immediate family members. These terrorist acts were perpetrated by the Taliban acting on the direction of and with material support and resources provided by the Defendants,

through their officials, employees, agents and instrumentalities, acting within the scope of their office, employment and agency.

120.    As a direct and proximate result of the willful, wrongful and intentional acts of the Taliban terrorists, which were committed with material support and resources provided by the Defendants, through their officials, employees, agents and instrumentalities, acting within the scope of their office, employment and agency, and for which the Defendants are vicariously, jointly and severally liable, Glenn Selig, Abdullah Waheed and Paula L. Kantor suffered personal injury and death, in that they endured extreme mental and emotional anguish, physical injury, pain and suffering, wrongful death and economic loss, all to their damage, and further, the immediate family members of these direct victims suffered extreme mental and emotional anguish.

121.    WHEREFORE, Plaintiff Charyn F. Selig on behalf of the Estate of Glenn L. Selig, Plaintiff Alya Waheed on behalf of the Estate of Abdullah Waheed, and Plaintiff Anthony C. Kantor on behalf of the Estate of Paula L. Kantor, and Plaintiffs Charyn F. Selig, JS, DS, Alya Waheed, Mina Waheed, MW, Amanullah Waheed, Anthony C. Kantor, Barbara B. Kantor, Anthony J. Kantor and Laura L. Styrlund, individually, demand that judgment be entered, jointly and severally, against the Defendants, for the damages they suffered, including, but not limited to, extreme mental and emotional anguish, physical injury, pain and suffering, wrongful death, solatium and/or economic loss, in such amounts as may be proven, and for their costs expended, including without limitation pre-judgment and post-judgment interest, an adjustment for the erosive effects of inflation, attorneys' and expert fees, and as otherwise permitted by this Court.

**COUNT II**
**PUNITIVE DAMAGES**
**(Under 28 U.S.C. § 1605A(c))**

122.    The Plaintiffs repeat and re-allege each and every allegation set forth above with like effect as if alleged herein.

123.    The actions of Defendants Iran and the IRGC, who have been committing, sponsoring, and supporting acts of international terror against Americans and others at least since 1979, and certainly since 1984 when Iran was first designated as a State Sponsor of Terrorism, are heinous in nature, politically motivated, and target the United States of America, its citizens, residents and visitors, and render both Defendants, jointly and severally, liable for the heinous murders of Glenn Selig, Abdullah Waheed and Paula Kantor, thereby entitling their estates and their respective family member Plaintiffs, to an award of damages in accordance with the laws of the United States.

124.    The acts of the Defendants, and each of them, carried out by their agents as described above, were malicious, willful, unlawful and in wanton disregard of life and the standards of law that govern the actions of civilized nations. The loss of life as above described was intended as a result by each Defendant. The aggrieved family members of Glenn Selig, Abdullah Waheed and Paula Kantor are each victims of the acts of international terror committed by the Taliban with the material support of each of the Defendants. The actions of those who carried out the attack described were within the scope of their agency on behalf of the Defendants. In accordance with the provisions of 28 U.S.C §1605A(c) the Plaintiffs are thereby entitled to a maximal award of punitive damages to the fullest extent of the law.

125.    The actions of the Taliban, as set forth hereinabove, were intentional and malicious and in willful, wanton, and reckless disregard of the rights and physical well-being of Glenn Selig, Abdullah Waheed and Paula Kantor. The actions of the Taliban were part of its

ongoing and continuing campaign of terror committed against citizens of the United States of America in support of the political goals and aims of the Taliban to destabilize the democratically elected government of Afghanistan, to oppose and change U.S. foreign policy in the region, and to use terror as a means of inflicting maximal damage on the U.S., consistent with the policies of the Defendants, Iran and the IRGC, both of which are avowed enemies of the U.S. and oppose U.S. foreign policy in the region. The acts of the Taliban were facilitated through funding, direction, training and other material support and resources furnished by Iran and the IRGC, directly and through various agencies and instrumentalities. In accordance with 28 U.S.C § 1605A(c), the Defendants, Iran and the IRGC, and each of them, are therefore liable for the actions of the Taliban and its terrorist members and agents.  The U.S. has designated Iran as a State Sponsor of Terrorism, and the IRGC as both an SDGTE and an FTO.  The U.S. has designated the Afghan Taliban a SDGTE and its Haqqani Network as both an SDGTE and an FTO. Notwithstanding said designations, the Defendants Iran and IRGC have continued to this day to sponsor and support Taliban terror. The Defendants, and each of them, must be punished by this Court for their continuing acts of sponsorship of Taliban terror. The Defendants, and each of them, must be held out as an example to the world that this Court will not countenance acts of terror, nor those who materially support and fund terror. A maximal award of punitive damages is requested as against all Defendants, jointly and severally, in accordance with the provisions of 28 U.S.C. §1605A(c), each of which are liable for punitive damages.

126.    WHEREFORE, the Plaintiffs pray that judgment be entered against Iran and the IRGC, jointly and severally, on behalf of each Plaintiff, in the amount of one billion U.S. Dollars ($1,000,000,000) in punitive damages for each Plaintiff, and their costs herein expended.

## PRAYER FOR RELIEF

127.    WHEREFORE, Plaintiffs request this Court find the Defendants, and each of them, liable for the acts alleged herein and enter joint and several Judgment against the Defendants as follows:

a.    Awarding to Plaintiffs compensatory damages for wrongful death, physical injury, pain and suffering, extreme mental and emotional anguish, solatium and economic loss, against Defendants Iran and the IRGC, jointly and severally, in amounts set forth herein and as shall be determined at trial, in accordance with evidence to be submitted to this Court;

b.    Awarding to Plaintiffs punitive or exemplary damages against Defendants Iran and the IRGC, jointly and severally, in the amount of one billion U.S. Dollars ($1,000,000,000), for each Plaintiff, as punishment for their continued provision of material support and resources for, and sponsorship of, acts of terror against Americans, and to send a message to the world that this Court will not countenance the continued sponsorship of terror by Iran and the IRGC, in accordance with evidence to be submitted to this Court;

c.    Awarding to Plaintiffs prejudgment interest and post-judgment interest as calculated at the maximum rate allowable by law;

d.    Awarding to Plaintiffs an adjustment for inflation to counteract the erosive effect of inflation on damages precedents established in historical judicial decisions;

e.    Awarding to Plaintiffs their costs, disbursements, reimbursement of expenses, and allowances of reasonable fees for their counsel and experts;

f.    Leave to amend this Complaint as the interests of justice may allow; and

g.    Granting any and all such further relief as the Court may deem just and proper.

Dated: September 25, 2019.

Respectfully submitted,

Heideman Nudelman & Kalik, P.C.
1146 19th Street, NW, Fifth Floor
Washington, DC 20036
(202) 463-1818

By: */s/Tracy Reichman Kalik*_____
    Richard D. Heideman (DC Bar No. 377462)
    Noel J. Nudelman (DC Bar No. 449969)
    Tracy Reichman Kalik (DC Bar No. 462055)

*Pending Motion for Admission Pro Hoc Vice*

F. R. Jenkins, Esq. (Maine Bar No. 04667)
Meridian 361 International Law Group, PLLC
97A Exchange Street, Suite 202
Portland, ME 04101
(866) 338-7087