## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CHARYN F. SELIG, et al., | : | |
| | : | |
| Plaintiffs, | : | Civil Action No. |
| | : | 19-cv-02889-TNM |
| v. | : | |
| | : | |
| THE ISLAMIC REPUBLIC OF IRAN, et al. | : | |
| | : | |
| | : | |
| Defendants. | : | |
| …………………………………………… | : | |

**PLAINTIFFS' MEMORANDUM OF LAW WITH POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR ENTRY OF DEFAULT JUDGMENT AGAINST DEFENDANTS THE ISLAMIC REPUBLIC OF IRAN AND THE ISLAMIC REVOLUTIONARY GUARD CORP**

Dated: April 12, 2021

Respectfully submitted,

HEIDEMAN NUDELMAN
& KALIK, P.C.
5335 Wisconsin Ave., Suite 440
Washington, DC 20015
Telephone: 202-463-1818
Telefax: 202-463-2999

By: */s/ Tracy Reichman Kalik*

 Richard D. Heideman (No. 377462)
 Noel J. Nudelman (No. 449969)
 Tracy Reichman Kalik (No. 462055)
 Joseph H. Tipograph (No. 997533)

MERIDIAN 361 INTERNATIONAL LAW
GROUP, PLLC
97A Exchange Street, Suite 202
Portland, ME 04101
Telephone: 866-338-7087

 By: */s/ F. Ronald Jenkins*____

 F. Ronald Jenkins (No. 1615786)

## TABLE OF CONTENTS

Page

INTRODUCTION……………………………………………………………………...1

PROCEDURAL BACKGROUND…………………………………………………………..3

ARGUMENT…………………………………………………………………………...4

I.  The Foreign Sovereign Immunity Act Requirements for Liability Under 28 U.S.C. § 1608(e) are Easily Met ……………………………………………………….....................4

II. The Taliban and the Haqqani Network ……………………………………………….6

   A.  The Haqqani Network Was an Integral Part of the Taliban in Afghanistan at the time of the 2015 Park Palace Hotel Attack and the 2018 Intercontinental Hotel Attack……...........6

   B.  The Taliban/Haqqani Network is Responsible for the 2015 Park Palace Hotel Attack……………………………………………………………………………8

   C.  The Taliban/ Haqqani Network is Responsible for the 2018 Intercontinental Hotel Attack………………………………………………………………………...10

III.  The Iranian Defendants are a Material Sponsor of the Taliban/Haqqani Network and are Liable for Injuring the Plaintiffs…………………………………………………………13

   A.   Iran Engages in High Level Coordination with the Taliban/Haqqani Network………..14

   B.  Iran Provides Safe Haven to the Taliban/Haqqani Network……………………………14

   C.  Iran Provides Logistical Training to the Taliban/Haqqani Network……………………14

   D.  Iran Provides Financial Support to the Taliban/Haqqani Network……………………..16

   E.  Iran Provides Arms to the Taliban/Haqqani Network…………………………………..17

   F.  Iran Assists in Planning Taliban/Haqqani Network Attacks……………………………18

   G.  Iran Has a Motive for Sponsoring the Taliban/Haqqani Network……………………...19

IV.  Default Judgment May be Entered by this Court Against the Iranian Defendants as Plaintiffs Have Met their Burden of Proof…................................................................................20

V. Upon Finding Iran Liable for Plaintiffs' Injuries, this Court Should Award Compensatory and Punitive Damages to Each of the Plaintiffs……………...............................................21

A.  The Estate of Paula Kantor is Entitled to an Award of Compensatory Damages for her Death…………………………………………………………………………22

1.  The Estate of Paula Kantor is entitled to a damages award for her personal injury/pain and suffering…………………………………….…………………………………22

2.  The Estate of Paula Kantor is entitled to economic loss damages………………….............23

B.  Paula Kantor 's Family is Entitled to Solatium/Intentional Inflection of Emotional Distress Damages…………………….........................................................................................24

1.  Anthony C. Kantor………………………………………………….........................27

2.  Barbara B. Kantor………………………………………………………...............29

3.  Laura L. Styrlund……………………………………………………………...32

4.  Anthony J. Kantor……………………………………………………………….35

C.  The Estate of Glenn Selig is Entitled to an Award of Compensatory Damages for his Death …………………………………………………………………………...37

1.  The Estate of Glenn Selig is entitled to a damages award for his personal injury/pain and suffering…………………………………………………………………37

2.  The Estate of Glenn Selig is entitled to economic loss damages…………………….......38

D.  Glenn Selig's Family is Entitled to Solatium/Intentional Inflection of Emotional Distress Damages………………………….......................................................................38

1.  Charyn F. Selig…………………………………………………….........................39

2.  Drew Selig……………………………………………………………………43

3.  J.S., a minor……………………………………………………….................53

E.  The Estate of Abdullah Waheed is Entitled to an Award of Compensatory Damages for his Death…………………………………………………………………………..55

1.  The Estate of Abdullah Waheed is entitled to a damages award for his personal injury/pain and suffering…………………………………………………………..55

2.  The Estate of Abdullah Waheed is entitled to economic loss damages…………………....56

F.  Abdulah Waheed's Family is Entitled to Solatium/Intentional Inflection of Emotional Distress Damages…………….....................................................................................56

1.  Alya Waheed…………………………………………………….................57

2.  Amanullah Waheed…………………………………………………………61

3.  Mina Waheed…………………………………………………………….............64

4.  Meelod Waheed………………………………………………….....................67

G.  This Court should Assess Punitive Damages Against the Iranian Defendants……………..71

CONCLUSION……………………………………………………………………………74

## EXHIBITS

| EXHIBIT | EXHIBIT NUMBER |
|---|---|
| Expert Report of Daveed Gartenstein-Ross, Valens Global, LLC | 1 |
| Expert Report of Dr. Craig Mallak, MD, JD | 2 |
| Expert Report of Chad M. Staller and Stephen Dripps, Center for Forensic Economic Studies (Glenn L. Selig) | 3 |
| Expert Report of Chad M. Staller and Stephen Dripps, Center for Forensic Economic Studies (Paula L. Kantor) | 4 |
| Expert Report of Chad M. Staller and Stephen Dripps, Center for Forensic Economic Studies (Abdullah Waheed) | 5 |
| Expert Report of Chad M. Staller and Stephen Dripps, Center for Forensic Economic Studies (Drew Selig) | 6 |
| Expert Report of Nadene Taniguchi and Tamar Fleischer, Balacare Solutions (Drew Selig) | 7 |
| Declaration of Anthony C. Kantor, 3-29-21 | 8 |
| Declaration of Anthony C. Kantor, 1-13-21 | 9 |
| Declaration of Barbara L. Kantor | 10 |
| Declaration of Laura L. Styrlund | 11 |
| Declaration of Anthony J. Kantor | 12 |
| Declaration of Olaf Erenstein | 13 |
| Declaration of Charyn F. Selig, 3-25-21 | 14 |
| Declaration of Charyn F. Selig, 1-15-21 | 15 |
| Declaration of Ben Pomales | 16 |
| Declaration of Danielle Reid | 17 |
| Declaration of Dr. Teresa Picciocchi | 18 |
| Declaration of Dr. Kristine Bennett | 19 |
| Declaration of Lesley Morter | 20 |
| Declaration of Alya Waheed, 3-25-21 | 21 |
| Declaration of Alya Waheed, 1-15-21 | 22 |
| Declaration of Ahmad Sadat | 23 |
| Declaration of Mina Waheed | 24 |
| Declaration of Amanullah Waheed | 25 |
| Declaration of Meelod Waheed | 26 |

## <u>TABLE OF AUTHORITIES</u>

Page(s)

### <u>Cases</u>

*Acosta v. The Islamic Republic of Iran*,
   574 F. Supp. 2d 15 (D.D.C. 2008) ........................................................................... 73

*Agudas Chasidei Chabad of U.S. v. Russian Fed'n*,
   528 F.3d 934 (D.C. Cir. 2008) ............................................................................. 4, 5

*Akins v. Islamic Republic of Iran*,
   332 F. Supp. 3d 1 (D.D.C. 2018) ..................................................................... 25, 26

*Arbaugh v. Y&H Corp.*,
   546 U.S. 500, 126 S. Ct. 1235, 163 L. Ed. 2d 1097 (2006) ................................... 74

*Baker v. Socialist People's Libyan Arab Jamahirya*,
   775 F. Supp. 2d 48 (D.D.C. 2011) ................................................................... 52, 55

*Bank of Kuwait v. Rafidain Bank*,
   15 F.3d 238 (2d Cir. 1994) ..................................................................................... 20

*Belkin v. Islamic Republic of Iran*,
   667 F. Supp. 2d 8 (D.D.C. 2009) ........................................................................... 24

*Bodoff v. Islamic Republic of Iran*,
   424 F. Supp. 2d 74 (D.D.C. 2006) ......................................................................... 26

*Botvin ex rel. Ellis v. Islamic Republic of Iran*,
   510 F. Supp. 2d 101 (D.D.C. 2007) ......................................................................... 2

*Cohen v. Islamic Republic of Iran*,
   268 F. Supp. 3d 19 (D.D.C. 2017) ........................................................... 23, 24, 38

*Colvin v. Syrian Arab Republic*,
   363 F. Supp. 3d 141 (D.D.C. 2019) ...................................................................... 5, 6

*Cronin v. Islamic Republic of Iran*,
   238 F. Supp. 2d 222 (D.D.C. 2002) ....................................................................... 72

*Doe v. Syrian Arab Republic*,
   No. 18-CV-0066 (KBJ), 2020 WL 5422844 (D.D.C. Sept. 10, 2020) ................... 22

*Flanagan v. Islamic Republic of Iran*,
   190 F. Supp. 3d 138 (D.D.C. 2016) ......................................................................... 5

*Flatow v. Islamic Republic of Iran*,
   999 F. Supp. 1 (D.D.C. 1998) ................................................................ 23, 25, 52, 72

*Fraenkel v. Islamic Republic of Iran, Ministry of Foreign Affs., et al.*,
   892 F.3d 348 (D.C. Cir. 2018) ............................................................................... 26

*Fritz v. Islamic Republic of Iran*,
   324 F. Supp. 3d 54 (D.D.C. 2018) ................................................................... 38, 55

*Gates v. Syrian Arab Republic*,
   580 F. Supp. 2d 53 (D.D.C. 2008) ......................................................................... 73

*Greenbaum v. Islamic Republic of Iran*,
   451 F. Supp. 2d 90 (D.D.C. 2006) ................................................................... 25, 26

iv

*Han Kim v. Democratic People's Republic of Korea*,
   774 F.3d 1044 (D.C. Cir. 2014) ........................................................................ 20
*Heiser v. Islamic Republic of Iran*,
   466 F. Supp. 2d 229 (D.D.C. 2006) ................................................................... 25
*Heiser v. Islamic Republic of Iran*,
   659 F. Supp. 2d 20 (D.D.C. 2009) ............................................................... 24, 73
*Hill v. Republic of Iraq*,
   328 F.3d 680 (D.C. Cir. 2003) .......................................................................... 22
*Howard Univ. v. Best*,
   484 A.2d 958 (D.C. 1984) ................................................................................. 26
*Kilburn v. Islamic Republic of Iran*,
   699 F. Supp. 2d 136 (D.D.C. 2010) ................................................................... 55
*Murphy v. Islamic Republic of Iran*,
   740 F. Supp. 2d 51 (D.D.C. 2010) ....................................................... 24, 25, 72
*Oveissi v. Islamic Republic of Iran*,
   768 F. Supp. 2d 16 (D.D.C. 2011) ..................................................................... 26
*Owens v. Republic of Sudan*,
   864 F.3d 751 (D.C. Cir. 2017) ............................................................................. 5
*Owens v. Republic of Sudan*,
   174 F. Supp. 3d 242, 278 (D.D.C. 2016) ............................................................. 4
*Salazar v. Islamic Republic of Iran*,
   370 F. Supp. 2d 105 (D.D.C. 2005) ................................................................... 22
*Steinberg v. Islamic Republic of Iran*,
   No. 17-CV-1910 (RCL), 2019 WL 6117722 (D.D.C. Nov. 18, 2019) ................. 25
*Stern v. Islamic Republic of Iran*,
   271 F. Supp. 2d 286 (D.D.C. 2003) ................................................................... 23
*Valore v. Islamic Republic of Iran*,
   700 F. Supp. 2d 52 (D.D.C. 2010) ............................................................. passim
*Waldon v. Covington*,
   415 A.2d 1070 (D.C. 1980) ............................................................................... 27
*Weinstein v. Islamic Republic of Iran*,
   184 F. Supp. 2d 13 (D.D.C. 2002) .............................................................. 3, 6, 7
*Wultz v. Islamic Republic of Iran*,
   864 F. Supp. 2d 24 (D.D.C. 2012) ............................................................... 23, 38

## Statutes

18 U.S.C. § 2339A, 2339B .................................................................................. 7
28 U.S.C. § 1350 ............................................................................................. 2, 5
28 U.S.C. § 1605A .............................................................................................. 2
28 U.S.C. § 1605A(a) ................................................................................ passim
28 U.S.C. § 1605A(c) ................................................................................ passim
28 U.S.C. § 1605A(h)(7) ...................................................................................... 5
28 U.S.C. § 1608 ....................................................................................... passim

## INTRODUCTION

This action arises out of the wrongful death and personal injuries of three American citizens murdered in terrorist attacks on two hotels in Kabul, Afghanistan. Plaintiff Paula L. Kantor, a United States citizen, was murdered in a terrorist attack on the Park Palace Hotel in Kabul, Afghanistan on May 13 and May 14, 2015 (the "Park Palace Hotel Attack").  Plaintiffs Glenn L. Selig and Abdullah Waheed, United States citizens, were murdered in a terrorist attack on the Intercontinental Hotel in Kabul, Afghanistan, on January 20 and January 21, 2018 (the "Intercontinental Hotel Attack").  Both were perpetrated by the Taliban, through its militant terrorist arm the Haqqani network (together, the Taliban and the Haqqani network are referred to hereinafter as the "Taliban/Haqqani network"). Since 2002, the Taliban has been designated as a Specially Designated Global Terrorist Entity ("SDGTE") under Executive Order (E.O) 13224, which imposes sanctions and penalties on terrorists and those providing support to terrorists or acts of terrorism. On September 19, 2012, the U.S. Department of State designated the Haqqani network as a Foreign Terrorist Organization ("FTO") under s. 219 of the Immigration and Nationality Act of 1965. These designations have never been lifted.  The Taliban/Haqqani network operate with material support and resources provided by the Islamic Republic of Iran ("Iran") and the Islamic Revolutionary Guard Corps ("IRGC") (together "Iranian Defendants"). In 1984, the U.S. Department of State designated Iran as a State Sponsor of Terrorism under s. 6(j) of the Export Administration Act, s. 40 of the Arms Export Control Act, and s. 620A of the Foreign Assistance Act. In 2007, the U.S. Department of the Treasury designated the Qods Force, an elite special operations unit within the IRGC, as an SDGTE under E.O. 13224. In 2017, the U.S. Department of the Treasury designated the Islamic Revolutionary Guard Corps as an SDGTE under E.O. 13224. On April 15, 2019, the U.S. Department of State designated the Islamic Revolutionary Guard Corps in its entirety, including its Qods Force, as an FTO under s. 219 of the Immigration

and Nationality Act. These designations have never been lifted.  These terrorists committed, and Paula L. Kantor, Glenn L. Selig and Abdullah Waheed were the victims of, acts of "torture" and "extrajudicial killing" as defined in the Torture Victim Protection Act ("TVPA"), 28 U.S.C. § 1350, and "personal injury" and "death" as required by 28 U.S.C. § 1605A, thereby entitling the Plaintiffs to bring this action and recover damages pursuant to applicable law.

The Plaintiffs include the Estates of Paula L. Kantor, Glenn L. Selig and Abdullah Waheed, and their families, including spouses, children, parents and siblings each of whom suffered injuries and each of whom are entitled to recover damages as a result of these heinous terror attacks.

Plaintiffs respectfully move this Court to make findings of fact and conclusions of law that (1) the Taliban/Haqqani network is responsible for the terrorist attacks which killed Paula L. Kantor, Glenn L. Selig and Abdullah Waheed and injured their near family members; (2) the Iranian Defendants provided material support and sponsorship to the Taliban/Haqqani network during the relevant time period furthering the Park Palace Hotel Attack and Intercontinental Hotel Attack; (3) enter Default Judgment against the Iranian Defendants as to liability on behalf of all Plaintiffs pursuant to the private cause of action found in 28 U.S.C. § 1605A(c); and (4) the Plaintiffs each suffered loss and damages and make compensatory and punitive damages awards commensurate with the damages evidence presented.

28 U.S.C. § 1608(e) provides that "no judgment by default shall be entered by a court of the United States or of a State against a foreign state, a political subdivision thereof, or an agency or instrumentality of a foreign state, unless the claimant establishes his claim or right to relief by evidence satisfactory to the court."  To satisfy this burden, plaintiffs must present evidence concerning their backgrounds and injuries suffered.  To evaluate the plaintiffs' proof the court can "accept as true the plaintiffs' uncontroverted evidence." *Est. of Est. of Botvin ex rel. Ellis v. Islamic*

*Republic of Iran*, 510 F. Supp. 2d 101, 103 (D.D.C. 2007).  The plaintiffs may establish their proof by affidavit.  *Weinstein v. Islamic Republic of Iran*, 184 F. Supp. 2d 13, 19 (D.D.C. 2002). Accordingly, Plaintiffs submit the sworn Declarations of experts Dr. Daveed Gartenstein-Ross, Dr. Craig Mallak, Dr. Chad L. Staller and Dr. Stephen M. Dripps of the Center for Forensic Economic Studies, Nadene Taniguchi and Tamar Fleischer of Balacare Solutions, the Declarations of Plaintiffs Anthony C. Kantor, Barbara L. Kantor, Laura L. Styrlund, Anthony J. Kantor, Charyn F. Selig, Alya Waheed, Ahmad Sadat, Mina Waheed, Amanullah Waheed, Meelod Waheed, their treating physicians and academic administrators, and other witnesses in further support of their Motion for Default Judgment against the Defendants.

## PROCEDURAL BACKGROUND

The Islamic Republic of Iran and the Islamic Revolutionary Guard Corps were served on September 2, 2020 with a copy of the Summons, Complaint, Notice of Suit, and administrative documents by diplomatic means pursuant to 28 U.S.C. § 1608(a)(4)[1].  *See* D.E. 21.  Having been served, and having failed to answer, Plaintiffs requested that the Clerk of the Court enter default judgment against the Islamic Republic of Iran and the Islamic Revolutionary Guard Corps.  *See* D.E. 23. On November 13, 2020, the Clerk of Court entered default against the Iranian Defendants. *See* D.E. 24.

The Plaintiffs respectfully move for this Court to enter Judgment as to liability against the Islamic Republic of Iran and the Islamic Revolutionary Guard Corps, jointly and severally, and

---

[1] Plaintiffs initially requested the Clerk of Court attempt to serve the Islamic Republic of Iran and the Islamic Revolutionary Guard Corps pursuant to 28 U.S.C. § 1608(a)(3) via the U.S.P.S.  *See* D.E. 17.  However, the USPS was unable to confirm that service pursuant to 28 U.S.C. § 1608(a)(3) has been achieved.  See Notice to Court Regarding Service of Process.   D.E. 18.  Therefore, Plaintiffs initiated service on each Defendant pursuant to 28 U.S.C. § 1608(a)(4) and requested that the United States State Department assist with service through diplomatic channels.

award compensatory and punitive damages commensurate with the injuries and resultant damages each Plaintiff has suffered.

## ARGUMENT

**I.  The Foreign Sovereign Immunity Act Requirements for Liability Under 28 U.S.C. § 1608(e) are Easily Met**

In order to establish subject matter jurisdiction in a default setting, Plaintiffs need to demonstrate "that the foreign state was designated a state sponsor of terrorism; that the claimant or victim was a U.S. national, service member, or government employee at the relevant time; and that, in certain circumstances, the foreign state was given a chance to arbitrate. *Owens v. Republic of Sudan*, 174 F. Supp. 3d 242, 278 (D.D.C. 2016), *aff'd*, 864 F.3d 751 (D.C. Cir. 2017) (*citing* 28 U.S.C. § 1605A(a)(2)(A)(i)-(iii)).  Iran was listed by the U.S. Department of State as a State Sponsor of Terrorism at the time of the Park Palace Hotel Attack and Intercontinental Hotel Attack, and remains so listed. Office of the Coordinator for Counterterrorism, U.S. Department of State, 2019 Country Reports on Terrorism.[2]  And as alleged in the Complaint, (Compl. ¶¶ 13-26) and confirmed by the Declarations of the Selig, Waheed and Kantor family members, all Plaintiffs were United States citizens when these terrorist attacks occurred. Finally, the requirement to arbitrate the claim prior to the initiation of this lawsuit does not apply where, as here, the immediate acts causing the injury and death of Glenn Selig, Abdullah Waheed and Paula Kantor occurred in Afghanistan and not in Iran. *See* 28 U.S.C. § 1605A(a)(2)(A)(iii).

Plaintiffs also need to demonstrate a "plausible claim" that Defendant provided "material support" for the murder of or injury to Plaintiffs. *Agudas Chasidei Chabad of U.S. v. Russian Fed'n*, 528 F.3d 934, 940 (D.C. Cir. 2008). 28 U.S.C. § 1605A(a) provides that a foreign state shall

---

[2] *See* https://www.state.gov/reports/country-reports-on-terrorism-2019/iran/#:~:text=Designated%20as%20a%20State%20Sponsor,and%20throughout%20the%20Middle%20East.

not be immune from the jurisdiction of U.S. courts in cases where plaintiffs seek money damages for personal injury or death caused by hostage taking, torture, or extrajudicial killing, if the damages were caused by:

> (1) the provision of "material support or resources" for hostage taking, torture, and extrajudicial killing; or
>
> (2)  if the provision of material support was engaged in by an official while acting within the scope of his office.

28 U.S.C. § 1605A(a)(1), (a)(2).

The Foreign Sovereign Immunity Act ("FSIA") terrorism exception defines extrajudicial killing to have the meaning given those terms in section 3 of the Torture Victim Protection Act of 1991 (28 U.S.C. § 1350 note).  28 U.S.C. § 1605A(h)(7).  The TVPA defines "extrajudicial killing" as a "deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples. Such term, however, does not include any such killing that, under international law, is lawfully carried out under the authority of a foreign nation." *Id.*

The D.C. Circuit has interpreted this to include three elements, that there was (1) a killing, (2) that it was deliberate and (3) that it was not authorized by a previous judgment pronounced by a constituted court.  *Owens v. Republic of Sudan*, 864 F.3d 751, 770 (D.C. Cir. 2017).  The plaintiffs must show that the attacks, as in the case here, were not authorized, deliberate and that there were casualties.  A "deliberated killing" has been recognized by a court in this jurisdiction as one that is "arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action.*" Colvin v. Syrian Arab Republic*, 363 F. Supp. 3d 141, 158 (D.D.C. 2019) *citing Flanagan v. Islamic Republic of Iran*, 190 F. Supp. 3d 138, 163 (D.D.C. 2016).  In cases where attacks were found to have resulted

in extrajudicial killings, courts have noted the foreign state's planning, timing, and intention in carrying out those attacks.  *Id.*

Upon meeting these procedural requirements, Plaintiffs must then prove that (1) the Taliban/Haqqani network committed the attacks which injured the Plaintiffs; (2) Iranian Defendants provided material support to the Taliban/Haqqani network; and (3) and this material support was reasonably connected to the terrorist attacks.

## II.     The Taliban and the Haqqani Network

### A.     The Haqqani Network Was an Integral Part of the Taliban in Afghanistan at the Time of the Park Palace Hotel Attack and the Intercontinental Hotel Attack

The Taliban is a Sunni militant group that operates primarily in Afghanistan and Pakistan. *See* Expert Report of Dr. Daveed Gartenstein-Ross in Support of Plaintiffs' Motion for Default Judgment[3] attached hereto as Exhibit 1 at p. 8. The group has been the primary adversary of the United States in Afghanistan since the first American troops arrived in 2001.  *Id.* During this time, the Taliban has frequently launched attacks against U.S. and allied forces, and against civilian targets.  *Id.* at 8-9. The Haqqani network is a term commonly used for the militant outfit whose origins date to the mid-1970's and whose allegiance lies with the Taliban.  *Id.* at 22-23.  The Haqqani network was designated by the United States Stare Department as a Foreign Terrorist Organization in September 2012.  *Id.* at 22.  It is unlawful to provide material support and resources, including currency or monetary

---

[3]Plaintiffs request that this Court find Dr. Daveed Gartenstein-Ross as a qualified expert under the Federal Rules for purposes of testifying on the Taliban and Haqqani network, its responsibility for the Park Palace Hotel Attack and Intercontinental Hotel Attack and the Iranian Defendants' material support of the Taliban and these attacks.  Dr. Gartenstein-Ross's qualifications are detailed in his Report. Dr. Gartenstein-Ross has qualified as an expert witness and provided expert testimony in many U.S. federal court proceedings and has testified in terrorism related cases involving the Taliban and Haqqani network. Ex.1

instruments, financial services, personnel, transportation, and other provisions to any components of a Foreign Terrorist Organization.  18 U.S.C. § 2339A, 2339B.

The Haqqani network's founder was Jalaluddin Haqqani.  Ex. 1 at 22.  Jalaluddin's son, Sirajuddin Haqqani, took over the Haqqani network's day-to-day operations in the mid-2000s. *Id* at 25.  Sirajuddin Haqqani officially succeeded his father as the head of the Haqqani network after his father's death in 2018 and leads the group to this day. *Id.*  Under Sirajuddin Haqqani, the Haqqani network's relationship with the Taliban passed through three stages. *Id.*  First, soon after the American invasion [of Afghanistan], the Haqqani network helped the Taliban establish an anti-American insurgency in Afghanistan, largely operating as the Taliban's Miranshah Shura, one of its three initial regional military councils. *Id.*  Second, the Taliban granted the Haqqani network even greater control over operations in its Loya-Paktia stronghold. *Id.*  Third, Sirajuddin Haqqani became the Taliban's deputy emir in 2015 and its top military leader. *Id.*  As a result of Sirajuddin Haqqani's new role, the Taliban and the Haqqani network became more closely integrated. *Id.*  "Before, during and after the attacks at issue in this case took place, the Haqqani network was officially part of the Taliban, and coordinated its attacks in Kabul closely with other elements of the Taliban." *Id.*

In Dr. Gartenstein-Ross' expert report, he identifies 32 separate attacks launched by the Taliban/Haqqani network in Kabul, Afghanistan.  *Id.* at 17-21.  These identified attacks show significant precedent for concluding that the Park Palace Hotel Attack and the Intercontinental Hotel Attack were also carried out by the Taliban/Haqqani network.  *Id.*  Moreover, the *quantitive* and *qualitive* analysis points to this conclusion.  First, as Dr. Gartenstein-Ross explains, the Taliban/Haqqani network has frequently attacked locations in Kabul popular with foreign civilians, and 12 of the 32 attacks identified by Dr. Gartenstein-Ross occurred at locations popular with foreign civilians.  *Id.*  Second, the list demonstrates the Taliban/Haqqani network's interest in attacking hotels

like the Park Palace Hotel and the Intercontinental Hotel. Eight attacks occurred at hotels in Kabul. One attack, targeting the Intercontinental Hotel in 2011, particularly demonstrates clear precedent for the Taliban/Haqqani network's attack on the same hotel in 2018.  *Id.*  Third, these attacks frequently targeted Americans.  *Id.*  And finally, American, Afghan, and other sources found that the Haqqani network executed seven of the ten sophisticated attacks on the list of 32. *Id.*   These sophisticated attacks were multipronged, used advanced weaponry and required multiple fighters. *Id.*  This finding was relevant given the complexity and sophistication of the Park Palace Hotel Attack and the Intercontinental Hotel Attack.  *Id.*

### B.   The Taliban/Haqqani Network is Responsible for the Park Palace Hotel Attack

The Park Palace Hotel Attack started late in the night of May 13, 2015 and stretched into the early morning of the following day.   *Id.* at 40.  Several sources estimate that 14 civilians were killed in the attack, though the highly credible Afghanistan Analysts Network claims that 15 were killed. *Id.* at 42.  According to the Agency Coordinating Body of Afghan Relief and Development, seven victims were humanitarian workers. Nine foreigners were killed in the attack, including one American, Paula Kantor.  *Id.*

The attack commenced shortly after 8:00 p.m. local time, when several gunmen entered the hotel complex and opened fire in the courtyard.  *Id.* at 40. After passing through the courtyard, the gunmen entered the hotel's main building. There, they went from room to room, reportedly targeting foreigners.  *Id. at 41.*  Eight members of Norwegian Special Operations Team 222 assisted Afghan Crisis Response Unit 222, a special police unit, in responding to the attack and rescuing hostages. *Id.* By around 9:20 p.m., the Norwegian operators arrived outside the hotel and convened with the Afghan special police team.  *Id.* Around 25 minutes later, a hotel guest handed a Norwegian operator a phone with American Paula Kantor on the other end.   *Id.* Despite her

injuries, Ms. Kantor was able to communicate to the Norwegians that she was in the hotel lobby, prompting a team of Afghan and Norwegian special forces to enter hotel's main building. *Id.* At 10:11 p.m., they found Ms. Kantor badly injured and carried her out of the building to receive medical attention. *Id.* By 12:05 a.m. on May 14, the special operations teams had succeeded in taking down the attackers. *Id.* Medical personnel were unable to save Ms. Kantor due to the severity of her injuries, and she died later that night. *Id.* at 42. According to the autopsy report, the terrorists shot Ms. Kantor five times: once in the head, once in the upper right back, once in the lower right back, once in the left buttock, and once in the left shoulder. *Id.* The autopsy report concluded that the cause of her death was multiple gunshot wounds, and that the manner of her death was homicide. *Id.* at 42.

On May 14, 2015, the Taliban/Haqqani network released a statement claiming responsibility for the Park Palace Hotel Attack. *Id.* The Taliban/Haqqani network posted the statement on its al-Emarah ("the Emirate") website, and listed Zabihullah Mujahid as its author. *Id.* Al-Emarah is one of the Taliban/Haqqani network's media outlets. Id at 42. It is an official Taliban/Haqqani network website that has existed in some form since 2005. *Id.* at 46. Zabihullah Mujahid is the persona that the Taliban/Haqqani network have used to claim responsibility for their attacks since 2007. *Id.* Dr. Gartenstein-Ross concludes that the Taliban/Haqqani network's claim of responsibility was authentic as it was (1) posted on the Taliban/Haqqani network's website as described above, (2) the source of the statement was credible, (3) the content of the statement was credible as it detailed and aligned with prior Taliban/Haqqani network propaganda and the Taliban/Haqqani network's area of operations. *Id.* at 45. It details that the gunman Muhammad Edris, whose involvement in the attack was confirmed by Afghan intelligence, was from Logar Province and the Logar Province is a Haqqani network stronghold. *Id.* at 46, and (4)

there was a video released on June 3, 2015 wherein two self-described Haqqani network collaborators, Abdul Wakil and Ghulam Aziz, confessed to helping Edris enter the Park Palace Hotel and affirmed their affiliation with the Haqqani network. *Id.* Therefore, this claim of responsibility, along with the facts that no other militant group in Afghanistan claimed responsibility, the Afghan government authorities indicated that the Haqqani network was involved and released a video of two individuals confessing to their roles in the plot, the United Nations Assistance Mission in Afghanistan and the British Foreign Minister found the Taliban/Haqqani network claim of responsibility credible, and finally that the Taliban/Haqqani network has a long history of targeting hotels and foreigners in Kabul, all demonstrate that the Taliban/Haqqani network was responsible for the Park Palace Hotel Attack. *Id.* at 47-49.

### C.    The Taliban/Haqqani Network is Responsible for the Intercontinental Hotel Attack

On January 20, 2018, between 8:45 and 9:00 p.m. local time, terrorists armed with AK-47s and rocket-propelled grenades attacked the Intercontinental Hotel in Kabul. *Id.* at 49. On January 22, *TOLOnews*, an Afghan publication, reported that the ministry of interior had officially confirmed 29 deaths, but other *TOLOnews* sources said the number could be closer to 43. *Id.* at 50. The U.S. State Department confirmed that some victims who lost their lives were U.S. citizens with either dual citizenship or relatives living in Afghanistan. *Id.* American citizens Glenn Selig and Abdullah Waheed were among those killed in the attack. *Id.*

Three terrorists entered the Intercontinental Hotel in an armored sport-utility vehicle through a "VIP-only access gate" reserved for diplomats and government officials. *Id.* Two other terrorists were already in the hotel restaurant and joined the shooting spree. *Id.* As the attack progressed, the gunmen shot down doors, shot guests in their rooms, and threw explosive devices into guests' rooms. *Id.* The terrorists held a number of guests as hostages. *Id.* According to

multiple independent reports of the event, the attack lasted between 12 and 17 hours. *Id.* at 50. Several survivors of the attack confirmed that the attackers spent hours going from room to room killing guests. *Id.* The attackers appeared to be specifically targeting foreigners. *Id.* After the attack, Mr. Selig's body was flown to Dover Air Base in the United States. *Id.* On January 28, 2018, the Armed Forces Medical Examiner performed a full autopsy examination of the body. *Id.* The autopsy report stated that Mr. Selig was inside the Intercontinental Hotel during the attack. *Id.* It concluded that the manner of Mr. Selig's death was homicide caused by several gunshot wounds and that Mr. Selig was shot eight times: twice to the right side of his head, one to the right arm, once to the right hip, once to the right groin, twice to the right thigh, and once to the left thigh. *Id.*

The terrorists also murdered U.S. citizen Abdullah Waheed. *Id.* at 51. After escaping to the United States during the Afghan War, Mr. Waheed lived in the United States with his family for over a decade, becoming a naturalized U.S. citizen in 2008. *Id.* Mr. Waheed subsequently returned to South Asia to become Afghanistan's Consul General in two Pakistani cities, first serving in Peshawar for two years and later in Karachi. *Id.* Afghan intelligence sources have said that the Taliban particularly disliked Mr. Waheed, and the attackers may have accessed his name and room number in order to specifically target him. *Id.* On the evening of the attack, Mr. Waheed was dining with friends, in a suite on the fourth floor of the hotel. *Id.* According to one survivor of the attack, shortly after the attack commenced, they heard banging on their door. *Id.* The attackers arrived at the fourth floor, firing at the doors. *Id.* They eventually broke down the door to the suite where Mr. Waheed was barricaded and threw an explosive inside. *Id.* The explosion killed Mr. Waheed. *Id.*

On January 21, 2018, the Taliban/Haqqani network claimed responsibility for the attack through multiple outlets. *Id.* at 51. That day, the Taliban/Haqqani network through its spokesman,

Zabihullah Mujahid, posted a message on Twitter claiming responsibility. *Id.* The Twitter post used the Twitter handle @ZabihullaM4. *Id.* at 53. Dr. Gartenstein-Ross has reviewed the post and determined it to be authentic because not only did the United Nations Assistance Mission in Afghanistan's 2018 report on civilian casualties in Afghanistan indicate that the Taliban/Haqqani network claimed credit for the Intercontinental Hotel attack via Twitter, and cited @ZabihullaM4's post as evidence, but also a credible local source indicated that @ZabihullaM4 was the Taliban/Haqqani network spokesman's official Twitter account, and using the Twitter handle @ZabihullaM4 to declare responsibility for the attack was consistent with the Taliban/Haqqani network's broader media strategy. *Id.* Zabihullah Mujahid had used Twitter to claim responsibility for attacks previously, joining the platform in 2012. *Id.* The statement was consistent with that of other Taliban/Haqqani network statements. *Id.* at 54. The United States and Afghan governments also attributed the attack to the Taliban/Haqqani network. *Id.* The Afghan government confirmed that it believed the Haqqani network executed the attack, at a time when Sirajuddin Haqqani effectively controlled both the Haqqani network and the Taliban's military apparatus. *Id.* at 56. Moreover, as the with the Park Palace Hotel Attack, no other Afghanistan-based militant groups in Afghanistan claimed responsibility for the attack, and the Intercontinental Hotel would have been an uncharacteristic target for them. *Id.* at 55. And finally, the Taliban/Haqqani network has a long history of targeting foreigners in hotels in Kabul and attacked this same hotel in 2011. *Id.* at 56. Dr. Gartenstein-Ross was even able to locate a transcript from the 2011 attack at the Intercontinental Hotel, wherein a leader of the Haqqani network was in real-time communications with one of the attackers, directing the attack and receiving updates. *Id.* These factors all lead Dr. Gartenstein-Ross to conclude that the Taliban/Haqqani network was responsible for the Intercontinental Hotel Attack. *Id.*

III.   **The Iranian Defendants are Material Sponsors of the Taliban/Haqqani Network and are Liable for Injuring the Plaintiffs.**

The Islamic Republic of Iran has provided the Taliban/Haqqani network with safe haven, training, financing, weapons, and high-level support for more than a decade.  *Id.* at 29. According to the U.S. Department of the Treasury, the Islamic Revolutionary Guard Corps' (IRGC) elite Quds Force is "the Iranian regime's primary instrument for providing lethal support to the Taliban." *Id. quoting* U.S. Department of the Treasury, press release, "Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism," October 25, 2007.  As a result, the U.S. Department of State has designated the entire IRGC, including the Quds Force, as a foreign terrorist organization.  U.S. Department of State, press release, "Designation of the Islamic Revolutionary Guard Corps," April 8, 2019.[4]  In recent years, both Iranian and U.S. officials have acknowledged Iran's relationship with the Taliban.  *Ex. 1* at 30. According to a 2019 public report by the Defense Intelligence Agency, "[s]ince at least 2007, Iran has provided calibrated support—including weapons, training, and funding—to the Taliban to counter U.S. and Western influence in Afghanistan, combat ISIS-Khorasan, and increase Tehran's influence in any post-reconciliation government.  *Id.*

As demonstrated below, over the course of many years, the Taliban/Haqqani network benefited from a wide range of material and other support from the Iranian regime.  Without this support from Iran, the Taliban/Haqqani network could not have evolved into the powerful terrorist group it became, controlling large swaths of territory and engaging in truly barbaric acts of terrorism against Americans and the Afghan people, including the Park Palace Hotel Attack and the Intercontinental Hotel Attack.

---

[4] https://www.state.gov/designation-of-the-islamic-revolutionary-guard-corps/

**A.  Iran engages in high level coordination with the Taliban/Haqqani Network.**

Iran's support for the Taliban/Haqqani network represents a decades-long, extensive effort coordinated by senior Taliban/Haqqani network and IRGC commanders to bolster the Taliban/Haqqani network in its fight against NATO and Afghan government forces.  *Id*. at 31.  In October 2001, meetings were conducted among a Taliban/Haqqani network delegation and the Deputy Commander of the Iranian Foreign Intelligence Service and the Head of the Afghan Department of the Iranian Foreign Intelligence Service.  *Id.*  Subsequently, the Taliban/Haqqani network opened offices in Iran for the purpose of coordinating with the IRGC.  *Id.* Dr. Gartenstein-Ross explains, given the way Iranian foreign policy is conducted, it is unlikely that such high-ranking Iranian intelligence officials would have met with Taliban officials and offered support without the sanction of Iran's Supreme Leader.  *Id.*  These meetings indicate a high level of coordination and cooperation between the Taliban/Haqqani network and Iran.  *Id.* at 31-32.

**B.  Iran provides safe haven to the Taliban/Haqqani Network.**

Iran also offered safe haven to Taliban/Haqqani network leaders and Taliban/Haqqani network fighters.  *Id.* at 32.  In 2011, evidence shows that Iran allowed the Taliban/Haqqani network to recruit, train, and house fighters in Iran.  *Id.* In 2017, the governor of Afghanistan's Farah province said publicly that "some Taliban leaders travel frequently to Iran. They have hideouts there and are being aided with a lot of material resources." *Id.*  In 2018, a Taliban/Haqqani network commander admitted that hundreds of Taliban fighters are in Iran at a time.  *Id.*

**C.  Iran provides logistical training to the Taliban/Haqqani Network.**

The U.S. Department of State and U.S. Department of the Treasury have revealed that Iran has been training Taliban/Haqqani network fighters in Iran and Afghanistan. *Id.* According to the U.S. State Department's annual Country Reports on Terrorism for each of the years 2008 through 2012, the "Qods Force provided training to the Taliban in Afghanistan on small unit tactics, small

14

arms, explosives, and indirect fire weapons, such as mortars, artillery, and rockets." Office of the
Coordinator for Counterterrorism, U.S. Department of State, *2008 Country Reports on Terrorism*,
April 30, 2009; Office of the Coordinator for Counterterrorism, U.S. Department of State, *2009
Country Reports on Terrorism*, August 5, 2010; Office of the Coordinator for Counterterrorism,
U.S. Department of State, *2010 Country Reports on Terrorism*, August 18, 2011; Office of the
Coordinator for Counterterrorism, U.S. Department of State, *2011 Country Reports on Terrorism*,
July 31, 2012; Office of the Coordinator for Counterterrorism, U.S. Department of State, *2012
Country Reports on Terrorism*, May 30, 2013. The U.S. Department of the Treasury affirmed in a
2010 fact sheet that "in Afghanistan, the IRGC-QF provides select members of the Taliban with
weapons, funding, logistics and training, " and the Treasury Department noted in a 2018 press
release that the Quds Force provided Taliban/Haqqani network fighters with "basic military
training near Birjand" in Iran in exchange for the Taliban/Haqqani network agreeing to attack the
Afghan government in Herat Province. Ex. 1 at 32.

 The U.S. Military has reached a similar conclusion.  An October 2012 military intelligence
assessment concluded that "IRGC officials helped transport groups of 10 to 20 Taliban fighters to
various locations in Iran for training on MANPADS," or man-portable air-defense systems, and a
Defense Intelligence Agency report indicates that Iran continued to train the Taliban/Haqqani
network through at least 2019.  *Id.* at 33.

 Taliban/Haqqani network leaders have confirmed these accusations. In 2010, a
Taliban/Haqqani network commander acknowledged that Iran had been training "teams of Taliban
fighters in small unit tactics."  *Id.*  By the summer of 2018, one Taliban/Haqqani network
commander reported that there were "between 500 and 600 of us in different stages of training" in
Iran. *Id.*  This training occurs in several locations. *Id. at* 33-34.   Iran reportedly has four training

camps for Taliban/Haqqani network fighters in the Iranian cities of Zahedan, Birjan, Maibod, and in the Shamsabad area near Tehran.  *Id.* at 34.

    **D.   <u>Iran provides financial support to the Taliban/Haqqani Network</u>.**

    Since 2007, the U.S. government has consistently concluded that Iran has financed the Taliban/Haqqani network. The State Department's Country Reports on Terrorism for 2007 indicated that "Iran's IRGC-Qods Force continued to provide weapons and financial aid to the Taliban to support anti-U.S. and anti-Coalition activity in Afghanistan."  Office of the Coordinator for Counterterrorism, U.S. Department of State, *2007 Country Reports on Terrorism*, April 30, 2008.  In 2018, the U.S. Treasury Department announced additional sanctions against IRGC for funding the Taliban/Haqqani network.  Ex. 1 at 34.

    In addition to paying fighters' salaries and financing operations, Iran has engaged in two particularly reprehensible means of financing the Taliban/Haqqani network.  *Id.*  First, Iran placed a bounty on U.S. service members, thus incentivizing the Taliban/Haqqani network to kill Americans. *Id.* According to *The Times of London*, Iran agreed to pay the Taliban/Haqqani network $1,000 for every American soldier killed in Afghanistan, and $6,000 for the destruction of each U.S. military vehicle.  *Id.* A U.S. military intelligence report from October 2010 confirmed these reports.  *Id.*

    Second, Iran has worked with drug smugglers to aid the Taliban/Haqqani network.  *Id.* at 35.  Opium-related revenue has been a major source of the Taliban/Haqqani network's finances. According to the U.S. military, opium-related revenue accounts for around $320 million per year, or 50% to 60% of the Taliban/Haqqani network's total revenue.  *Id.*

E.  **Iran provides arms to the Taliban/Haqqani Network**.

Iran has provided the Taliban/Haqqani network with a consistent stream of weaponry, including sophisticated weapons capable of targeting American planes and tanks. *Id*. The State Department's *Country Reports on Terrorism* produced for each of 2007 through 2012 stated: "Since 2006, Iran has arranged arms shipments to select Taliban members, including small arms and associated ammunition, rocket propelled grenades, mortar rounds, 107mm rockets, and plastic explosives. Iran has shipped a large number of weapons to Kandahar, Afghanistan, in particular, aiming to increase its influence in this key province." Office of the Coordinator for Counterterrorism, U.S. Department of State, *2007 Country Reports on Terrorism*, April 30, 2008; Office of the Coordinator for Counterterrorism, U.S. Department of State, *2008 Country Reports on Terrorism*, April 30, 2009; Office of the Coordinator for Counterterrorism, U.S. Department of State, *2009 Country Reports on Terrorism*, August 5, 2010; Office of the Coordinator for Counterterrorism, U.S. Department of State, *2010 Country Reports on Terrorism*, August 18, 2011; Office of the Coordinator for Counterterrorism, U.S. Department of State, *2011 Country Reports on Terrorism*, July 31, 2012; Office of the Coordinator for Counterterrorism, U.S. Department of State, *2012 Country Reports on Terrorism*, May 30, 2013.  The U.S. Department of the Treasury reached a similar conclusion. It has concluded that the Quds Force has supplied the Taliban/Haqqani network with weapons.  Ex. 1 at 36.

The U.S. military and intelligence community have identified specific shipments of sophisticated weapons from Iran to the Taliban/Haqqani network, as well as caches of Iranian-made weapons that made their way to Taliban/Haqqani network strongholds.  *Id*.  On September 6, 2007, U.S. forces intercepted a shipment of "advanced technology improvised explosive devices" from Iran heading to the Taliban/Haqqani network.  *Id*.  In a 2009 NATO sweep of

Marjah, a Taliban/Haqqani network stronghold in Helmand Province, revealed "44 bricks of Iranian-made explosives and Iranian-made mortars. *Id*.

U.S. allies have concurred in these assessments. *Id.* at 37. British and Afghan forces have discovered extensive amounts of Iranian weaponry in the Taliban/Haqqani network's hands. *Id.* In 2008, British special forces discovered that Iran was giving the Taliban/Haqqani network explosively formed projectiles (EFPs), highly lethal explosives notorious for killing many U.S. soldiers in Iraq. *Id.*

Arms shipments like these are not a secret. *Id.* Several Taliban/Haqqani network commanders have publicly admitted that they have received weapons from Iran. *Id.* Iran has provided the Taliban/Haqqani network with more than just small arms: It has provided anti-tank weapons, anti-aircraft weapons, bomb-making materials, and advanced explosives like EFPs. *Id.* There is no indication that these arms transfers from Iran to the Taliban/Haqqani network have diminished in recent years. *Id.* In fact, Iran reportedly began to *increase* its support, particularly weapons transfers, to the Taliban/Haqqani network around 2015. *Id.*

**F.   Iran Assists in Planning Taliban/Haqqani network attacks.**

The IRGC has played an active role in planning and executing some Taliban/Haqqani network attacks, including attacks in Kabul. *Id.* at p. 48. In 2004, the Taliban/Haqqani network created a "Kabul Attack Network" for the specific purpose of hitting targets in Kabul. *Id.* The IRGC provided support, supplies and travel documents to members of the Kabul Attack Network." *Id.* An Iranian agent masquerading as an Afghan policewoman killed an American trainer in Kabul in 2012. *Id.* Secretary of State Mike Pompeo accused Iran of playing a role in a May 2019 attack in Kabul. *Id.* Iranian commandos, according to Afghan officials, have been embedded with Taliban/Haqqani network fighters during some attacks. *Id.* at 38. During a 2017 Taliban/Haqqani

network offensive in Herat Province, Taliban/Haqqani network fighters, recruited and trained in Iran, launched an attack.  *Id.*  According to the Treasury Department, Iran has also played a role in organizing Taliban/Haqqani network suicide bombings.  *Id.*

G.  **Iran Has a Motive for Sponsoring the Taliban/Haqqani network.**

Dr. Gartenstein-Ross identifies several reasons for Iran's support of the Taliban/Haqqani network.  *Id.* at 38-40.  First, it is a matter a self-preservation.  *Id.* at 38.  Dr. Gartenstein-Ross explains, "[a]fter the United States intervened in two neighboring states, Iranian leaders almost certainly worried that they could be next. And short of fears of regime change, Iran also wanted to limit the U.S.'s ability to operate in the Middle East and South Asia. Iranian leaders likely saw aiding the Taliban as a way to raise the cost of intervention in Afghanistan."  *Id.*  In addition to self-preservation, Iranian support for the Taliban/Haqqani network was designed to maintain influence within Afghanistan.  *Id.* at 39.  Dr. Gartenstein-Ross cites a U.S. Department of Defense report stating that Iran has been backing multiple insurgent groups, including the Taliban/Haqqani network, in Afghanistan in order "to maximize its influence".  *Id.*  Finally, Dr. Gartenstein- Ross explains that Iran is motivated so that it can leverage its relationship with the Taliban/Haqqani network to influence local issues in eastern Afghanistan that impact Iran's population.  *Id.*

These factors all demonstrate Iran's material support of the Taliban/Haqqani network has been wide-ranging and substantial.  The safe haven, recruitment and training of Taliban/Haqqani network fighters has strengthened and allowed the Taliban/Haqqani network to flourish throughout Afghanistan.  Iran has provided sophisticated weaponry, finances and has also incentivized the Taliban/Haqqani network to kill Americans.   Iran has provided direct support and attack planning assistance to the Taliban/Haqqani network.  While it is difficult to "precisely" determine the full impact of Iran's support for the Taliban/Haqqani network, Dr. Gartenstein-Ross concludes that

that the Taliban/Haqqani network would be, "a less lethal and effective fighting force without Iranian support. Without Iranian explosives and training, the Taliban may have been unable to conduct some of its attacks in Kabul. Without Iranian financing and revenue generated by the drugs transported through Iran, the Taliban may have struggled to fund its most sophisticated Kabul operations and pay many of its fighters." *Id.* at 40.

## IV. Default Judgment May be Entered by this Court Against the Iranian Defendants as Plaintiffs have Met their Burden of Proof.

28 U.S.C. § 1608(e) provides that "no judgment by default shall be entered by a court of the United States or of a State against a foreign state, a political subdivision thereof, or an agency or instrumentality of a foreign state, unless the claimant establishes his claim or right to relief by evidence satisfactory to the court." *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1047 (D.C. Cir. 2014) ("when the defendant State fails to appear and the plaintiff seeks a default judgment, the FSIA leaves it to the court to determine precisely how much and what kinds of evidence the plaintiff must provide, requiring *only* that it be 'satisfactory to the court.'"), *citing* 28 U.S.C. § 1608(e) (emphasis added).

To satisfy this burden, plaintiffs must present evidence concerning their backgrounds and injuries suffered.  28 U.S.C. § 1608(e) does not require any more evidence or a higher standard of evidence than the Court would ordinarily receive to render a judgment. *See Han Kim*, 774 F.3d at 1046 (finding that because the defendants "'[had] not participated in the proceedings' . . . the plaintiffs 'cannot be expected to meet a typical standard for judgment as a matter of law.'"); *see also Com. Bank of Kuwait v. Rafidain Bank*, 15 F.3d 238, 242 (2d Cir. 1994) (explaining that 28 U.S.C. § 1608(e) does not require "evidentiary hearings or explicit findings where the record shows that the plaintiff provided sufficient evidence in support of its claims.").

Here, default judgment is proper given the Plaintiffs have demonstrated that (1) the Taliban/Haqqani network committed the Park Palace Hotel Attack which killed American Paula Kantor and the Intercontinental Hotel Attack which killed Americans Glenn Selig and Abdullah Waheed, and (2) Iran is liable to the Plaintiffs under 28 U.S.C. § 1605A(c) for its role in sponsoring and providing material support to the Taliban/Haqqani network at the relevant times. Accordingly, as Iran and ICRG have been served with Summons, Complaint and Notice of Suit, as required under 28 U.S.C. § 1608(a), and both have failed to answer, and default has been entered by the Clerk of Court, judgment may now be entered by this Court finding the Islamic Republic of Iran and the Islamic Revolutionary Guard Corps jointly and severally liable for the Plaintiffs' injuries and damages.

V.     **Upon Finding Iran Liable for Plaintiffs' Injuries, This Court Should Award Compensatory and Punitive Damages to Each of the Plaintiffs.**

The Plaintiffs are each entitled to damages because they have been injured.  Paula Kantor, a United States citizen, was murdered in the Park Palace Hotel Attack.  Her immediate family members, her mother, father, brother and sister have suffered the unbearable pain of knowing their daughter and sister not only died from the lethal attack, but was conscious after the attack, and suffered for several hours after the attack while medical personnel tried to save her.  Glenn Selig and Abdullah Waheed, each United States citizens, were murdered in the Intercontinental Hotel Attack.  Their families also have suffered extreme emotional injuries as a result, entitling each to recovery.  In addition to the compensatory damages they each are seeking, each of them is entitled to an award of punitive damages against the Iranian Defendants, under 28 U.S.C. § 1605A(c), for their sponsorship of the Taliban/Haqqani network and these heinous acts of terrorism.  In order for a plaintiff to receive damages, the plaintiff must show that her injuries were "reasonably certain" to occur, that is, more likely to occur than not, as a result of the state sponsor of terror's conduct.

21

*Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 115 (D.D.C. 2005) (*quoting Hill v. Republic of Iraq*, 328 F.3d 680, 681 (D.C. Cir. 2003)) (internal quotations omitted).  Courts should be guided by precedent and awards that have been previously handed down and decided under the FSIA.  *Doe v. Syrian Arab Republic*, No. 18-CV-0066 (KBJ), 2020 WL 5422844, at *15 (D.D.C. Sept. 10, 2020).

A. **The Estate of Paula Kantor is Entitled to an Award of Compensatory Damages**.

Pursuant to 28 U.S.C. § 1605A(c),  nationals of the United States  may bring a private cause of action for their individual personal injury claims, including, pain, suffering, economic loss and solatium damages.

1. **The Estate of Paula Kantor is entitled to a damages award for Paula's personal injury/pain and suffering.**

The Estate of Paula Kantor is entitled to damages for Paula's pain, suffering and ultimate death.  Dr. Craig Mallak[5] was the chief forensic pathologist for the U.S. Armed Forces from 2002 to 2012 and was responsible for the autopsies of 7000 civilian and military personnel killed in Iraq and Afghanistan.  Ex. 2 at ¶¶11-12. As described in Dr. Mallak's Declaration, Paula Kantor suffered multiple gunshot wounds in the Park Palace Terrorist Attack, and died as a direct result of the gunshot wounds she sustained.  Ex. 2 at ¶20, 31.  Dr. Mallak opines that Paula Kantor was alive and consciously experienced extreme pain and suffering for a prolonged period of time during and after the attack and prior to her death.  *Id.* at ¶31.  He cites to numerous evidentiary factors compelling his conclusion.  *Id.* at ¶23.  He explains that Paula's gunshot wound to her face, the part of the body with the most nerves sensing pain, "was a wound that produced unfathomable suffering" before her death.  *Id.* at ¶20.

---

[5] Plaintiffs request that this Court find Dr.Craig Thomas Mallak as a qualified expert under the Federal Rules for purposes of testifying on the manner and cause of death for Paula Kantor and Glenn Selig.  Dr.Mallak's qualifications are detailed in his Declaration at Section A. Dr.Mallack has qualified as an expert witness and provided expert testimony in over 200 judicial proceeding including this Court. Ex. 2, ¶15

Upon evidence of conscious pain and suffering, determination of the compensation is left to the trier of fact based upon factors including the duration and nature of the suffering endured. *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 28 (D.D.C. 1998). Courts in the D.C. Circuit have noted "[a]n award is even more warranted in an action for a violent and cruel death by terrorism." *Stern v. Islamic Republic of Iran*, 271 F. Supp. 2d 286, 300 (D.D.C. 2003). Courts have "adopted a general procedure for the calculation of damages that begins with the baseline assumption that persons suffering substantial injuries in terrorist attacks who survive the attack are entitled to $5 million in compensatory damages." *Wultz v. Islamic Republic of Iran*, 864 F. Supp. 2d 24, 37–38 (D.D.C. 2012); *accord Cohen v. Islamic Republic of Iran*, 268 F. Supp. 3d 19, 24 (D.D.C. 2017). Therefore, this Court should award significant damages to the Estate of Paula Kantor for her conscious pain and suffering at the baseline of $5 million with such upward adjustment as the Court may deem appropriate in light of Paula's unique and prolonged suffering prior to her succumbing to her injuries.

2. **The Estate of Paula Kantor is entitled to economic loss damages**.

In addition to the pain and suffering damages to which Paula Kantor's estate is entitled, the Court should award the estate damages for its economic loss. Prior to the attack, Paula Kantor worked towards helping women in developing countries start businesses in various roles: as a professor, a researcher, a policy analyst, a fundraiser and a field worker. Barbara Kantor Decl., Ex. 10, ¶6; Anthony C. Kantor Decl., Ex. 8, ¶11-14; Olaf Erenestien Declaration, Ex. 13. The details of Paula's economic loss are described in the Economic and Statistical Analysis performed by Dr. Chad L. Staller and Stephen M. Dripps of the Center for Forensic Economic Studies[6] ("Staller

---

[6] Plaintiffs request that this Court find Dr. Chad L. Staller and Stephen M. Dripps of the Center for Forensic Economic Studies as qualified experts under the Federal Rules for purposes of testifying on the economic loss to the Estates of Paula Kantor, Glenn Selig, Abdullah Waheed and on the economic damages of Plaintiff Drew Selig. Dr. Staller and Mr. Dripps qualifications are detailed in each of their reports for these Plaintiffs.  See Ex. 3, 4,5,6.  Dr.

Kantor Report"). Ex. 4. According to the Staller Kantor Report, the total economic loss is $1,718,416 (based on statistical worklife expectancy). *Id.* at 5. This value does not include the value of past medical expenses, Paula's pain and suffering, or any additional elements of non-economic damages.

**B.  Paula Kantors' Family is Entitled to an Award for their Solatium/Intentional Infliction of Emotional Distress Damages.**

Damages for solatium are to compensate for "the mental anguish, bereavement[,] and grief that those with a close personal relationship to a decedent experience as the result of the decedent's death, as well as the harm caused by the loss of the decedent['s] society and comfort." *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 85 (D.D.C. 2010) (*citing Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 22 (D.D.C. 2009)).

Under the FSIA, a solatium claim is indistinguishable from an IIED claim. *Id.* Relying principally on the Restatement (Second) of Torts, this Court has set out the following standard for recovery on a theory of IIED in 28 U.S.C. § 1605A(c) cases: "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." *Est. of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 26 (D.D.C. 2009) (quoting Restatement (Second) of Torts § 46 (1965)). A party can still be held liable for an IIED action if the party who is claiming the emotional distress/loss of solatium is (1) a member of the victim's immediate family and (2) and the conduct was sufficiently outrageous and intended to inflict severe emotional conflict at the time of the extreme and outrageous conduct. *See Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 75 (D.D.C. 2010). The "immediate family" requirement is

---

Staller and Mr. Dripps have each qualified as expert witnesses and provided expert testimony in hundreds judicial proceedings including in this Court. *Id.*

strictly construed in FSIA cases—generally, only spouses, parents, siblings, and children are entitled to recover. *Id.* As to the issue of presence, this Court has previously held that one "need not be present at the time of a terrorist attack upon a third person to recover for severe emotional injuries suffered as a result." *Est. of Steinberg v. Islamic Republic of Iran*, No. 17-CV-1910 (RCL), 2019 WL 6117722, at *7 (D.D.C. Nov. 18, 2019) *citing Valore*, 700 F. Supp. 2d at 80. This is because terrorism is sufficiently extreme and outrageous to demonstrate that it is intended to inflict severe emotional harm, even on those not present. *Id.* Each of the Kantor family member plaintiffs suffered a severe degree of emotional distress as a direct and proximate result of the murder of Paula in the Park Palace Hotel Attack, as described in their Declarations.  Even though the family members were not at the site of the attack, this is not a requirement for their solatium claims.  *Id.* at *8.

In previous FSIA decisions, this Court has established a framework for awarding solatium damages.  The general, baseline rule of the Court under the "*Heiser* framework" is that a spouse of a deceased is awarded $8 million; a child receives $5 million, a parent receives $ 5 million, and a sibling receives $2.5 million.  *Est. of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229, 269 (D.D.C. 2006).  *Akins v. Islamic Republic of Iran*, 332 F. Supp. 3d 1, 43 (D.D.C. 2018).

These amounts may fluctuate from the baselines if there are aggravating circumstances, such as a "general feeling of permanent loss or change caused by decedent's absence," *Murphy*, 740 F. Supp. 2d at 79 (*quoting Flatow*, 999 F. Supp. at 31), or other "circumstances that appreciably worsen a claimant's pain and suffering." *Murphy*, 740 F. Supp. 2d at 79 (*quoting Greenbaum v. Islamic Republic of Iran*, 451 F. Supp. 2d 90, 108 (D.D.C. 2006)).  "[F]amilies of victims who have died are typically awarded greater damages than families of victims who remain alive." *Akins*, 332 F. Supp. 3d at 43 *citing Estate of Heiser*, 466 F. Supp. 2d at 269.  Aggravating

circumstances allow the Court considerable discretion to increase a plaintiff's damages by substantial amounts. *See Valore*, 700 F. Supp. 2d at 86 (solatium damages increased by 25% due to aggravating circumstances); *Greenbaum*, 451 F. Supp. 2d at 108 (solatium damages increased by $1 million due to aggravating circumstances).   These numbers serve only as a baseline from which the Court may deviate in order to compensate for specific circumstances. *See Fraenkel v. Islamic Republic of Iran, Ministry of Foreign Affs., et al.*, 892 F.3d 348, 362 (D.C. Cir. 2018) ("While past solatium awards from comparable cases are appropriate sources of guidance for district courts, different plaintiffs (even under FSIA) will prove different facts that may well (and should) result in different damage awards." (internal quotation marks omitted)). Factors militating in favor of an award enhancement generally fall into one of three categories: "evidence establishing an especially close relationship between the plaintiff and decedent, particularly in comparison to the normal interactions to be expected given the familial relationship; medical proof of severe pain, grief or suffering on behalf of the claimant; and circumstances surrounding the terrorist attack which made the suffering particularly more acute or agonizing." *Oveissi v. Islamic Republic of Iran*, 768 F. Supp. 2d 16, 26–27 (D.D.C. 2011). "Decisions to deviate from the starting points provided by the *Heiser* framework are committed to the discretion of the particular court in each case ...." *Akins*, 332 F. Supp. 3d at 26 *citing Oveissi*, 768 F. Supp. 2d at 26.

Courts in the District of Columbia have held that a plaintiff is entitled to recover for their own emotional distress when (1) extreme and outrageous conduct on the part of the Defendant (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress.  *Howard Univ. v. Best*, 484 A.2d 958, 985 (D.C. 1984) (citations and internal quotations omitted).  Actual physical injury is not necessary to establish intentional infliction of emotional distress.  *Bodoff v. Islamic Republic of Iran*, 424 F. Supp. 2d 74, 85–86 (D.D.C. 2006); *See also Howard University*, 484

26

A.2d at 985(*citing Waldon v. Covington*, 415 A.2d 1070, 1076 (D.C. 1980) (noting that "an action for intentional infliction may be made out even in the absence of physical injury or impact")).

The murder of Paula Kantor caused significant and severe unbearable pain, anguish and damage to each member of her family members as set forth more specifically in their Declarations and below.

### 1.   Anthony C. Kantor

Paula Kantor's father, Anthony Christopher Kantor, experienced and continues to experience a most severe and unconscionable level of mental anguish, bereavement, and unbearable grief as a result of his daughter's murder and tragic death, and his corresponding loss of society and comfort. In his Declaration, attached hereto as Exhibit 8 and incorporate herein by reference, are details of Mr. Kantor's unbearable and most painful anguish, continued grief and enormous sense of loss.

In his Declaration, Anthony avers that he is citizen of the United States, born on ███████ ███████ in Chicago, Illinois.   Anthony Christopher Kantor Decl., Ex. 8, ¶2.  He is the father of Paula Kantor, also a citizen of the United States.  *Id.* ¶2, 8.

Paula was a wonderful daughter to Anthony, and they had a very close relationship. *Id.* at ¶15.  Anthony was very proud of Paula's accomplishments, and saw Paula living the life that he and his wife had wanted for her—helping others in need.  *Id.*  Despite Paula's busy travel schedule, she always made time for her family.  *Id.*  She would frequently come back to stay with her parents, usually for two to three weeks at a time.  *Id.*  When she stayed with them, Anthony enjoyed providing Paula with guidance about saving and investing for retirement, though he would often learn as much, if not more than he taught, given Paula's savvy business acumen.  *Id.*  Paula's final

time staying with her parents lasted three months—from December 2014 to February 2015—as she waited for the paperwork needed for her to start a new job in Pakistan to be processed. *Id.* Anthony thought Paula would ultimately take care of the family as he and his wife reached their later years of life, as Paula was very attentive to their needs. *Id.* at ¶16. When Anthony had back surgery, Paula came home from overseas to help take care of him and the house. *Id.*

Anthony's plans for a future that involved Paula, however, were suddenly cut short by the Park Palace Hotel Attack. *Id.* at ¶17. Anthony was with his wife in the kitchen (both were retired at the time) when they got a call from the United States Department of State at about 3:00pm Eastern Standard Time (EST) on May 13, 2015—about 12:30am Afghanistan Time (AFT) the next day. *Id.* at ¶18. He had heard about a terrorist attack in Kabul on the news prior to receiving this call, but did not think much about it, as he thought Paula was in Pakistan at the time. *Id.* He was informed that Paula was staying at the hotel where the attack occurred, she had been injured in the attack and she was being treated at a military hospital. *Id.* When he hung up the phone, he was under the impression that Paula was in good care and would ultimately survive, but an hour later, the Kantors received another call from the Department of State, in which they learned that Paula had died in surgery. *Id.* They were shocked and totally devastated by the news that their baby daughter had been murdered in cold blood. *Id.*

Everything that followed from that moment was a blur. *Id.* at ¶19. In the days and weeks that followed, he received a lot of information from the U.S. Federal Bureau of Investigation, including how Paula's body was cared for, how it would be brought back home to the United States and the results of her autopsy. *Id.* Meanwhile, he helped arrange for her funeral, manage her estate, and spent a lot of time doing all of the dreadful things a parent must do for a child who dies before

them.  *Id.*  Every single task has been very emotional for Anthony and the work continues to this day, almost six years later.  *Id.*

Following Paula's murder, Anthony lost his appetite, which caused him to lose 15-20 pounds right away.  *Id.* at ¶20.  He has had a very hard time sleeping, as he breaks into tears uncontrollably whenever sees her picture around his house or in his mind.  *Id.*  As much as he misses and wants to hold onto every memory he has of Paula, thinking about his murdered daughter makes his life too hard, so instead he has to try to push her memory out of his mind, and resist the urge to think about her.  *Id.*  Nevertheless, Anthony often finds himself visualizing Paula's last moments, imagining what she was thinking and feeling as she lay wounded and bleeding after being shot so many times.  *Id.* at ¶21.  This causes him immense pain, which he feels in his heart and in his head and which makes grieving her loss much harder.  *Id.*

Today, Anthony is just trying to put one foot in front of the other, so he can continue with his life.  *Id.* at ¶22.  However, a part of him is forever missing. *Id.* at ¶23.  He suffers from permanent and unbearably intense anxiety, stress, anger, immense fear, depression, pain and emptiness. *Id.*

While the courts typically award a baseline solatium damages award of $5 million for the death of a child, Plaintiffs suggest to and request of the Court that Anthony is entitled to a significant upward adjustment as the Court deems proper for the unbearable personal loss which Anthony has suffered as a result Paula's murder.

### 2.  Barbara B. Kantor

Paula Kantor's mother, Barbara Kantor, experienced and continues to experience a most severe and unconscionable level of mental anguish, bereavement, and unbearable grief as a result of her daughter's murder and tragic death, and her corresponding loss of society and comfort.

In her Declaration, Barbara avers that she is citizen of the United States, born on ▮▮▮▮▮ ▮▮▮▮▮ in Chicago, Illinois.   Barbara Kantor Decl., Ex. 10, ¶2.

Paula was a wonderful daughter to Barbara and the two had a very close relationship. *Id.* at ¶7.   Barbara was so proud of Paula's accomplishments, and how she spent her life helping others in need. *Id.*  Despite Paula's busy travel schedule, she would frequently come back to stay with her parents, usually for two to three weeks at a time. *Id.*  Paula's final time staying at their home lasted three months from December 2014 to February 2015, as she was waiting to start a new job in Pakistan working for the International Maize and Wheat Improvement Center. *Id.* at ¶6-7.   During this visit, Barbara noticed that Paula was happy with who she was and what she was doing. *Id.* at ¶8. Though Paula was away most of the time, she was always a part of Barbara's life. *Id.* at ¶9.  Paula loved reading books and sharing them with Barbara. *Id.*  Paula was very thoughtful, regularly communicated with Barbara and always remembered to call Barbara on holidays and birthdays. *Id.*  Barbara learned a lot from Paula, including about problems of the world that do not get reported in the news *Id.*  Barbara felt like she herself was making a difference in the world from having brought Paula into it. *Id.*  Barbara wanted to be more like Paula, who inspired her every day. *Id.*  Knowing that Paula traveled to dangerous places, kept Barbara praying all of the time for Paula's safety. *Id.*

Barbara was in the kitchen with her husband Anthony and recalls the same sequence of events related by her husband as they learned the horrifying news of Paula's injuries and death at the hands of terrorists on May 13, 2015. *Id.* at ¶¶10-11.  They were shocked and totally devastated by the news that their baby daughter had been murdered in cold blood. *Id.*

Later, Barbara remembers learning about the results of the autopsy, and that it took an excruciatingly long time for her daughter's body to come home. *Id.* Barbara was not really aware

of what was going on inside of herself, as she had difficulty processing that Paula was really gone. *Id.*

Knowing that Paula was suffering in her final moments really got to Barbara, and she feels absolutely horrible that she could not protect Paula or be there for Paula in her final moments. *Id.* at ¶13. There is a hole in Barbara's heart that is always bleeding. *Id.* She cries herself to sleep at night but tries to keep up all of the activities she used to do before the death as that is the only way she finds herself able to move forward. *Id.* Paula is still always in the back of Barbara's mind and colors everything she does. *Id.* When Barbara volunteers at church, people engage her on the subject a lot, but that is not necessarily a good thing as it holds her captive to her trauma. *Id.*

When Barbara meets someone else who has lost a child, both will share their stories and Barbara compares internally how certain stories may be more or less tragic than her own. *Id.* at ¶14. After Paula's death, Barbara learned about all of the lives Paula touched, as she received letters and phone calls with condolences, and stories, from India and elsewhere. *Id.* at ¶15-16. Among the many testimonials was one from a woman in India named Sunyana Walia who considered Paula a sister. *Id.* at ¶16. She calls Barbara every anniversary and they talk about Paula. *Id.*

While the courts typically award a baseline solatium damages award of $5 million for the death of a child, Plaintiffs suggest to and request of the Court that Barbara is entitled to a significant upward adjustment as the Court deems proper for the unbearable personal loss which Barbara has suffered as a result Paula's murder.

31

### 3.  Laura L. Styrlund

Paula Kantor's sister, Laura Styrlund, experienced and continues to experience a most severe and unconscionable level of mental anguish, bereavement, and unbearable grief as a result of her sister's murder and tragic death, and her corresponding loss of society and comfort.

In her Declaration, Laura avers that she is citizen of the United States, born on ████ ████ in Evergreen Park, Illinois.   Laura Styrlund Decl., Ex. 11, ¶2.

Though Paula loved traveling, she also cared very deeply about her family, including Laura and Laura's family.  *Id.* at ¶5.  Paula and Laura had an extremely close sisterhood.  *Id.* When Laura's children were born, Paula took a job teaching at the University of Wisconsin-Madison to be close to Laura's home in Janesville, Wisconsin. *Id.* Her home was only 40 minutes away, so this allowed the sisters to spend a lot of time together until 2002, when both Laura and her husband lost their jobs and needed to move to Michigan.  *Id.* Paula decided to move shortly thereafter. *Id.* Paula loved Laura and her family so much that she listed Laura's kids as her beneficiary on certain investments, namely retirement accounts.  *Id.*

Growing up, Paula and Laura always got along and as they got older, they got closer. *Id.* at ¶6.  When Laura went to college, they stayed in touch and visited each other often. *Id.*  Laura also visited Paula when she was in college in Philadelphia and as Paula moved around, Laura would make a point to go to visit her. *Id.* The sisters saw each other in places all around the world including Seattle, Alaska, the Czech Republic, and Washington, DC. *Id.*

Paula was the maid of honor at Laura's wedding when she married her husband in 1995. *Id.* at ¶7.  Laura remembers that it snowed twelve inches the week before, and Paula was instrumental at helping to get everything ready, coordinating social events for attendees, making sure the family took all the right pictures, and welcoming guests.  *Id.*

Laura was always inspired by Paula's drive. *Id.* at ¶8.  Paula's intelligence made her seem much older than her age reflected, so even though they were five years apart in age, Laura and Paula were spiritually very connected from very young. *Id.*

Whenever Laura's mother would drive her back to college, Paula would come with them. These journeys would always end up being a very fun girls' trip, which would culminate with Laura, Paula and their mother Barbara having dinner with Laura's college friends once they arrived. *Id.* at ¶9.  Everyone loved Paula, she fit in as if she were just one of the girls.  *Id.* She was more than a sister to Laura; Paula was Laura's best friend. *Id.*

Thus, Laura endured significant pain and suffering when Taliban terrorists shot Paula many times as part of a coordinated attack on the hotel.  *Id.* at ¶10. On the fateful day of May 13, 2015, Laura was at work about to go into a meeting when her husband called. *Id.* at ¶11.  The organization Paula worked with called Laura's house and told her husband that Paula was shot and injured, but alive. *Id.* Laura was confused and worried, but she hung up the phone with the sense that everything was going to be fine.  *Id.*  After her meeting, she spoke with her mother and learned that Paula died in surgery. *Id.* Laura was devastated and as she learned more—i.e., that it was a terror attack and that Paula suffered so much before she died—it became even harder to digest.  *Id.*

Going through the initial aftermath, bringing Paula's body back, and her memorial service, was tremendously painful for Laura. *Id.* at ¶12.  She felt like nothing was real and she was just going through the motions as if driven by a motor. *Id.* There were lots of frustrations along the way. *Id.*  Laura needed to know the details of Paula's murder for her own edification, including the step-by-step process of how the terrorists got inside, and how they got access to their weapons. *Id.*  She spoke a lot with those working in victim services for the Federal Bureau of Investigation, so she could follow the trials of the perpetrators and their conspirators. At the same time, Laura

generally did not want to think about the whole evening, because it makes her very emotional, causing her to cry uncontrollably. *Id.* She feels pain and hurt that she does not have her sister Paula around anymore and there is nothing she could have done to help her. *Id.*

Laura cannot read or talk about the incident without feeling this awful pain in her chest and needing to try to control herself from shaking. *Id.* Every time the attack comes up in conversation, it stays in Laura's mind, distracts her from work, and keeps her awake at night. *Id.* This was especially the case at first. *Id.* Whenever there are other terror attacks, it also brings Laura back, as she thinks about the families and what they are going through. *Id.* News of school shootings or any mass shootings cause Laura severe distress and anxiety. *Id.*

Whenever Laura travels on her own, she is always looking around, being extra sensitive and careful, and feeling significant anxiety because of the terror attack in which her sister Paula was murdered. *Id.* at ¶13. In the summer 2015, for many months after the attack, Laura suffered from depression, erratic behavior and crying at the drop of a hat. *Id.* She never saw a therapist, even though she admits she probably needs to, because she does not want to talk or think about the attack and would rather suppress the memory. *Id.*

The terror attack also causes Laura to have a lot more anxiety about her two children when they travel. *Id.* at ¶14. Right now, her daughter Lindsay is teaching English in Paris, where many terror attacks have occurred in recent years. *Id.* Laura did not want her daughter to go and told her so. *Id.* Whenever there are any incidents in or around Europe it causes Laura to feel anxiety, scared that what happened to Paula could happen to Lindsay. *Id.* Even though that is a discussion Laura generally avoids, she will talk to Lindsay about what happened to Paula for as long as she can with the hopes that it will keep Lindsay aware of her surroundings at all time. *Id.*

Consequently, Laura Styrlund should receive a baseline solatium damages award of $2.5 million and such significant upward adjustment as the Court deems proper for the unbearable loss which Laura has suffered because of her sister Paula's murder.

**4.  Anthony J. Kantor**

Paula Kantor's brother, Anthony John Kantor ("Tony"), experienced and continues to experience a most severe and unconscionable level of mental anguish, bereavement, and unbearable grief as a result of his sister's murder and tragic death, and his corresponding loss of society and comfort.

In his Declaration, Tony avers that he is citizen of the United States, born on ███████ in Evergreen Park, Illinois.   Anthony John Kantor Decl., Ex. 12, ¶2.

Tony remembers Paula as the genius of the family, the virtuous one and a great person to be around.  *Id.* at ¶6.  Due to her work addressing gender economic issues in South Asia, Tony did not get to see Paula as much as he would have liked.  *Id.*  As Tony and both of his sisters, Paula and Laura Styrlund, all have birthdays in May, they would always have one big birthday party together.  *Id.*  He enjoyed listening to Paula's stories from being overseas.  *Id.* at ¶7.

Paula and Tony had a close brother-sister relationship.  *Id.* at ¶8.  After Paula was murdered, Tony's parents and sister told him that Paula always looked up to him.   *Id.*  This surprised Tony because Paula was always the smart one in the family, and he did not he himself as being as smart, but he thinks it had to do with his overcoming adversity of an undiagnosed hearing disability growing up, because helping people overcome adversity was a mission of her life.   *Id.*  As kids Tony and Paula played games like Twister, and Clue.  *Id.*   When Paula graduated from the University of Pennsylvania, Tony went with the rest of the family to attend Paula's graduation, then to Washington, DC where Tony remembers fondly touring all the sights with Paula.   *Id.*  Tony

also fondly recalls a family trip to Wisconsin as well as his parents' 50th anniversary, which was one of the last times he and his parents and siblings were all together as a family. *Id.*

Thus, Tony endured significant pain and suffering due to the Terrorist Attack when Taliban terrorists shot Paula multiple times including in the face as part of a coordinated attack on the hotel. *Id.* at ¶10.  On that fateful day of May 13, 2015, Tony returned from his job at Walgreens to his parents' house where he lives in an apartment in the basement. *Id.* His parents left a note for him to come upstairs, which he did, and there his mother told him that Paula was killed in a terrorist attack. *Id.*  Hearing this, Tony remembers feeling very sad and angry, because Paula was taken from him way too soon.  *Id.* There is perhaps nobody in Tony's life who he would have been sadder to lose. *Id.*  He tried to go about his everyday life, but it was hard.  *Id.* Paula's death was always on his mind.  *Id.*

The aftermath of the attack in which Paula was murdered was incredibly hard for Tony. *Id.* at ¶12. He told his supervisor about it and she did not seem to care about it, leading Tony to quit his job at Walgreens about four months after the attack.  *Id.*  The attack also triggered a depression in Tony that he has only recently been able to identify.  *Id.* He started taking ████ this past December, and he knows its related to the attack, because that is the only traumatic event that has happened in his life. *Id.*  In just one month after his sister's murder, Tony gained 20 lbs. from 277 to 297, the most he had ever weighed at the time. *Id.*  Eventually, his weight increased to 317. *Id.* All of this happened, as Tony found himself eating more unhealthy foods because of the stress and anxiety he felt as a result of the attack. *Id.* Today, Tony weighs 300 lbs. as treating his depression has helped him better control his eating habits. *Id.* In November 2020, Tony stopped caring about life due to stress he was feeling at work, which exacerbated the trauma. *Id.* Tony feels that if Paula

was still around, he could have gone to her for advice, and he might not have had these issues in the first place. *Id.*

Any time Tony hears about a terrorist attack in Afghanistan, or see someone who looks like Paula, he is triggered. *Id.* at ¶13. He gets sad, he gets stressed, he eats, and he has difficulty focusing. *Id.* Paula was a real hero to Tony. *Id.* at ¶14. He admires how she was wounded in the attack, but still had the wherewithal to pick up the phone and call somebody, and how she lost her life, but saved the lives of over forty other people. *Id.*

Consequently, Tony Kantor should receive a baseline solatium damages award of $2.5 million and such significant upward adjustment as the Court deems proper for the unbearable loss which Tony has suffered because of his sister Paula's murder.

**C**. **The Estate of Glenn L. Selig is entitled to an award of compensatory damages.**

    **1. The Estate of Glenn Selig is entitled to a damages award for his personal injury/pain and suffering damages.**

The Estate of Glenn Selig is entitled to damages for Glenn's pain, suffering and ultimate death sustained in the Intercontinental Hotel Attack. As described in Dr. Mallak's Declaration, Glenn suffered multiple gunshot wounds in the attack, and died as a direct result of those wounds. See Exhibit 2 at ¶27, 31. In addition, Dr. Mallak opines that Glenn survived his initial gunshot wounds, and was alive and consciously experienced extreme pain and suffering before the terrorists returned to his hotel room and put him to death. *Id.* at ¶31. Dr. Mallak bases his opinion on numerous factors, among them the report made by a witness interviewed by the Diplomatic Security Service immediately after the attack. *See Id.* at ¶29. It was not until the terrorists returned to Mr. Selig's room and shot him in the head that he suffered a non-survivable fatal wound. *Id.* at ¶31. Therefore, this Court should award to the Estate of Glenn Selig significant damages for conscious pain and suffering at the baseline amount of $5 million, with such upward adjustment

as the Court may deem appropriate in light of Glenn's unique and prolonged suffering prior to him succumbing to his injuries. *Wultz*, 864 F. Supp. 2d at 37–38; *accord Cohen*, 268 F. Supp. 3d at 24.

   2.      **The Estate of Glenn Selig is entitled to economic loss damages.**

Prior to the attack, Glenn Selig was a public relations expert and a local newscaster. Lesley Morter Decl., Ex. 20, ¶10.  He owned his own business, Selig Multimedia. Charyn Selig Decl., Ex. 14, ¶15.

The details of Glenn's economic loss are described in the Economic and Statistical Analysis performed by Dr. Staller Mr. Dripps of the Center for Forensic Economic Studies ("Staller Selig Report") Ex. 3.  According to the Staller Selig Report, the total economic loss that the Estate of Glenn Selig suffered ranges from $2,393,773 (based on statistical worklife expectancy) to $2,574,836 (based on Social Security retirement age).  Staller Selig Report, Ex.3 at 6.  Courts in this district awarding damages in FSIA cases have opted to use the later retirement age calculation, since "[c]urrent trends indicate that individuals are more likely to work beyond the average work life."  *Fritz v. Islamic Republic of Iran*, 324 F. Supp. 3d 54, 60 (D.D.C. 2018). Accordingly, Plaintiffs propose that the Court use the later retirement age calculation.   This value does not include the value of past medical expenses, Glenn's pain and suffering, or any additional elements of non-economic damages.

   D.   **Glenn Seligs' family is entitled to an award for their solatium/intentional infliction of emotional distress damages.**

Glenn Selig's murder caused significant and severe unbearable pain, anguish and damage to each member of his family members as set forth more specifically in their Declarations and below. In the case of Drew Selig, these damages include not just solatium, but also future costs of care and lost earnings.

### 1. Charyn F. Selig

Glenn Selig's wife, Charyn Selig, experienced and continues to experience a most severe and unconscionable level of mental anguish, bereavement, and unbearable grief as a result of Glenn's murder and tragic death, and her corresponding loss of society and comfort.

In her Declaration, Charyn avers that she is citizen of the United States. Charyn Selig Decl., Ex. 14 ¶4 at Ex. C. She and Glenn got married on July 2, 2000, two years after they first met at a fundraising event. *Id.* at ¶3, 6, 7. They were joyfully married continuously and without any periods of separation for 18 years, until the day that Glenn was murdered by terrorists in the Kabul Intercontinental Hotel attack. *Id.* at ¶7. They had they first child, a daughter Drew, two years after getting married and their second child, a son J.S., two years after Drew was born. *Id.*

Glenn was the finest and best man Charyn will ever know. *Id.* at ¶8. He gave everyone the benefit of the doubt, went to great lengths to help everyone and believed in his heart about being kind to people for the sake of doing right. *Id.*

The Seligs were a very traditional family. *Id.* at ¶9. Charyn was a teacher, and she quit teaching to be a stay-at-home mother to their children. *Id.* Glenn was the cornerstone of the family, the sole breadwinner, the head of the household, the dreamer, and the "fun" parent. *Id.* at ¶10. Glenn was the President of his synagogue where there is now a plaque memorializing him on a wall and many well-meaning congregants who inquire of the Seligs' well-being. *Id.* at ¶17. These reminders of Glenn are very hard and painful for the family to endure, so they have not gone to temple in a very long time. *Id.*

When Glenn left to go for Kabul, he had a last-minute problem with his visa and could not fly out on the day planned. *Id.* at ¶18. Glenn saw this as a sign that he should not go on the trip, but he had been making a lot of trips to places like Dubai, Bulgaria and Kazakhstan, parts of the

world where it might be dangerous for a Jewish man, and had always come back. *Id.*   Charyn

believes that she could have stopped Glenn from going to Kabul by saying to him that it was too

dangerous for a father with children who needed him and feels deeply guilty for not doing so. *Id.*

On the evening of Saturday, January 19, Charyn was watching a movie with J.S. when she

received calls from the administrator of Glenn's business and a State Department official in Kabul

who both told her there had been "an incident" at the Hotel and Glenn was missing. *Id.* at ¶20.

Charyn was in shock and could not consider that Glenn could be injured or killed. *Id.*

On Sunday, Charyn woke up thinking that by then Glenn should have called her. *Id.* at ¶21.

After fruitlessly searching the Internet for pictures of a surviving Glenn among the crowds in Kabul

around the Hotel, she called her mother and reported that Glenn was either hurt "or worse" and so

her mother flew down and arrived that night. *Id.*   On Monday, the FBI and the State Department

contacted Charyn, and told her that they had spoken with one of Glenn's business partners who

accompanied him on the trip, and said she heard his voice down the hallway during the attack. *Id.*

at ¶22.   They asked for DNA from Glenn and his children to make a positive identification, so

Charyn gave them chopsticks her kids had used, and some of Glenn's grooming items. *Id.*

The next day, Charyn left the house, and when she came back, the FBI men were there

inside the house waiting for her, together with the Cantor from her synagogue. *Id.* at ¶23. She

immediately knew this meant Glenn was dead without needing to be told. *Id.* Charyn has serious

memory gaps from when she told J.S. and Drew that their father had been killed, because it was

so traumatizing. *Id.* at ¶25. They were in the sitting room after school, and Charyn was on the sofa

with the kids on either side of her, while J.S.'s guidance counselor sat across from them on a chair.

*Id.*   Charyn remembers sitting there, unable to think of the first word to say for what felt like 15

minutes, before looking at the counselor who started the conversation. *Id.*   At some point, Charyn

took over, but does not remember what either said and only remembers sitting on the sofa and crying with her children over their shared traumatic loss of Glenn. *Id.*

There was a two-week delay before the funeral could be held as Glenn's body traveled from Kabul to Florida and was autopsied. *Id.* Over that period, Charyn became overwhelmed and felt like she was breaking from having to deal with her family, her in-laws, schools and teachers, the FBI, the State Department, Glenn's friends and colleagues, the synagogue and congregants, and Glenn's business. *Id.* at ¶28. Her mother called her doctor, who prescribed her with medication for depression and anxiety, but it was not strong enough, so they gave her a second, stronger one, which she took for about one month.  *Id.* The Selig family finally sat Shiva, a Jewish mourning ritual which is supposed to last for seven days, but the Seligs could not withstand the pain for that long and ended it after three days. *Id.* at ¶29.

Charyn's hair was falling out.  *Id.* at ¶30.  She did not want to shower or brush her teeth or wash her face, and sometimes did not for days.  *Id.*  She wore the same clothes day after day, the same pair of jeans and the same sweatshirt. *Id.*  She forgot how to be herself and live. *Id.*  In the first year after Glenn's death, and into the second, she started to drink more wine with dinner. *Id.* She saw a therapist. *Id.* at ¶31. She was a wreck and would cry hysterically. *Id.*  Then she went to the Tampa Bay Crisis Center and started seeing a different therapist, once a week, for a year.  *Id.* She also did an intensive 8-week grief counseling program, in which participants shared their stories with others. *Id.*  Whenever Charyn shared hers, the group agreed it was the worst one.  *Id.*

The Selig family has not been able to celebrate any holidays, because it is too painful for all of them without Glenn leading all of the prayers and blessings, cooking and bringing his strong spirit to the occasion.  *Id.* at ¶32.  Glenn and Charyn believed strongly in family dinners, but the

Seligs cannot handle seeing Glenn's empty chair at the dinner table, so they instead eat on the sofa while watching television. *Id.*

Charyn is now terrified for the safety of her children. *Id.* at ¶33. J.S. is learning to drive, and flipped the car one day. *Id.* Charyn started screaming uncontrollably "I can't lose more! I can't lose more!" *Id.* She allowed J.S. to go to Israel with a Jewish youth group Hillel, and while he was there, a bombing happened. *Id.* The chaperones called Charyn to assure her that they were on the other side of the country and nowhere near the violence, but Charyn was hysterical, certain that J.S. would be killed. at ¶34. Glenn was Charyn's past, present, future, and everything. *Id.* at ¶41. Their life together was all she ever wanted: to be Glenn's wife and the mother of his children. *Id.* She lacks purpose, as she does not have a career, because her ambition was to be a wife and mother. *Id.* She has lost all of her friends except one and does not know how to go back out into the world and make new friends. *Id.*

Dealing with the fallout of Glenn's murder, especially the impact on her daughter Drew, has demanded all of Charyn's time, placing her own grieving and therapy on hold until recently. *Id.* at ¶42. Her weight has fluctuated dramatically. *Id.* Initially, after Glenn was killed, Charyn stopped eating and lost a tremendous amount of weight, but then she started overeating and gained at least 50 pounds more than her normal weight. *Id.* Ever since the murder, she has slept poorly having nightmares in which she sees herself running around as fast as she can but not fast enough, terrified, and looking for Glenn. *Id.*

Charyn's pain remains as sharp today, as it was when she first learned of Glenn's murder, and she expects it will remain acute. *Id.* at ¶43. She is very scared that she will spend the rest of her life feeling utterly alone. *Id.*

While the courts typically award a baseline solatium damages award of $8 million for the death of a spouse, Plaintiffs suggest to and request of the Court that Charyn is entitled to a significant upward adjustment as the Court deems proper for the unbearable personal loss which Charyn has suffered as a result Glenn's murder.

### 2. Drew Selig

Glenn Selig's daughter, Drew Selig, experienced and continues to experience a most severe and unconscionable level of mental anguish, bereavement, and unbearable grief as a result of her father's murder and tragic death, and her corresponding loss of society and comfort.

In her Declaration, Charyn avers that Drew is a citizen of the United States. Ex.14 at ¶5. *Id.* The impact that Glenn's murder by terrorists had on Drew cannot be overstated. *Id.* at ¶36. She is not emotionally or psychologically capable of making a statement regarding her father's murder. *Id.*   Charyn has also reviewed and confirmed the accuracy of the following Declarations, which are attached hereto and incorporated by reference as follows, *Id.* at ¶36:

- Drew's treating psychologist Dr. Teresa Picciocchi (Exhibit 18),

- Drew's former counselor Lesley Morter of Hillsborough High School (Exhibit 20),

- Drew's former Principal Dr. Kristine Bennett of Brooks Debartolo High School (Exhibit 19),

- Drew's current Principal Ben Pomales of Keystone Prep High School (Exhibit 16), and

- Drew's former dancing coach Danielle Reid (Exhibit 17).

According to Charyn, Glenn and Drew had a very special relationship from the moment Drew was born. Ex. 14 at ¶13. When Drew was a little baby and would wake up crying in the

43

middle of the night, Glenn would be the one to go to her. *Id.* Glenn put her to bed every night, even when he was very busy because he cherished the opportunity. *Id.* He would read books to Drew, and talk to her about the difficulties she encountered. *Id.* He took Drew to a father-daughter dance every year that was special to the both of them. *Id.*

Drew had aspired to be a neuropsychologist or a neuropsychiatrist. *Id.* at ¶35. She talked about this frequently and felt strongly that she would follow this path.

Glenn's murder impacted Drew significantly. *Id.* at ¶36. Dr. Teresa M. Picciocchi is a licensed clinical psychologist in Florida whose areas of specialty include mood disorders, trauma, grief, and academic difficulties. She is Drew's treating psychologist. She opines that the most impairing elements of Drew's psychological profile have been caused by the mental and emotional trauma inflicted on Drew by the terrorist killing of her father, and they are permanent, debilitating conditions that Drew will struggle to manage for the rest of her life. Dr. Teresa M. Picciocchi Decl., Ex. 18, ¶1, 2, 19.

Dr. Picciocchi's work with Drew Selig commenced on December 20, 2019. *Id.* at ¶4. Before working with Dr. Picciocchi, Drew had worked with a number of other therapists, but had not made substantial progress overcoming her extreme grief, and she needed long-term professional care, not just short-term or medium-term care. *Id.* at ¶4-5.

Dr. Picciocchi has formally diagnosed Drew with a complex of psychological conditions that did nor pre-exist her father's murder and were caused by it: ███████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████. *Id.* at ¶18. Drew's mood symptoms include ██████████████████████

████████████████████████. *Id.* In Dr. Picciocchi's professional medical opinion, Drew

suffers from ███████████████████████████████ that has been caused by the mental and emotional trauma inflicted on Drew by the terrorist killing of her father. *Id.* at ¶22. Drew is not able to function independently or live by herself. *Id.* If it were not for her mother, she would have to live in a long-term care facility. *Id.* In their sessions, Drew tells Dr. Picciocchi that she wants to live in a "compound" with her mother and brother forever. *Id.* Dr. Picciocchi does not have any reason to project that this situation will change materially. *Id.*

At this time, Dr. Picciocchi is not optimistic that Drew will be able to attend and complete college due to the great difficulty Drew is experiencing simply completing high school. *Id.* at ¶23. Dr. Picciocchi believes Drew certainly has the intelligence to perform college-level work, but fears that Drew's extreme anxiety will block her progress. *Id.* Dr. Picciocchi can reasonably project that Drew will require at least the level of psychiatric and psychological care that she is now receiving, the same kind and frequency, indefinitely. *Id.* at ¶24.

Following her father's terrorist killing, Drew developed suicidal ideation and attempted to kill herself. ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████. *Id.*

    When Dr. Picciocchi started working with Drew, ████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████ *Id.*

    Dr. Picciocchi has reviewed Drew's medical records, and observed that since her father's murder, other healthcare providers have placed Drew on a series of medications to alleviate her significant mood symptoms. *Id.* at ¶14. Drew and her mother have both told Dr. Picciocchi that Drew has resisted her mother's efforts to discard her father's belongings, insisting on retaining them and taking them with her wherever she goes. *Id.* at ¶16. She avoids social media at holidays because seeing images of fathers with their families cause her great pain. *Id.*

    The murder of Drew's father by terrorists has permanently derailed her academic progress. At the time of her father's murder, Drew attended Hillsborough High School ("HHS"), in Tampa, Florida, and was enrolled and succeeding in its prestigious pre-International Baccalaureate ("IB") program. Lesley Morter Decl., Ex. 20, ¶2, 3, 5, 18. Drew left HHS in May 2018, since she was unable to remain in the academically demanding program following Glenn's murder. *Id.* Lesley Morter, the HHS School Counselor, is not aware of any event in Drew's life, other than the murder of her father, that accounts for Drew's emotional trauma, suicidal disposition and resulting academic decline. *Id.*

46

Ms. Morter met with Drew and worked with her academically, and also met Drew's parents Charyn and Glenn, prior to Glenn's murder. *Id.* at ¶6. She also worked with Drew following the attack. *Id.* Prior to the attack, Drew was an excellent student with excellent grades. *Id.* at ¶8. She came to HHS with high school credit that she had earned in middle school, and straight As in math, science and foreign language. *Id.* In her First Semester at HHS, Drew maintained a 3.77 grade point average in the demanding pre-IB Program with fine attendance and no disciplinary problems. *Id.* at ¶9. *Id.* She engaged well with peers and teachers, participated on the school dance team and was on track to graduate from the IB Program and go on to college. *Id.*

Drew's father's murder in a terrorist attack in January 2018 changed everything for Drew. *Id.* at ¶11. Drew went from a happy go lucky kid enjoying school, to a sad, distraught child struggling to get up in the morning to come to school, to participate, to focus, and ultimately to a child who was suicidal. *Id.* Glenn's murder was a catastrophic disruption to the Selig family system. *Id.* at ¶12.

Prior to her father's killing, Drew did not visit the counselor's office beyond infrequent short visits. *Id.* at ¶13. Following the murder, Drew came to Ms. Morter's office frequently and for extended periods of time to sit and cry. *Id.* She was in trauma and distraught. *Id.* She expressed feeling socially isolated, that her friends did not know how to approach her, and excluded in the Dancerette dancing team. *Id.* Her absences had increased dramatically. *Id.* at ¶14.

Drew became suicidal. *Id.* at ¶15. On February 12, 2018, she verbalized to Ms. Morter that she had a plan to kill herself, and that she could carry it out. *Id.* She explained her logic and was convincing herself of all of the reasons why she needed to kill herself. *Id.* She said "I want to be with my father." *Id*. at ¶15., Ex 20-A. *Id.* This was far from mere attention-seeking, Ms. Morter

called Charyn and the HHS Resource Officer, who determined that she was a threat to herself and needed to be placed under observation. *Id.*

Drew began to struggle academically at HHS and was no longer able to be academically successful there. *Id.* at ¶16. She was grieving and struggling to deal with her loss. *Id.* She wanted to be with her brother at the Brooks DeBartolo Collegiate High School ("BDCHS"). *Id.* After consultation with Drew, Charyn and Drew's teachers, there was a mutual agreement that Drew would leave HHS and enroll at BDCHS, and she did. *Id.* HHS did however allow Drew to continue to participate in the HHS Dancerette team, even after leaving HHS. *Id.*

Dr. Kristine Bennett is the Principal at BDCHS, a public charter, college preparatory high school located in Tampa, Florida, and has been so since 2011. Dr. Kristine Bennett Decl., Ex. 19, ¶3. Dr. Bennett followed Drew's progress closely since she enrolled at BDCHS in the Fall of 2018, as a high school sophomore. *Id.* at ¶5-6. In an effort to help Drew to acclimate to BDCHS, the staff made it possible for her to come onto the campus in the summertime of 2018, but when classes commenced in August 2018, Dr. Bennett witnessed Drew's mental and emotional health deteriorate drastically. *Id.* at ¶7-8. Drew suffered from extreme anxiety at school. *Id.* at ¶9. She would present as pale, with tears, disheveled hair, difficulty breathing, physical shaking, and wanting to isolate herself from everyone. *Id.* She would shut down and leave the classroom or other scheduled activities and hide herself away in the bathroom or under the stairs. *Id.* Her panic attacks were sometimes so severe that they could not be controlled with standard techniques, such as breathing exercises. *Id.* at ¶10. On more than one occasion, Drew was placed under the supervision of the school's nurse to ensure that she was getting enough oxygen. *Id.*

Drew's anxiety frequently forced her to leave the classroom in order to have the support of the BDCHS counselors in Student Services. *Id.* at ¶11. She stayed for longer and longer periods of

48

time in Student Services, sometimes the entire day. *Id.* She could not eat lunch with other students, and instead ate by herself in Student Services. *Id.*

Drew's mother Charyn came to the school for substantial amounts of time, in order to be available on-site just in case Drew needed her, and was at the school every day, all day, for weeks during periods when Drew was experiencing panic attacks. *Id.* at ¶12. In spite of these efforts, Drew was increasingly absent from school, sometimes for days at a time, due to the deterioration in her mental and emotional wellbeing. *Id.* at ¶13, Ex. 19-A.

In August 2018, ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████ *Id.* at ¶15.

In September 2019, Drew attempted suicide. Danielle Reid Decl., Ex. 17, ¶12. The Dancerette team was rehearsing all day at HHS for an upcoming competition. *Id.* At lunchtime, the team coach Danielle Reid went to pick up some lunch for those girls who had forgotten to bring food and drink. *Id.* On her way back she received text messages from some of the girls, reporting that they had discovered Drew laying on the ground in the locker room and she was non-responsive. *Id.* When Ms. Reid arrived in the locker room, Drew was still on the floor, unresponsive, with her eyes rolling back into her head. *Id.* at ¶13. Drew's breathing was shallow and pulse was slow. *Id.* Ms. Reid immediately called the paramedics. Drew was taken to St. Joseph's Hospital emergency room, and then to a facility where she was placed under close observation so that she would not hurt herself again. *Id.* at ¶15.

Drew re-enrolled at BDCHS in January 2020. Dr. Kristine Bennett Decl., Ex. 19, ¶15. Ultimately, however, Drew's extreme mental and emotional trauma and anxiety made it

impossible for her to interact normally with teachers and students, or to manage even a dramatically reduced course load. *Id.* at ¶16

In March 2020, Drew was failing 4 of her 5 academic classes. *Id.* at ¶17., Ex.19-A. Dr. Bennett discussed and agreed with Charyn that Drew needed to be in a different educational environment. *Id.* at ¶17. According to Dr. Bennett, nothing other than the murder of Drew's father in the terror attack could account for Drew's extreme emotional trauma and anxiety and resulting decline in academic performance. *Id.* at ¶18.

Drew left BDCHS in March 2020 and went to the Keystone Prep High School ("KPHS"). *Id.* at ¶17. KPHS is a private, college preparatory high school (grades 9-12) located in the Tampa Bay area of Florida. Ben Pomales Declaration attached hereto as Ex. 16. Ben Pomales is the Head of School at KPHS and has been personally involved in assisting Drew academically and emotionally, and has followed Drew's progress closely. *Id.* at ¶6. From everything that he has seen and heard, the murder of Drew's father was the turning point in her life. *Id.* Mr. Pomales met Drew in February 2020, and she enrolled at KPHS at the end of March 2020 with the intention of completing the remainder of the second semester of her junior year. *Id.* at ¶7. Due to COVID-19, Drew's work was done remotely in April and May. *Id.*

Drew spent some time at KPHS in the summer of 2020. *Id.* at ¶8. There were only five or six children in summer school. *Id.* Drew came to see the buildings, get used to the classroom, and the KPHS staff. *Id.* The idea was to help Drew to become comfortable. *Id.* That strategy did not work. *Id.* When school started in August 2020, Drew would not get out of her car. *Id.* at ¶9. On many occasions, Mr. Pomales encountered Drew outside the building, unable emotionally to open the door to enter the building. *Id.* At times, Mr. Pomales has been able to coax her into the building with the assistance of a counselor or other faculty member. *Id.* It took two months before Drew

would enter the school building by herself, without a counselor or teacher meeting her outside and guiding her into the building. *Id.* Drew still refuses to enter the building on some days. *Id.* With a few very limited exceptions, Drew has not been able to enter into the classroom or engage with other students or teachers. *Id.* at ¶10.

Mr. Pomales has had to create places at KPHS where Drew can isolate herself, away from the classroom. *Id.* at ¶11. While she is on the school premises in her place of isolation, she uses Zoom in order to join the classroom remotely. *Id.* Frequently, Drew has panic attacks and cannot stay at school at all, even in her safe space. *Id.* at ¶12. Once Mr. Pomales discovered Drew in her safe space, cowering under desk, with her chair pulled in to hide her, shaking. *Id.* at ¶13. One-on-one conversation works much better for Drew, and accordingly, without abandoning the effort to integrate Drew into the classroom, Mr. Pomales has organized one-on-one teaching. *Id.* at ¶14. However, Drew's ability to participate is inconsistent. *Id.* Teachers at KPHS must allow Drew to initiate the conversation, which slows progress. *Id.*

In the Fall 2020 semester, Drew failed all but one of the classes that she was taking at KPHS. *Id.* at ¶15. She was still not participating, not engaging, and not completing assignments. *Id.* She could not handle preparing for or discussing her assignments, evaluations, midterms. *Id.* Drew's regularly recurring anxiety attacks are disturbing to witness, and Mr. Pomales has seen many of them. *Id.* at ¶16. She sometimes scratches her arms and legs to the point of bleeding. *Id.* On more than one occasion, Mr. Pomales has assisted Drew to wrap her fingers in band-aids so that she cannot hurt herself. *Id.* At these times she is not in control of herself, crying and shaking, pulling at her clothes, shuts down, and has difficulty breathing. *Id.* She collapses on the ground and sobs. *Id.* Breakthroughs are few and far between. *Id.* at ¶17.

Drew should have completed the second semester of her sophomore year in 14 weeks, but after 6 months she has still not completed it.  *Id.* at ¶18. Many schools would not be able to provide the level and intensity of time-consuming support that KPHS provided to Drew.  *Id.* Florida regulations require that she complete 900 hours of direct instruction with an educator, in order to graduate from high school. *Id.* At this point, it is unclear whether Drew is capable of progressing in her current condition.  *Id.*  It is hard for Mr. Pomales to imagine Drew attending and succeeding at college or working productively in employment in her current condition.  *Id.* He is unable to identify any explanation for Drew's condition besides the murder of her father. *Id.* at ¶21.

Drew's suicidal behavior, psychological disorders and medical treatment are all significant aggravating factors.  The Court may look to "[t]estimony which describes a general feeling of permanent loss or change caused by decedent's absence or [m]edical treatment for depression and related affective disorders." *Flatow*, 999 F. Supp. at 31. "Self-destructive behavior or a need for psychiatric treatment starting after the incident may also indicate a particularly powerful feeling of loss." *Baker v. Socialist People's Libyan Arab Jamahirya*, 775 F. Supp. 2d 48, 83 (D.D.C. 2011) (citing *Valore*, 700 F. Supp. 2d at 86).  Thus, while the courts typically award a baseline solatium damages award of $5 million for the death of a parent, Plaintiffs suggest a baseline award for Drew Selig is inappropriate, and request the Court make a significant upward adjustment to the baseline commensurate with the severity and permanence of Drew's injuries.

In addition, because of the extreme and debilitating injuries which Drew has sustained, an expert life care planner has been consulted regarding Drew's current prognosis and future needs for lifetime care.  Nadene Taniguchi and Tamar Fleischer[7] of Balacare Solutions has determined

---

[7] Plaintiffs request that this Court find Nadene Taniguchi, R.N. and Tamar Fleischer, R.N. of Balacare Solutions as qualified experts under the Federal Rules for purposes of testifying on the life care plan Drew Selig is anticipated to require as a result of the traumatic loss of her father. Ex. 7. Ms. Taniguchi's and Ms. Fleischer's qualifications are detailed in their CV's attached to their expert life care plan for Drew Selig.  See Ex. 7.

the type, quantity and duration of psychological care and supported living services that Drew will require for the rest of her anticipated lifespan, and calculated the total lifetime cost at U.S. $615,602 should she remain at home, and U.S. $3,301,747 should she live in an external, third party supported living facility.  Ex. 7at p. 5.

Dr. Staller and Mr. Dripps have calculated the present value of Drew's required future care based on the report prepared by BalaCare.  Ex. 6. Moreover, because of Drew's inability to labor and earn money, they have also included in their calculations, her lost earnings.  *Id.*  They calculate the net present value of Drew's combined future care costs and lost earnings[8] as $6,583, 175 on the lower end of the range, and as $7,002,607 on the higher end of the range if Drew Selig were to only receive home care.  *Id.* at 8.   If Drew Selig were to require supportive living[9] the net present value of Drew's combined future care costs and lost earnings would be $7,677,707 on the lower end of the range, and as $8,097,139.  Accordingly, Plaintiffs request that the Court award to Drew Selig, in addition to solatium, an appropriate amount of economic damages for future care and lost earnings.

3.  **J.S., a minor**

Glenn Selig's minor son, J.S., experienced and continues to experience a most severe and unconscionable level of mental anguish, bereavement, and unbearable grief as a result of his father's murder and tragic death, and his corresponding loss of society and comfort.

Charyn Selig avers that J.S. is citizen of the United States. Charyn Selig Decl., Ex. 14, ¶5. J.S. was born in Florida on ███████████.  *Id.*   J.S. is under the age of 18, and Charyn does

---

[8] Lost earnings are reflected in Dr. Staller and Mr. Dripps report at Tables 1 and 2.  Ex. 7, p.9-10
[9] The supportive living calculation is based on Charyn Selig's Healthy Life Expectancy, age 76.4 in the year 2043, which is the year that is assumed by Dr. Staller and Mr. Dripps that Drew would need to transition to support living. Ex. 7, p.4.

not believe that he is read, or able to make a statement to a lawyer regarding his father's murder. *Id.* at ¶38.

Glenn was thrilled when he learned Charyn was pregnant with a boy because he knew the Selig name would carry on. *Id.* at ¶15.   Glenn talked about passing Selig Multimedia down to both of the kids, but given J.S.'s interests, that idea usually focused on J.S. who was joyful to think of the idea of working together with Glenn one day. *Id.*   Glenn would pick J.S. up from school and bring him to the office where J.S. would pretend to work as an employee. *Id.*

Glenn was J.S.'s only male role model. *Id.* at ¶16.   J.S. turned 13, approximately 30 days prior to Glenn's murder and the Seligs had been planning his Bar Mitzvah, scheduled to occur on March 24. *Id.*   One of the last things they did together as a family was to go to check out the hotel where it would be held.   *Id.*   After Glenn's murder, the Bar Mitzvah was hell on earth for the family emotionally, and no one in the family has any real memories from it.   *Id.*   It was not the rite of passage that J.S. deserved.   *Id.*   J.S.'s grieving has been mostly inward.   *Id.*  He comes home, goes into his room and does not want to play with his friends.   *Id.*  On the surface, he appears to be alright, but Charyn worries that when his pain and grief finally come out, J.S. will experience a huge setback.   *Id.*

J.S. did have therapy, at Charyn's request, for about 2 or 3 months.   *Id.* at ¶39.   J.S. did not want to share anything with her about the therapy, and says that he cannot change anything by crying, but Charyn knows he hurts inside.   *Id.*   She thinks J.S. feels a strong sense of responsibility to be a steady force, since Drew and Charyn are not steady emotionally.

One day, J.S. asked Charyn if he could stop seeing the counselor about his father's murder, but he told her his anxiety level was a 20, on a scale of 1 to 10. *Id.* at ¶40. He burst that night and was placed on ▮▮▮▮▮▮▮ the next day.   *Id.*   J.S. feels that Charyn is so busy managing Drew

that she does not have time for him. *Id.* At the same time, J.S. perceives that Charyn's expectations of him are higher than her expectations of Drew, which hurts him as being unfair. *Id.*

While the courts typically award a baseline solatium damages award of $5 million for the death of a parent, Plaintiffs suggest to and request of the Court that J.S. is entitled to a significant upward adjustment as the Court deems proper for the unbearable personal loss which J.S. has suffered as a result of his father's murder.

### E. The Estate of Abdullah Waheed is entitled to an award of compensatory damages.

#### 1. The Estate of Abdullah Waheed is entitled to a damages award for his personal injury/pain and suffering damages.

The Estate of Abdullah Waheed is entitled to damages for his pain, suffering and ultimate death which he sustained in the Intercontinental Hotel Attack. Compensation for pain and suffering for direct victims is appropriate when a victim knows his death is imminent. *Fritz,* 324 F. Supp. 3d at 60. *See Baker*, 775 F. Supp. 2d at 81–82 ("Courts have been influenced not only by the length of time that the victim endured physical suffering, but by the victim's mental anguish stemming from the knowledge that death was imminent."); *Kilburn v. Islamic Republic of Iran*, 699 F. Supp. 2d 136, 157 (D.D.C. 2010). Here, Alya Waheed, Abdulla Waheed's wife, has given testimony in her Declaration that on January 21, 2018, at about 11:30 am Eastern Standard Time, Alya received seven or eight calls on her cell phone from Abdullah. Alya Waheed Decl., Ex. 21, at ¶18-19. She did not know that he was trying to reach her as while she was grocery shopping. *Id*. When she saw those missed calls, she called him back, and was able to speak with him. *Id.* Abdullah told her that he heard gunshots in and around the hotel and shouting, he thought terrorists were inside the hotel, but he was on the fourth floor. *Id*. Alya told Abdullah to get off the phone and focus on staying safe. *Id*. She could hear the terror in his voice. *Id*. He was afraid for his life. *Id*. This fear and terror entitles the Estate of Abdullah Waheed to pain and suffering

damages commensurate to the extreme fear and duress Abdullah suffered immediately prior to his death when he was trapped in his hotel room, and then when the terrorists entered his hotel room in order to kill him. Therefore, this Court should award significant damages to the Estate of Abudallah Waheed for his pain and suffering at the baseline of $5 million with such upward adjustment as the Court may deem appropriate in light of Abdullah's extreme fear and duress immediately prior to his death.

     **2.  The Estate of Abdullah Waheed is entitled to economic loss damages.**

Prior to the attack, Abdullah Waheed was a diplomat for the Afghanistan government. Alya Waheed Decl., Ex. 21, ¶16.  Shortly before his death, he had been formally nominated to be the Afghan Consul General to Karachi, Pakistan.  *Id.*

As described in the Economic and Statistical Analysis performed by Dr. Chad L. Staller and Stephen M. Dripps of the Center for Forensic Economic Studies ("Staller Waheed Report"), which the Plaintiffs attached hereto as Exhibit 5 and incorporate herein by reference, are the details of Abdullah's total economic loss.

According to the Staller Waheed Report, the total economic loss that the Estate of Abdullah Waheed suffered is equal to $1,212,608. Staller Waheed Report, Ex. 5 at 5.  This value does not include the value of past medical expenses, Abdullah's pain and suffering, or any additional elements of non-economic damages.  Accordingly, Plaintiffs request the Court award the sum of $1,212,608 to the Estate of Abdullah Waheed in economic damages.

    **F.  <u>Abdullah Waheed's family is entitled to an award for their solatium/intentional infliction of emotional distress damages.</u>**

The murder of Abdullah Waheed caused significant and severe unbearable pain, anguish and damage to each member of his family members as set forth more specifically in their Declarations and below.

1.  **Alya Waheed**

Abdullah Waheed's wife, Alya Waheed, experienced and continues to experience a most severe and unconscionable level of mental anguish, bereavement, and unbearable grief as a result of Abdullah's murder, and her corresponding loss of society and comfort.

Alya avers that she is citizen of the United States. Alya Waheed Decl., Ex. 21, at ¶6.  She was born in Kabul, Afghanistan as Alya Saadat. *Id.* at ¶3. She married Abdullah on October 23, 1994, in Kabul. *Id.* at 3, Ex. 21--A. Abdullah and Alya had 3 biological children: Mina Waheed, , Amanullah ("Aman") Waheed, and Meelod Waheed.  Ahmad Saddot Decl., Ex. 23, ¶4-5; Alya Waheed Decl., Ex. 21, at ¶5, 8, Ex 21-I.  All members of the Waheed family not born in the United States subsequently naturalized as United States citizens and have been citizens continuously since then. Alya Waheed Decl., Ex. 21, at ¶6-7, Ex. 21-E-H.

Alya met Abdullah working for the Ministry of Information and Culture where Abdullah was the Chairman of Culture and Art and interviewed her for the job. *Id.* at ¶10.  While employed at the Ministry, Alya also wrote articles for newspapers, which started to get Abdullah's attention. *Id.* at ¶11. He started to become romantically interested in Alya and eventually asked her to marry him. *Id.* From the first day of their relationship until the day of his death, he was always romantic. *Id.*

When Mina was fourteen months old, and Aman was one week old, the Taliban invaded and attacked Kabul. *Id.* at ¶12. The former Afghan President, Dr. Najibullah, was caught while escaping Kabul and executed. *Id.* All current and former government officials were at extreme risk of being executed in their own homes. *Id.* The Waheeds fled to Peshawar, Pakistan, but were not safe there either once the Taliban crossed the border, so the Waheeds sought help from the United Nations and relocated to the United States as political refugees on March 21, 2001. *Id.*

The Waheeds settled in Philadelphia, Pennsylvania. *Id.* at ¶14. Overnight, Abdullah went from being a senior Afghan government official and Editor-In-Chief of a newspaper to becoming a minimum wage worker in a 7-11 convenience store in Philadelphia, because he was not a United States citizen. *Id.* This was a tremendous loss of status and income, but Abdullah was determined to take care of his family and give them a new life in the United States that they loved. *Id.* Abdullah naturalized in 2008 and looked for better jobs. *Id.*

In January 2009, Abdullah was hired as a cultural advisor and translator to the United States Army, which needed fluent Pashto and Dari speakers to accompany those deployed in Afghanistan. *Id.* at ¶15.  During this time, the Waheed family moved to Virginia. *Id.* Abdullah began traveling back and forth between the United States and Kabul, working very closely with the high-ranking Army Generals in Kabul and receiving many awards for his work. *Id.*

Following President Hamid Karzai's presidency, Ashraf Ghani ran a campaign to become Afghanistan's next President. *Id.* at ¶16.  President Ghani sought well-educated expatriates to assist him with his campaign and hired Abdullah to be his press secretary and spokesman. *Id.* Ghani won the election, and asked Abdullah to help rebuild the country and hired Abdullah as the Afghan Consul General to Peshawar, Pakistan. *Id.* However, Abdullah wanted to work on behalf of Afghanistan in the United Nations and have a posting in New York so that he could be in the United States and travel less. *Id.* Abdullah flew to Kabul to meet with President Ghani about this and checked into the Kabul Intercontinental Hotel, but the meeting never happened. *Id.* at ¶17.

Everything changed for all of the Waheed family, forever, in one day. *Id.* at ¶18. On January 21, 2018, at about 11:30 am Eastern Standard Time, Alya received seven or eight calls on her cell phone from Abdullah while she was grocery shopping. *Id.* When she called him back, he told her that he heard gunshots in and around the hotel and shouting, he thought terrorists were

inside the hotel, but he was on the fourth floor and safe with his door closed and locked, so Alya need not worry. *Id.* Alya told Abdullah to get off the phone and focus on staying safe. *Id.* She could hear the terror in his voice. *Id.* He was afraid for his life. *Id.* Alya started to shake with fear, prayed, left the cart full of groceries in the store and went straight home. *Id.* Alya tried to text Abdullah, but he would not respond. *Id.* at ¶19. She turned on the television and saw that the hotel was under attack and that there was a fire in the hotel. *Id.* She did not know what to do besides pray and walk around the house all day and night. *Id.* She could not sleep or eat and her head was hurting. *Id.* By the morning, no one had called her, so she called her relatives in Kabul, but no one had any information about Abdullah. *Id.* She was told that there were many ambulances at the hotel and many people were being transported to the hospital. *Id.* She was told that terrorists had stalked through the hotel for hours. *Id.*

Alya's daughter received a call from the Afghan Ambassador to the United States, who told her that Abdullah had been killed in the attack on the hotel. *Id.* at ¶20. In complete shock and disarray, Alya decided to fly out to Kabul the next day. *Id.* When she arrived in Kabul, she went to a relative's house and asked so many questions, but no one had any information. *Id.* She felt as though her entire world was crumbling down. *Id.* She tried to sleep but could not. *Id.* She was exhausted and in pain, yet still had hope. *Id.* Her relatives said they would look for Abdullah in the hospital. *Id.* The next morning, Alya's family and friends came to her and told her that "Abdullah is at peace." *Id.* That triggered an episode of screaming and crying, which lasted all morning; Alya felt her heart stop and her body was shaking. *Id.* That afternoon, Alya went to Sardar Mohammad Daoud Khan National Military Hospital. *Id.* at ¶21. There was high security and a helicopter flying over the perimeter. *Id.* Everyone there gave Alya their respects, saluted her, and shared their condolences. *Id.* She had no idea who they were, but they loved Abdullah. *Id.*

"Alya was proud of Abdullah, but none of this lessened her pain. *Id.* He was gone, and she felt that she would be alone and emotionally destroyed for the rest of her life. *Id.*

The violent and lonely way Abdullah died made Alya ill. *Id.* at ¶24. She began to worry more about her children. *Id.*

Alya suffers emotionally and her body shakes whenever she hears a story of Abdullah's untimely death. *Id.* at ¶26. Seeing fire on the news upsets Alya and reminds her of that horrible day. *Id.* She worries about her children's safety all the time, and it keeps her awake at night. *Id.* She sees women with their husbands, and it brings her right back to her life with Abdullah, and it hurts her so deeply. *Id.* It hurts Alya so much that Abdullah will never see his children succeeding in their careers and will never see them married; he will never meet their spouses or their children. *Id.* Alya has lost her best friend and partner. *Id.* She sleeps, walks, and eats, but nothing means anything to her because she has lost her beloved. *Id.*

Alya's children are very concerned about her. *Id.* at ¶27. They told her that she needs to find a job to get her mind off of Abdullah. *Id.* She was hired by a clothing store to work as a cashier. *Id.* Initially, she was assigned to work in the men's department, but seeing couples buy suits together and trying them on made her very sad because Abdullah loved wearing suits and would always look nice in them. *Id.* It was so painful for her that she would burst into tears in front of customers and had to be moved to the women's department. *Id.*

After Abdullah's murder, Alya developed chronic, severe pain in her stomach—something she had never experienced before. *Id.* at ¶28, Ex. J. She suffers from this pain today. *Id.* On two occasions it has been so severe that she was taken to the emergency room. *Id.* She has seen a gastroenterologist, and after examining her stomach, colon, gallbladder, and liver he concluded

that the pain is stress induced. *Id.* Alya also saw her physician who diagnosed her with anxiety and depression, prescribed and referred her to a psychiatrist. *Id.*

While the courts typically award a baseline solatium damages award of $8 million for the death of a spouse, Plaintiffs suggest to and request of the Court that Alya is entitled to a significant upward adjustment as the Court deems proper for the unbearable personal loss which Alya has suffered as a result of Abdullah's murder.

## 2. Amanullah Waheed

Abdullah Waheed's son, Amanullah ("Aman") Waheed, experienced and continues to experience a most severe and unconscionable level of mental anguish, bereavement, and unbearable grief as a result of his father's murder and tragic death, and his corresponding loss of society and comfort.

Aman was born in Kabul but became a naturalized United States citizen. Aman Waheed Decl., Ex. 25, at ¶4, Ex. 25-A, B.  It is very difficult for Aman to speak about the emotional pain inflicted on him by the murder of his father, especially due to the sudden nature of the event. *Id.* At ¶5.  He was extremely emotional explaining his situation to his school counselor and even debated taking time away from the university—but knew he could not incur the debt and had to step up to take care of his family in such a short timeframe. *Id.* This tragedy is rarely discussed by the Waheed family due to the horrifying memories attached.  *Id.*

His father was extremely hardworking and dedicated to his family. *Id.* at ¶6.  He worked his whole life and worked for everything he had. *Id.*  Aman has a poignant memory of his father staring at his minimum wage paycheck from 7-11 and looking so disappointed. *Id.*  Aman looks back on that moment and is so grateful for his father because he did what was necessary to make ends meet. *Id.*

Aman developed such a deep bond with his father, especially as his oldest son. *Id.* at ¶8. Abdullah had high hopes for Aman, and Aman planned to allow his parents to retire comfortably by working hard like his father during his prime working years. *Id.* He can never make that dream a reality. *Id.* Aman's favorite memory of his father was when Abdullah showed him around 7-11 and explained how the store would make profits. *Id.* at ¶9. At that moment, Aman knew he wanted to work in a business and eventually have his own. *Id.* Abdullah was a major influence on Aman and his pursuit of attending a top business school in this country. *Id.* Abdullah pushed Aman to be the best version of himself. *Id.*

Abdullah was the definition of a family man. *Id.* at ¶11. Aman could speak with him about anything, especially his aspirations in education and future goals. *Id.* Abdullah understood Aman in ways that others cannot. *Id.* Aman could trust his father with all of his personal matters and trust his father would always remain honest with him. *Id.* To this day, Aman has never had another relationship as close. *Id.*

Northeast Philadelphia, where the Waheeds lived before moving to Virginia, was not an ideal place to raise a family. *Id.* at ¶13. The school systems were struggling, and many of Aman's peers were led down a path of addiction and devastating futures. *Id.* Bad influences were strong and apparent for many young kids. *Id.* Abdullah led his family through that time and protected his children. *Id.* Aman credits him for allowing Aman to stay focused on education and staying away from the streets because of the influences present. *Id.*

When Abdullah was murdered Aman was an undergraduate student at the University of Virginia and 21 years old at the time. *Id* at ¶14. He found out about his father's death on the news, and it quickly became hard on him. *Id.* He tried to gather confirmation from his mother, but she was not answering the phone. *Id.* It took him a few weeks of working with the school counselor to

stabilize himself, as he was not sure about his father's true fate. *Id.* He desired to leave school early and then return the following year, but he did not want to take on debt to obtain his degree or delay entering the workforce since doing so could harm his family financially. *Id.*

Aman is 24 years old and is trying to fill a huge void left by the death of his father. *Id.* at ¶19. He feels intense pressure to be a provider as the oldest son. *Id.* Every decision he has made since his father's death is based on his mother's and siblings' best interests. *Id.* He even lives with his mother to help and comfort her. *Id.* If he were to leave, she would be devastated. *Id.*

Aman has still not recovered and still grieves for the loss of his close relationship with his father. *Id.* at ¶20. No one else understands Aman the way Abdullah did. *Id.* Aman misses his father's guidance and support, and dreams of a full life with him in which they would have been business partners. *Id.* Abdullah gave Aman and his brother Meelod each a necklace and a watch, which Aman still has and will never lose.

Aman went to the gym regularly before his father died, but after Abdullah's murder, he stopped going altogether and has dealt with his grief poorly by overeating. *Id.* at ¶21. His weight increased from approximately 130 pounds to approximately 180 pounds in two years. *Id.* Food quickly became Aman's escape, as he never wanted to tell anyone how he truly felt. *Id.* No one could understand him because of how rare his situation is. *Id.* He feels as if he has sunken into a bog. *Id.* He does not like to socialize as much and has distanced friends from his personal life. *Id.* Faith was extremely important to Abdullah. *Id.* at ¶22. This year, Aman has become more faithful, and is attempting to turn his life around. *Id.* He prays to have a better future and continue to think about Abdullah. *Id.* Aman credits his father with inspiring him to go down this this path, but he know he will never, ever have his father back on this earth, and the pain of lost promises and opportunities will never go away. *Id.*

While the courts typically award a baseline solatium damages award of $5 million for the death of a parent, Plaintiffs suggest to and request of the Court that Amanullah is entitled to a significant upward adjustment as the Court deems proper for the unbearable personal loss which Amanullah has suffered as a result of his father's murder.

### 3. Mina Waheed

Abdullah Waheed's daughter, Mina Waheed, experienced and continues to experience a most severe and unconscionable level of mental anguish, bereavement, and unbearable grief because of her father's murder and tragic death, and her corresponding loss of society and comfort.

Mina is a citizen of the United States. Mina Waheed Decl., Ex. 24, at ¶5, Ex. 24-B.  She was born in Kabul, Afghanistan. *Id.* at ¶3. She came to the United States with her family as a refugee on March 21, 2001 and became a naturalized citizen on June 7, 2007.  *Id.* at ¶2-3, Ex. 24-A.

On the day of the attack on the Kabul Intercontinental Hotel, Mina was working when her mother Alya called to say that there was an incident at the Hotel and to come straight home after work. *Id.* at ¶6.  When Mina got home, her mother was emotionally overwhelmed, frightened, stressed and her face was very red. *Id.* She told Mina that terrorists had snuck their way into the banquet hall of the hotel and started shooting. *Id.* They turned on the television to watch cable news from the region. *Id.* The news was reporting the hotel attack live on television. *Id.*  The hotel was on fire. *Id.*  Reporters were saying that the terrorists were shooting everyone and throwing explosives into guest rooms. *Id.*  Alya told Mina that her father had called from his hotel room and informed her that terrorists invaded the hotel, and were shooting downstairs and outside, but that he was locked in his room. *Id.* Alya was hysterical.  *Id.*  Mina tried to calm her mother down, saying that while this horror was undeniably happening, surely the police and special forces would

be on the scene and regain control very quickly. *Id.*  Inside, Mina was terrified and desperately worried about her father. *Id.*  It was a very stressful night, praying for her father and his safety, Alya and Mina did not sleep. *Id.*  Things became very quiet. *Id.*  Mina told herself that her father would be alright, that the situation was scary, but he would come out of it alive. *Id.*  Her focus was on taking care of her mother.  *Id.*

By the next day, Abdullah had not called the family nor had any relatives in Kabul, and Mina was starting to fall apart. *Id.* at ¶8.  She could also hear the total fear in her mother's shaking voice. *Id.*  Mina was glued to the television and the phone waiting for information about her father. *Id.*  The images of the devastated hotel were terrifying. *Id.*

Mina received a phone call from the Afghan Ambassador to the United States, Hamdullah Mohib. *Id.* He gave her condolences and informed her that her father had been killed in the attack. *Id.*  Mina was in a state of shock, her body went numb, she could not feel her own body, and could not process the information at that moment. *Id.*  She just sat there for hours. *Id.* Her mother Alya decided to go to Afghanistan and booked a flight for the next day. *Id.*  Alya left Mina in charge of the house and her younger brother.  *Id.*  Friends and neighbors started to come by the Waheed house and calling and texting Mina to ask how the family was doing. *Id.* at ¶9.  While Mina knows these were acts of kindness and is grateful for them, at the time each one was a new injury and so hard for Mina to process. *Id.*  She was still moving back and forth between denial and acceptance. *Id.* Even after her conversation with the Ambassador, Mina just wanted to believe that her father was just missing, and that her mother was going to get him. *Id.*

The next day was supposed to be the start of Mina's final semester of college. *Id.* at ¶10. Waking up that day was very hard, and this was the hardest day of her life so far. *Id.*  Mina wanted to believe she was waking up from a nightmare, but when she looked at her phone she saw the

headlines—"Afghan Consul General Killed in Attack" and "12-hour siege." *Id.*  The numbness started to fade, and she started to hurt very badly, as if she had been stabbed in the heart. *Id.* She was shaking, overwhelmed and started worrying about her mother's safety. *Id.*

Mina met with her academic advisor and adjusted her college schedule. *Id.* at ¶11.  She broke down in the meeting and was gasping for air. *Id.*  She would no longer graduate with her friends on time. *Id.* She had to process the murder of her father alone, without her brothers, because her mother had instructed her not to tell them, which was extremely hard. *Id.* When she was alone in her car, or alone in the shower, Mina would scream and cry for hours. *Id.*

Mina's mother Alya returned from Kabul after about one week. *Id.* at ¶12. About two weeks after her return, Mina attended a special memorial service for my father hosted by the Afghan Ambassador in Washington, D.C. *Id.* Many fine things were said about Abdullah, and he was praised for his character and contributions to both Afghanistan and the United States. *Id.*

Mina's earliest memory of her father is from Pakistan. *Id.* at ¶13. He took her and her brother Aman to fly kites, just like in the novel the *Kite Runner* by Khaled Hosseini. *Id.* Mina would hold the kite with Aman and run with it, while Abdullah tried to get it up into the air. *Id.* They would do this for hours and then have playful kite fights with others. *Id.*  Mina cherishes this memory. *Id.*  Mina is so proud to be Abdullah's daughter. *Id.* at ¶14.  He went from being a senior government official in Afghanistan to being a refugee fleeing Kabul, to be a minimum wage employee in a 7-11 in Philadelphia. *Id.*  With hard work and belief in this country, he became an interpreter and liaison for senior U.S. Army officers in Kabul and then served his native Afghanistan as Consul General to Peshawar, Pakistan. *Id.*  Her father is Mina's hero, and always will be. *Id.* What he lived through in his life was enough to destroy most people, and what he stood for makes Mina so proud. *Id.*

Mina had a very special father-daughter relationship and bond with her father. *Id.* at ¶15. He was her best friend in the world. *Id.* He was very in tune with who Mina was, what she was doing in school, her interests, and her friends. *Id.* Abdullah and Mina would speak often about the day that Mina would be married. *Id.* at ¶16. He would always assure her that he would be there to support her emotionally and financially, that she would have the wedding of her dreams. *Id.* This was extremely important to him, and it is something they shared. *Id.* Mina now cannot imagine even getting through her wedding without breaking down. *Id.* She becomes overwhelmed and emotional every single time that she thinks about getting married. *Id.* Mina has been engaged to be married for two years and cannot imagine taking the next step. *Id.*

Mina has developed anxiety, lost her confidence and become afraid to travel alone. *Id.* at ¶17. Mina worries constantly and irrationally about her family and does not enjoy life as much. *Id.* Since her father's murder, Mina's hair has started falling out, and she has developed alopecia and psoriasis, conditions that she never had prior to her father's murder. *Id.* at ¶17, Ex. 24-C. None of the birthdays or the holidays are the same now. *Id.* at ¶23. No one from the Waheed family smiles as big as they did when Abdullah was alive, and Mina doubts they ever will. *Id.* She will never stop worrying that her father suffered when he was dying at the hands of the terrorists. *Id.*

While the courts typically award a baseline solatium damages award of $5 million for the death of a parent, Plaintiffs suggest to and request of the Court that Mina is entitled to a significant upward adjustment as the Court deems proper for the unbearable personal loss which Mina has suffered as a result of her father's murder.

### 4. Meelod Waheed

Abdullah Waheed's son, Meelod Waheed, experienced and continues to experience a most severe and unconscionable level of mental anguish, bereavement, and unbearable grief as a result

of his father's murder and tragic death, and his corresponding loss of society and comfort. In his Declaration, Meelod avers that he is citizen of the United States. Meelod Waheed Decl., Ex. 26, at ¶4, Ex. 26-A.  He was born in Philadelphia, Pennsylvania. *Id.* At the time that this lawsuit was initiated, Meelod was a minor. *Id.* at ¶3.  His mother Alya asserted his claims on his behalf.  *Id.* He is now over nineteen years of age, and hereby ratifies and adopts the actions taken by his mother on his behalf, and the claims asserted in the Complaint, as his own.  *Id.*

It is not easy for Meelod to talk openly about his father's murder by terrorists. *Id.* at ¶5. The family does not discuss it, because it is too painful.  *Id.*

Even though he traveled a lot, Abdullah would always try to stay in touch and be there for Meelod. *Id.* at ¶7.  Growing up, the Waheed family would often spend time together. *Id.* A tradition Abdullah always wanted to uphold was having family time during the weekends. *Id.* Some of Meelod's favorite things included going to the mall, the park, and Washington D.C.  *Id.*

Abdullah taught Meelod many things during his life, notably how to ride a bike, play basketball, drive a car, and shave. *Id.* at ¶9.  His mother was too scared to teach him how to drive, so his father stepped up and taught him. *Id.* It was during those moments that Meelod fell in love with driving. *Id.* Now, he constantly feels reminded of those memories every time he is behind the wheel. *Id.* He will never have these moments with his father again—and that crushes him.  *Id.*

On the day the terrorists attacked the Intercontinental Hotel, Alya picked Meelod up from a track meet. *Id.* at ¶10. He could tell she seemed off and was on edge but did not think much about it at first until later at home when she was still stressed. *Id.* Nobody told him anything, and he was unaware of what was going on. *Id.* The only thing he knew at this point was that something was clearly and obviously wrong.  *Id.* The next day, Meelod's mother had her luggage packed and ready to go to Afghanistan.  *Id.* at ¶11.  He tried to get more information, but Alya would not tell

him what happened. *Id.* He had suspected at this point that it could have something to do with his father. *Id.* Within the next couple of days, his sister Mina told him that his father was injured. *Id.* He then searched on the internet and found an article posted by the New York Times asserting that his father was killed in a terrorist attack at the Intercontinental Hotel. *Id.*

Initially, Meelod had no idea what or how to feel. *Id.* at ¶12. He was filled with confusion, doubt and disbelief, continuing to hope that his father was still alive. *Id.* Days later, his sister and mother confirmed the truth crushing Meelod's last hope. *Id.* It hit him hard and he was devastated, sadder than he had ever been in his life. *Id.* He sat in silence, blocking out everything and everyone around him, hurting deep down, crying at night, losing sleep, and unable to eat. *Id.*

Meelod broke down during his father's wake, crying during a prayer and simultaneously trying to hide his tears with tissues. *Id.* at ¶13. He felt as though all eyes were looking at him, and he hated it. *Id.* He continued to sit there and cried to heaven for hours. *Id.* Meelod poured his anger and energy into running track and field. *Id.* at ¶14. He was a sophomore when his father was killed. *Id.* A year later, he won a State Title in the men's 4 X 100 meters relay. *Id.* Abdullah had encouraged Meelod to run and was his biggest supporter. *Id.* Meelod had once told his father that he did not think he was fast enough to compete, and win given his athleticism. *Id.* Abdullah told him to take those thoughts and throw them out the window and to never give up. *Id.* The murder of his father and the grieving process interfered with Meelod's academic work. *Id.* at ¶15. His high school grades slipped in all classes. *Id.* In calculus, he sunk from an A to a D in one quarter. *Id.* He lost his motivation to study, and he was unable to stabilize his grades until his senior year. *Id.* Abdullah had always helped Meelod with his work and tutored him in his difficult classes. *Id.*

Since the day of the terrorist attack, Abdullah's death has affected Meelod mentally, emotionally, and physically. *Id.* at ¶17. He has developed anxiety, is afraid to travel alone and constantly worries about his mother and siblings. *Id.* Meelod is always worried about the Waheed family's financial situation because his father was the sole income provider, and his death became a huge financial burden on the family. *Id.* at ¶18. Meelod's dream was to go to a top four-year university, but he knew that was out of reach financially, so he thought it was best to stay home and enroll at Northern Virginia Community College for the family's sake. *Id.* Abdullah had a huge focus on education and wanted Meelod to become a better person, help the family and help the community. *Id* Abdullah's passing has caused Meelod emotional stress, anxiety and bad feelings on the dates of his father's death anniversary and birthday, on Father's Day and whenever Meelod sees his friends with their parents, having fun and being together. *Id.* at ¶19. Now he has nobody to support him the way his father once did. *Id.* After his father's murder, Meelod missed all the fun activities he used to do with his father. *Id.* at ¶20. Now, the Waheed family does not do those activities since it reminds them of him wherever they go, and it hurts. *Id.* One thing Abdullah loved was having a barbeque in the Spring and Summer. *Id.* Ever since he was killed, the Waheed family has not had a barbeque. *Id.*

Meelod will miss his father's presence, being around him, seeing his face, hearing his voice, watching him as he made pancakes for breakfast—all of those small moments Meelod once took for granted. *Id.* at ¶21. Abdullah gave Meelod and his brother, Aman, a necklace and a watch, which Meelod still has and with which he will never part. *Id.*

Now, Meelod's faith is moving him forward. *Id.* at ¶22. He started to pray for his father as a way to think about him and try to make Abdullah's dreams of Meelod attending a top

university come true. *Id.* It comforts Meelod and is very important. *Id.* He still lays awake at night for hours, missing and thinking about his father. *Id.* at ¶23.

While the courts typically award a baseline solatium damages award of $5 million for the death of a parent, Plaintiffs suggest to and request of the Court that Meelod is entitled to a significant upward adjustment as the Court deems proper for the unbearable personal loss which Meelod has suffered as a result of his father's murder.

G. **This Court should assess Punitive Damages Against the Iranian Defendants.**

The Islamic Republic of Iran has been on the State Department list of State Sponsors of Terror since 1984. In 2007, the U.S. Department of the Treasury designated the Qods Force, an elite special operations unit within the Islamic Revolutionary Guard Corps, as an SDGTE under E.O. 13224. In 2017, the U.S. Department of the Treasury designated the Islamic Revolutionary Guard Corps as an SDGTE under E.O. 13224. On April 15, 2019, the U.S. Department of State designated the Islamic Revolutionary Guard Corps in its entirety, including its Qods Force, as an FTO under s. 219 of the Immigration and Nationality Act. These designations have never been lifted. Iran and the ICRG have been found liable for numerous acts of sponsored terror by this Court. Yet, together, they unabashedly continue to sponsor terror organizations and carry out act of terrorism with impunity. The awarding of punitive damages serves multiple purposes. Punitive damages were legislatively created to apply to State Sponsors of Terror with the purpose to serve to "punish and deter the actions for which they are awarded." *Murphy*, 740 F. Supp. 2d at 80. Four factors determine the amount of punitive damages: "(1) the character of the defendants' act, (2) the nature and extent of harm to the plaintiffs that the defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants." *Id.*

28 U.S.C. § 1605A(c) specifically allows the award of punitive damages for personal injury or death resulting from an act of state-sponsored terrorism.  In recognition of the difficulty of bringing terrorists to justice personally, Congress created jurisdiction over, and rights of action against, their foreign state sponsors.  Punitive damage awards under the FSIA serve multiple purposes:

> [b]y creating these rights of action, Congress intended that the Courts impose a substantial financial cost on states which sponsor terrorist groups whose activities kill American citizens. This cost functions both as a direct deterrent, and also as a disabling mechanism: if several large punitive damage awards issue against a foreign state sponsor of terrorism, the state's financial capacity to provide funding will be curtailed.

*Flatow*, 999 F. Supp. at 33.  Therefore, in addition to the traditional focus of punitive damages upon individual punishment and general deterrence, this law emphasizes specific deterrence of the transgressing state sponsors of terrorism so that future sponsorship may be prevented.

In this case, the evidence shows that this Defendants have materially and continuously supported, protected, harbored, aided, abetted, enabled, sponsored, provided safe haven to and conspired with and subsidized a known terrorist organization whose *modus operandi* includes the targeting, brutalization and murder of American citizens and others.  The character of these acts requires a significant award of punitive damages.  *E.g., Cronin v. Islamic Republic of Iran*, 238 F. Supp. 2d 222, 235 (D.D.C. 2002)(finding the character of the defendant's act—where the defendant provided material support and resources to terrorist organizations to carry out acts such as kidnapping and torture—supported a punitive damage award of $300,000,000.00).

Specifically, in cases that have calculated the punitive damages for state sponsors of terrorism, such as *Acosta v. The Islamic Republic of Iran*, 574 F. Supp. 2d 15, 31 (D.D.C. 2008), this Court held that a three times multiplier should be applied to the state sponsor of terrorism's

annual budget for terrorism in order to determine an appropriate punitive damage award to adequately deter state sponsors of terrorism. Moreover, in *Estate of Heiser*, 659 F. Supp. 2d at 30–31, this Court saw no reason to depart from the *Acosta* methodology in calculating punitive damages as this methodology was considered to have the requisite deterrent effect. *See Id.*

In *Valore*, this Court upheld the methodology in *Heiser* and *Acosta* but used a five times multiplier of annual state sponsored terrorism expenditures, rather than the three times multiplier used in *Heiser* and *Acosta*. The court held specifically that two numbers are at issue: the multiplicand (the amount of the state sponsor of terrorism's annual expenditures on terrorist activities) and the multiplier (the factor by which the multiplicand should be multiplied to yield the desired deterrent effect). *Estate of Heiser*, 659 F. Supp. 2d 20 In *Valore*, this Court awarded one billion dollars in punitive damages against Iran.

In *Gates v. Syrian Arab Republic*, 580 F. Supp. 2d 53 (D.D.C. 2008), the measure applied by the court in awarding $300 million dollars was $150 million dollars per family for each of the two families. Judge Collyer found that with regard to Syria's sponsorship of terrorism in the year of 2004, "[p]remeditated violence against civilian targets is not a legitimate action by any government. Civilized society cannot tolerate states whose partnership with terrorist surrogates…is formed for the purpose of achieving political victory through heinous acts of barbarism". *Gates*, 580 F. Supp. 2d at 74. Courts have also used a multiplier of three to five times the amount of compensatory damages awarded to determine an appropriate punitive damages amount. *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 126 S. Ct. 1235, 163 L. Ed. 2d 1097 (2006).

Considering each of the stated purposes of punitive damages, noting that Iran has provided and continues to provide material support to the Taliban/Haqqani network, it is clear that Iran's conduct remains undeterred with regard to their ongoing and continuing providing of material

support that enabled the Taliban to commit heinous acts of terror, year after year.  Iran is unrepentant in their support for terror.

Therefore, the Court should find that the range of appropriate punitive damages can be found in such awards as *Heiser*, *Acosta* and *Valore*, which used the multiplier of terrorism related expenditures ranging from three to five times the annual expenditure on terrorism, and accordingly this Court should assess a punitive damages award against the Defendants, and at a minimum make an award to the Kantor, Selig and Waheed families of three to five times the amount of awarded compensatory damages in accordance with *Arbaugh*, but in no event less than $150 million dollars in punitive damages.

## **CONCLUSION**

WHEREFORE, for the reasons set forth above, Plaintiffs respectfully request that pursuant to 28 U.S.C. § 1608(e), this Court enter default judgment in their favor and find liability of the Islamic Republic of Iran and the Islamic Revolutionary Guard Corps, jointly and severally, for the terrorist attacks that resulted in the killings of Paula Kantor, Glenn Selig and Abdullah Waheed, and award to each of the Plaintiffs damages for their injuries pursuant 28 U.S.C. § 1605A(c), in such amount as the Court deems appropriate and just; and, in addition thereto, that the Court determine an assessment of punitive damages against Islamic Republic of Iran and the Islamic Revolutionary Guard Corps for their continued and unrelenting support of acts of international terror; and thereby award the Plaintiffs the highest possible dollar amount to the maximum extent allowed by applicable law, including pre-judgment and post-judgment interest and assessment of costs, for all of which attachment may be had, against the Defendants.

74

Dated: April 12, 2021.                           Respectfully submitted,

HEIDEMAN NUDELMAN
& KALIK, P.C.
5335 Wisconsin Ave., Suite 440
Washington, DC  20015
Telephone:  202-463-1818
Telefax:  202-463-2999

By: _/s/ Tracy Reichman Kalik___

  Richard D. Heideman (No. 377462)
  Noel J. Nudelman (No. 449969)
  Tracy Reichman Kalik (No. 462055)
  Joseph H. Tipograph (No. 997533)

MERIDIAN 361 INTERNATIONAL LAW
GROUP, PLLC
97A Exchange Street, Suite 202
Portland, ME 04101
Telephone: 866-338-7087

By: __/s/ F.Ronald Jenkins_____

  F. Ronald Jenkins (No. 1615786)