## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **CHARYN F. SELIG,** *et al.***,** | |
| Plaintiffs, | |
| v. | Case No. 1:19-cv-02889-TNM |
| **ISLAMIC REPUBLIC OF IRAN,** *et al.***,** | |
| Defendants. | |

## <u>MEMORANDUM OPINION</u>

This civil action for compensatory and punitive damages arises under the terrorism exception to the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605A.  Fourteen Plaintiffs sue the Islamic Republic of Iran and the Islamic Revolutionary Guard Corps for the wrongful death and pain and suffering of three American citizens and their estates, as well as intentional infliction of emotional distress on the decedents' family members.  Plaintiffs allege that Defendants provided material support and resources to the Taliban and its military arm, the Haqqani network, which carried out the attacks that killed the Americans.

Defendants did not respond, and Plaintiffs now move for default judgment.  The Court finds that Plaintiffs successfully established personal and subject matter jurisdiction under 28 U.S.C. § 1605A and proved that Defendants are liable under wrongful death and intentional infliction of emotional distress theories of liability.  Plaintiffs are therefore entitled to default judgment and damages.

## I.       BACKGROUND

The terrorist attacks at issue took place in Kabul, Afghanistan, in 2015 and 2018.  Compl. ¶ 2, ECF No. 1.  Plaintiffs allege that agents of the Taliban and the Haqqani network are

responsible for both attacks and that the Islamic Republic of Iran and the Islamic Revolutionary Guard Corps (IRGC) provided "material support and resources." *Id.* ¶ 4.  The Foreign Sovereign Immunities Act (FSIA) "establishes a general rule granting foreign sovereigns immunity from the jurisdiction of United States courts . . . [but] that grant of immunity is subject to a number of exceptions." *Mohammadi v. Islamic Repub. of Iran*, 782 F.3d 9, 13–14 (D.C. Cir. 2015).  One of these exceptions, known as the "terrorism exception," waives sovereign immunity for countries that provide material support to terrorist organizations.  *See* 28 U.S.C. § 1605A.  Plaintiffs bring their case under this exception.  Compl. ¶ 5.

Because Iran and the IRGC did not respond, Plaintiffs move for default judgment.  Entry of default judgment is "not automatic," *Mwani v. Bin Laden*, 417 F.3d 1, 6 (D.C. Cir. 2005), but rests with the "sound discretion" of this Court, *Boland v. Yoccabel Const. Co.*, *Inc.*, 293 F.R.D. 13, 17 (D.D.C. 2013).  Plaintiffs must thus show both that default judgment is warranted and that they have met the requirements for waiver of sovereign immunity under the terrorism exception.

Before the Court can enter default judgment, Plaintiffs must establish subject matter and personal jurisdiction.  *See Jerez v. Repub. of Cuba*, 775 F.3d 419, 422 (D.C. Cir. 2014) ("A default judgment rendered in excess of a court's jurisdiction is void."); *Mwani*, 417 F.3d at 6 (explaining that a court must "satisfy itself that it has personal jurisdiction before entering judgment against an absent defendant").  Section 1605A provides a mechanism for Plaintiffs to show both types of jurisdiction over a non-responsive foreign sovereign.

The Court's analysis thus focuses on whether Plaintiffs have properly pled all elements of a claim under § 1605A.  To do this, Plaintiffs must identify the terrorist groups responsible for the attack and show that Iran and the IRGC provided support to these groups.  Plaintiffs provide

extensive expert testimony to make these showings.[1]  The Court assesses this evidence and makes findings of fact before proceeding to its findings of law.

## II.      FINDINGS OF FACT

### A.      The Taliban and the Haqqani Network

Both the Taliban and the Haqqani network claimed responsibility for the attacks.  Exp. Witness Rep. of Dr. Daveed Gartenstein-Ross (Gartenstein-Ross Rep.) at 43–45, 52–56, ECF No. 27-3.[2]  Plaintiffs provide a long history of the two terror groups showing that they operate as a single entity and that their competing claims of responsibility do not cast doubt on who is responsible for the attacks.

Mullah Omar founded the Taliban in 1994.  *Id.* at 13.  The Taliban is a Sunni militant group operating mainly in Afghanistan and Pakistan that controlled Afghanistan before the United States began its military campaign there.  *Id.* at 9, 13–15.  The United States toppled the Taliban-led government within weeks, and many of its leaders fled to Pakistan.  *Id.* at 15. Although the Taliban gradually regained ground in Afghanistan, *id.* at 15–16, the Taliban did not control Kabul from the time of the U.S. invasion in 2001 until America's recent exit.  *Id.* at 18. But because one of the core pillars of Taliban ideology is "opposition to Western influence, and

---

[1]  In terrorism cases, expert testimony is often sufficient for plaintiffs to meet their burden because "firsthand evidence and eyewitness testimony is difficult or impossible to obtain from an absent and likely hostile sovereign."  *Owens v. Repub. of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017), *vacated and remanded sub nom. Opati v. Repub. of Sudan*, 140 S. Ct. 1601 (2020); *see also Schwartz v. Islamic Repub. of Iran*, No. CV 18-1349 (RDM), 2020 WL 7042842, at *2 (D.D.C. Nov. 30, 2020) (accepting expert declarations as sufficient to meet plaintiffs' evidentiary burden).  The Court has reviewed the qualifications of Plaintiffs' experts and is satisfied that each is qualified to offer the opinions discussed below.  *See* Gartenstein-Ross Rep. at 2–9 (listing qualifications); Decl. of Craig Thomas Mallak, J.D., M.D. at 2–4 ("Mallak Decl."), ECF No. 27-4 (same); Exp. Rep. of Chad M. Staller and Stephen Dripps, Ctr. for Forensic Econ. Studs. at 9–26, ECF No. 27-6 (same).

[2]  All page citations refer to the pagination generated by the Court's CM/ECF system.

a willingness to use violence to realize its ideological vision," the Taliban took the fight to Kabul using terrorism.  *Id.* at 10.  Dr. Gartenstein-Ross details 32 terrorist attacks attributable to the Taliban from January 2008 to January 2018, not including the two attacks at issue.  *Id.* at 18–22.

The Haqqani network was instrumental to the Taliban's ability to carry out these attacks. The network dates to the 1970s when Jalaluddin Haqqani, head of a madrassa, led an unsuccessful uprising against the pro-Soviet, ruling regime in Afghanistan.  *Id.* at 23.  Despite its initial failure, the network became a "potent" military force during the fight against the Soviets and in the Afghan Civil War following Soviet withdrawal.  *Id.* at 24.

Notwithstanding initial mutual "suspicion and hostility" between the network and the Taliban, by 1995 "Jalaluddin Haqqani had been persuaded to lend his military expertise to the group."  *Id.* at 25.  They grew even closer during the U.S. invasion.  *See id.* at 26–30.  For example, in a 2008 interview, Haqqani confirmed his loyalty to Mullah Omar, the Taliban's founder.  *Id.* at 27.  In 2010 and again in 2012, Sirajuddin Haqqani, Jalaluddin's son who took over the network's day-to-day operations in the mid-2000s, claimed the network and the Taliban were united.  *See id.* at 26–27.  The United States has also recognized the close alliance between the two groups.  In 2016, Gen. Charles Cleveland, USA, stated: "Sirajuddin increasingly runs the day-to-day military operations for the Taliban."  *Id.* at 29.  And Dr. Gartenstein-Ross concludes that "Sirajuddin Haqqani, demonstrating his political and military savviness, in large part took over the Taliban's day-to-day operations."  *Id.*

Based on Dr. Gartenstein-Ross's careful recounting of the history between the Taliban and the Haqqani network, the Court finds that the original distinctions between these two groups have collapsed.  Their competing claims of responsibility do not cast doubt on who is responsible for the attacks.  They are both to blame.

### B. Iranian Support for the Taliban

Plaintiffs next seek to implicate Iran and the IRGC by establishing the support they have provided to the Taliban and the Haqqani network. Dr. Gartenstein-Ross identifies six ways that Iran provided this support. *First,* high-level coordination with the Taliban. In 2001, a Taliban delegation "met with the Deputy Commander of the Iranian Foreign Intelligence Service and the Head of the Afghan Department of the Iranian Foreign Intelligence Service." *Id.* at 32 (cleaned up). Dr. Gartenstein-Ross contends that such high-ranking Iranian intelligence officials likely would have met with Taliban officials and offered support only with the sanction of Iran's Supreme Leader. In 2011 and 2012, the Taliban opened offices in Iran. One of the offices "included two representatives from the Haqqani network to liaise with the Revolutionary Guards." *Id.* In 2016, Iran's ambassador to Afghanistan said that Iran was in contact with the Taliban for "control and intelligence." *Id.* at 33.

*Second*, providing a safe haven for the Taliban. In 2011, Afghan police and a Taliban commander stated that "Iran has allowed the Taliban to recruit, train, and house fighters in Iran." *Id.* In 2017, the governor of one of Afghanistan's provinces said the Taliban "have hideouts [in Iran] and are being aided with a lot of material resources." *Id.* "In 2018, a Taliban commander admitted to a Western newspaper that hundreds of Taliban fighters are in Iran at a time." *Id.*

*Third*, the IRGC's provision of training. The U.S. State Department produces annual country reports on terrorism. For each of the years 2008 through 2012, the report on Iran stated: "[T]he Qods Force provided training to the Taliban in Afghanistan on small unit tactics, small arms, explosives, and indirect fire weapons, such as mortars, artillery, and rockets."[3] *Id.* A

---

[3] The Qods Force (also spelled Quds Force) is an elite element of the IRGC. Gartenstein-Ross Rep. at 30.

Defense Intelligence Agency assessment concluded that Iran trained the Taliban through at least 2019. Defense Intelligence Agency, *Iran Military Power* (Aug. 2019), https://man.fas.org/eprint/iran-dia-2019.pdf.[4] And the Taliban confirmed this. One Taliban commander stated that in the summer of 2018, there were "between 500 and 600 of us in different stages of training in Iran." Gartenstein-Ross Report at 34 (cleaned up).

*Fourth*, financing the Taliban. In 2010, the U.S. Treasury Department sanctioned Quds Force's Gen. Hossein Musavi and Col. Hasan Mortezavi for providing financial and material support to the Taliban. U.S. Dep't of the Treas., *Fact Sheet: U.S. Treasury Department Targets Iran's Support for Terrorism* (Aug. 3, 2010), https://www.treasury.gov/press-center/press-releases/Pages/tg810.aspx. In 2018, Secretary of State Pompeo concluded that "Iran's support to the Taliban in the form of weapons and funding leads to further violence and hinders peace and stability for the Afghan people." Gartenstein-Ross Rep. at 35. Iran has placed a bounty on U.S. service members, "incentivizing the Taliban to kill Americans." *Id.* And Iran has worked with drug smugglers to aid the Taliban, which derives 50-60% of its revenue from the opium trade. *Id.* at 36. Two of Afghanistan's three known opium routes transit Iran. *Id.*

*Fifth,* arming the Taliban. The State Department's terrorism country reports for each of the years 2007 through 2012 stated that "Iran has arranged arms shipments to select Taliban members." *Id.* at 37. In 2018, Secretary Pompeo confirmed that those weapons shipments were continuing. *Id.* The U.S. military and intelligence community have intercepted multiple shipments of weapons from Iran to the Taliban. *Id.* More, "Taliban commanders have publicly admitted that they have received weapons from Iran." *Id.* at 38.

---

[4] A court "may take judicial notice of facts contained in public records of other proceedings, and of historical, political, or statistical facts, and any other facts that are verifiable with certainty." *Johnson v. Comm'n on Pres. Debates*, 202 F. Supp. 3d 159, 167 (D.D.C. 2016) (cleaned up).

*Sixth*, Iranian assistance in planning and executing attacks.  Dr. Gartenstein-Ross concludes that Iran "has played an active role in planning and executing some Taliban attacks." *Id.*  In 2014, the U.S. Department of the Treasury sanctioned three IRGC officials and an Afghan associate for their activities in Afghanistan.  U.S. Dep't of the Treas., *Treasury Targets Networks Linked to Iran* (Feb. 6, 2014), https://www.treasury.gov/press-center/press-releases/pages/jl2287.aspx.  During some attacks, Iranian commandos embedded with Taliban fighters.  Gartenstein-Ross Rep. at 39.  On other occasions, Iran has "played a role in organizing Taliban suicide bombings."  *Id.*

Dr. Gartenstein-Ross also identifies several motivations behind Iran's support of the Taliban and the Haqqani network.  The first is self-preservation.  *Id.*  After the United States invaded Afghanistan and Iraq, "Iranian leaders almost certainly worried that they could be next." *Id.*  Supporting the Taliban was "a way to raise the cost of intervention in Afghanistan."  *Id.* More, "Iranian support for the Taliban was designed to maintain influence within Afghanistan." *Id.* at 40.  By backing multiple groups in Afghanistan, Iran likely hoped to "maximize its influence . . . in eastern Afghanistan, along the Iran-Afghanistan border."  *Id.*  Finally, Iran has tried to leverage its relationship with the Taliban to influence local issues in eastern Afghanistan that impact Iran's population.  *Id.*  For example, some experts believe Iran uses the Taliban to oppose dam construction in Afghanistan that could threaten Iran's water supply.  *Id.*

The effect of this support, says Dr. Gartenstein-Ross, is "wide-ranging and substantial." *Id.* at 41.  Although he admits that "it is difficult to precisely determine the full impact of Iran's support for the Taliban," he concludes that "the Taliban would be a less lethal and effective fighting force without Iranian support."  *Id.*  Without Iran's explosives and training, the Taliban "may have been unable to conduct some of its attacks in Kabul."  *Id.*   And without Iranian

financing and revenue generated by the drugs transported through Iran, "the Taliban may have struggled to fund its most sophisticated Kabul operations and pay many of its fighters."  *Id.*  Both the Taliban and Afghan governments "have acknowledged Iran's substantial impact."  *Id.*  And Afghan officials have stated that "Iran's support was key" to the Taliban's resurgence and territorial gains in Afghanistan in 2018.  *Id.*

Based on the above, unrebutted expert testimony and U.S. Government statements, the Court finds that Iran and the IRGC provided material support in the form of arms, training, funds, and technology to the Taliban and the Haqqani network for decades.  And Iran was providing this support during the period that the attacks took place.

### C.    Park Palace Hotel Attack

Plaintiff Paula L. Kantor died in an attack that occurred on May 13–14, 2015, at the Park Palace Hotel in Kabul (Park Palace Hotel Attack).  Compl. ¶ 2.[5]  The Park Palace Hotel caters to "foreign researchers, journalists, businessmen, and aid workers."  *Id.* ¶ 67.  On the evening of the attack, the hotel was preparing to host "a concert by a well-known Afghani classical musician in support of international aid organizations."  *Id.*  Just before the concert, several terrorists opened fire on the attendees in the hotel courtyard.  Gartenstein-Ross Rep. at 41–42.  The gunmen then went room-to-room targeting foreigners.  *Id.* at 42.

About ninety minutes after the attack began, an eight-member Norwegian Special Operations team convened outside the hotel with an Afghan special police unit.  *Id.*  As the teams planned their response, a hotel guest who had escaped handed one of the Norwegians a phone.  Paula was on the line.  *Id.*  She said that she was in the hotel lobby, and soon after they

---

[5]  Because this case involves multiple persons with the same last name, the Court will introduce these individuals by first and last name and thereafter refer to them by first name only.

entered with the Afghan police to locate her.  *Id.*  They found her bleeding on the lobby floor and evacuated her for medical treatment.  *Id.*  Despite receiving medical attention, she died later that night.  The terrorists had shot her five times:  once in the head, once in the upper right back, once in the lower right back, once in the left buttock, and once in the left shoulder.  *Id.* at 43.  Paula was one of approximately 15 civilians killed by the terrorists.  *Id.*

Dr. Craig Mallak prepared a forensic expert report describing Paula's experience based on her injuries.  The gunshot wound to her face, although survivable, likely produced "unfathomable suffering."  Mallak Decl. at 6.  The cause of Paula's death was a shot that entered her liver.  Although this wound was "certainly fatal," it is likely that Paula "survived several hours with excruciating pain."  *Id.*

The Taliban claimed responsibility for the attack the day after it began.  Gartenstein-Ross Rep. at 43.  They posted their claim of responsibility on *al-Emarah*, "an official Taliban website that has existed in some form since 2005."  *Id.* at 47.  Dr. Gartenstein-Ross analyzed the Taliban's claim of responsibility and found it credible because "details in the statement . . . align with prior Taliban propaganda and the Taliban's area of operations."  *Id.*  Afghanistan's National Directorate of Security released a video of two individuals who confessed to helping the primary gunman enter the hotel.  Both individuals claimed an affiliation with the Haqqani network.  *Id.*  Given the substantial evidence of Taliban involvement, Dr. Gartenstein-Ross arrives at the "clear conclusion" that the Taliban's claim of responsibility was authentic.  *Id.* at 48.  And "the Afghan government's allegations about Haqqani involvement only further corroborate the Taliban's involvement."  *Id.*

Dr. Gartenstein-Ross provides several justifications for ruling out the involvement of other terrorist organizations operating in the area at the time:  Hezb-e-Islami Gulbuddin (HIG), a

Taliban ally, and Islamic State—Khorasan Province (ISIS-K), the Afghanistan offshoot of ISIS. *See id.* at 15, 49.  Neither HIG nor ISIS-K claimed responsibility for the attack, and "Afghan government authorities indicated that the Haqqani network . . . was involved." *Id.* at 49.  More, "the United Nations Assistance Mission in Afghanistan and the British Foreign Minister found the Taliban claim of responsibility credible enough to repeat it in their statements condemning the attack." *Id.*  Finally, the Taliban "has a long history of targeting hotels and foreigners in Kabul." *Id.*

Dr. Gartenstein-Ross links Iranian support for the Taliban and the Haqqani network to this attack.  Iran has a long history of involvement in Taliban attacks in Kabul, and the training it has provided to the Taliban "bears a reasonable connection to this attack." *Id.*  Iranian financing has bolstered the range of Taliban operations, including ones in Kabul, and Iran's arming of the Taliban "included the provision of small arms such as those employed in [this] attack." *Id.* at 50. Iran helped plan and execute similar attacks, making the Park Palace Hotel Attack more likely to succeed.  Finally, Iran has provided support to militants based in Peshawar, Pakistan, which "may have assisted the Park Palace attack" because the Haqqani network's chief planner of the attack was based in Peshawar. *Id.*

Dr. Gartenstein-Ross concludes that "[t]hese indicia outline a reasonable connection between Iran and the Taliban/Haqqani network figures who were behind the 2015 Park Palace Hotel Attack." *Id.*  The Court agrees and finds that Paula died at the hands of the Taliban and the Haqqani network, both of which were materially supported by Iran and the IRGC.

### D.     Intercontinental Hotel Attack

Plaintiffs Glenn L. Selig and Abdullah Waheed died in an attack that occurred on January 20–21, 2018, at the Intercontinental Hotel in Kabul (Intercontinental Hotel Attack).  Compl. ¶ 2.

The Intercontinental Hotel is "a 5-star, government owned hotel" located "near a former royal palace." *Id.* ¶ 56.  As Afghanistan's first luxury hotel, it often hosted "Afghan politicians and other VIPs" as well as Western "diplomats, businessmen, journalists[,] and tourists." *Id.*

On the evening of January 20, a group of terrorists "armed with AK-47s and rocket-propelled grenades" attacked the hotel.  Gartenstein-Ross Rep. at 50.  Two terrorists were already in the hotel and had registered as guests, giving them access to codes to move between areas of the hotel.  *Id.*  They were joined by three attackers who shot their way in through the kitchen.  *Id.*  The gunmen went room-to-room, targeting foreigners.  *Id.*  They "shot down doors, shot guests in their rooms, and threw explosive devices into guests' rooms." *Id.* at 50–51.  Estimates of the dead ranged from 18 to 43, with many others injured.  *Id.* at 51.

The attackers shot Glenn seven times, but not all at once.  Mallak Decl. at 7.  They first shot him in the right arm, twice on the right side of his pelvis, and twice in the right thigh.  *Id.*  Although "extremely painful," these shots were not fatal.  *Id.*  One of Glenn's business associates heard him crying out in pain and asking for help.  *Id.*  The attackers also heard his cries and returned to shoot him twice in the head—an "immediately fatal wound." *Id.*

Dr. Mallak could not determine the amount of time between when Glenn was first shot and when he died.  But he could conclude that Glenn "experienced extreme pain and suffering during the attack." *Id.* at 8.  "[Glenn] was awake and conscious when the terrorists came back and pointed a gun at his head" and killed him.  *Id.*  Dr. Mallak also concluded that if the terrorists had not returned and shot him, Glenn might have survived.  *Id.*

On the night of the attack, Abdullah was dining with friends in a suite on the fourth floor of the hotel.  Gartenstein-Ross Rep. at 52.  One of those friends, a reporter, provided an account to CNN after the incident.  *Id.*  When the attack began, the group heard banging on the door, and

hotel waiters entered and told them that the hotel was under attack.  *Id.*  Abdullah and others barricaded the door, and Abdullah called his wife.  *Id.*; Decl. of Alya Waheed ¶ 18 (Alya Decl.), ECF No. 28-9.  Abdullah told his wife not to worry, but she "could hear the terror in his voice."  Alya Decl. ¶ 18.   The attackers eventually broke down the door and threw an explosive inside, killing him.  Gartenstein-Ross Rep. at 50.

The Taliban claimed responsibility the next day.  *Id.* at 52.  The group posted claims of responsibility both on its Twitter account and on its website, *al-Samoud*.  *Id.*  Dr. Gartenstein-Ross assessed these claims of responsibility and found them to be authentic.  *Id.* at 45–55.  Al Jazeera released a transcript of a conversation between Badruddin Haqqani, a key Haqqani network commander, and an attacker who provided Badruddin with real-time updates on the attack.  *Id.* at 20, 57.  The Taliban publicly stated its motivation was to target "Americans and a number of top officials from the agent Kabul administration."  *Id.* at 56.  Dr. Gartenstein-Ross contended that by killing these individuals, the Taliban sought to "raise the cost of remaining in Afghanistan" and "destabilize the Afghan government."  *Id.*

As with the Park Palace Hotel Attack, Dr. Gartenstein-Ross ruled out participation by the two other local terror groups, ISIS-K and HIG.  It is unlikely that ISIS-K was responsible for the attack because it usually claims responsibility for its attacks and did not do so here.  *See id.*  And the style of the attack—multiple shooters coordinating their assault—is unlike ISIS-K, which typically relies on suicide bombers.  Finally, most of the ISIS-K attacks that year were far from Kabul.  *See id.*

It is also unlikely that HIG was responsible.  It did not claim responsibility, and the Afghan government and its allies did not blame HIG for the attack.  *Id.*  HIG was not very active

in Kabul around the time of the attack, claiming responsibility for only one 2013 attack and one 2015 attack in the city. *Id.*

Dr. Gartenstein-Ross identified several reasons to tie Iran's support of the Taliban to this attack. Many of these are like the factors he outlined for the Park Palace Hotel Attack. Iran has a record of involvement in Taliban attacks in Kabul, and Iran was "providing the Taliban with extensive support in 2018." *Id.* at 57–58. Multiple attackers came from provinces where Iran has historically supported the Taliban. *Id.* The training that Iran has provided to the Taliban bore a reasonable connection to the attack, including "such skills and aspects of tradecraft as gathering intelligence . . . conducting pre-attack surveillance, small-team tactics, and even marksmanship." *Id.* And Iran's arming of the Taliban included giving them weapons like the ones used in this attack. *Id.* Even if Iran did not provide the specific weapons used in this attack, "[t]he flow of small arms from Iran to the Taliban made it easier to devote weaponry to attacks like the one that struck the Intercontinental Hotel." *Id.* at 59. Finally, Iranian assistance in planning and executing made attacks like the Intercontinental Hotel Attack more likely to succeed. *Id.*

The Court finds that Glenn and Abdullah died at the hands of the Taliban and the Haqqani network, both of which were materially supported by Iran and the IRGC.

## III.   LEGAL STANDARDS

Under Federal Rule of Civil Procedure 55(b)(2), the Court may enter default judgment when a party applies for it. But the entry of a default judgment "is not automatic." *Mwani*, 417 F.3d at 6. The Court has an "affirmative obligation" to determine whether it has subject matter jurisdiction over the matter. *Hecht v. Ludwig*, 82 F.3d 1085, 1092 (D.C. Cir. 1996). A court must also "satisfy itself that it has personal jurisdiction before entering judgment against an

absent defendant," but "[i]n the absence of an evidentiary hearing, although the plaintiffs retain the burden of proving personal jurisdiction, they can satisfy that burden with a *prima facie* showing." *Mwani*, 417 F.3d at 6–7 (cleaned up).

Additional procedures govern entry of default when the defendant is a sovereign state. Federal district courts "have original jurisdiction" over "any nonjury civil action against a foreign state" asserting "any claim for relief in personam with respect to which the foreign state is not entitled to immunity" under the FSIA.  28 U.S.C. § 1330(a).  "The Foreign Sovereign Immunities Act . . . affords the sole basis for obtaining jurisdiction over a foreign state in United States courts." *Mohammadi*, 782 F.3d at 13.  "While the FSIA establishes a general rule granting foreign sovereigns immunity from the jurisdiction of United States courts . . .  that grant of immunity is subject to a number of exceptions." *Id.* at 13–14.

The exception relevant here is the so-called terrorism exception found in 28 U.S.C. § 1605A.  Section 1605A confers subject matter jurisdiction, recognizes a federal cause of action against foreign states subject to the exception, and addresses personal jurisdiction by specifying procedures that a plaintiff must follow to effect service on a foreign state. *See Schwartz*, 2020 WL 7042842, at *9.

Different standards of proof govern the Court's personal jurisdiction and subject matter jurisdiction inquiries.  Plaintiffs need only make a "prima facie showing" of personal jurisdiction. *Mwani*, 417 F.3d at 6–7.  But for the Court to exercise subject matter jurisdiction, Plaintiffs need to "establish[] [their] claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e).  The statute does not specify what constitutes "evidence satisfactory to the court," and the D.C. Circuit has left it to courts to determine "how much and what kinds of evidence the plaintiff must provide." *Han Kim v. Democratic People's Repub. of Korea*, 774

F.3d 1044, 1046–51 (D.C. Cir. 2014). "[C]ourts have the authority—indeed, we think, the obligation—to adjust evidentiary requirements to . . . differing situations." *Id.* at 1048 (cleaned up). The evidence must consist of "admissible testimony in accordance with the Federal Rules of Evidence," *id.* at 1049 (cleaned up), and it must be sufficient for the court to come to the "logical conclusion" that the defendant is responsible for the plaintiffs' injuries, *id.* at 1051.

The Court's analysis proceeds like this: because personal jurisdiction under the FSIA hinges on subject matter jurisdiction, *see* 28 U.S.C. § 1330(b), the Court will first determine whether it has subject matter jurisdiction. This analysis considers whether Plaintiffs have carried "their burden of producing evidence sufficient to show that their claims fall within the state-sponsored terrorism exception to the FSIA." *Schwartz*, 2020 WL 7042842, at *2. Next, the Court considers whether it has personal jurisdiction over Defendants. Then the Court evaluates whether Plaintiffs have pled a federal cause of action and proven a theory or theories of liability. Finally, the Court assesses Plaintiffs' claims for monetary damages.

## IV.    ANALYSIS

### A.    Subject Matter Jurisdiction

"FSIA begins with a presumption of immunity" under 28 U.S.C. § 1330(a). *Bell Helicopter Textron, Inc. v. Islamic Repub. of Iran*, 734 F.3d 1175, 1183 (D.C. Cir. 2013). So to establish subject matter jurisdiction, Plaintiffs bear "the initial burden to overcome [that presumption] by producing evidence that an exception applies." *Id.* Once Plaintiffs make this showing, "the sovereign bears the ultimate burden of persuasion to show the exception does not apply." *Id.*

The terrorism exception in 28 U.S.C. § 1605A establishes two threshold showings for waiver of sovereign immunity. First, the claimant or victim must be a U.S. national, a member

15

of the U.S. armed forces, or a U.S. government employee or contractor when the act of terrorism

occurred.  28 U.S.C. § 1605A(a)(2)(A)(ii).  Plaintiffs here easily meet this requirement because

the three decedents were all citizens.  Compl. ¶ 2.

Next:  "the foreign state must be designated as a state sponsor of terrorism both at the

time the act occurred (or was so designated as a result of the act) and at the time the lawsuit was

filed (or was so designated within the six-month period preceding the filing of the suit)."

*Schwartz*, 2020 WL 7042842, at *10.  Plaintiffs meet this requirement because the U.S. State

Department designated Iran as a State Sponsor of Terrorism in 1984, and this designation was in

effect at the time of the attacks.  Compl. ¶ 4; *see also* Dep't of State, Bureau of

Counterterrorism, *State Sponsors of Terrorism* (last accessed Nov. 17, 2021),

https://www.state.gov/state-sponsors-of-terrorism.  In 2007, The U.S. Department of the

Treasury designated the Quds Force "under E.O. 13224 for providing material support to the

Taliban and other terrorist organizations."  U.S. Dep't of Treasury, *Fact Sheet: Designation of

Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism* (Oct. 25,

2007), https://www.treasury.gov/press-center/press-releases/pages/hp644.aspx.  And in 2017, the

Treasury designated the IRGC as a terrorist entity in its entirety.[6]  Press Release, U.S. Dep't of

Treasury, *Treasury Designates the IRGC under Terrorism Authority and Targets IRGC and*

---

[6] Although the IRGC was not designated in its entirety until 2017—two years after the Park
Palace Hotel Attack—Plaintiffs allege that the Quds Force—which was designated in 2007—is
the IRGC entity responsible for the IRGC's "strategic objectives worldwide" and "arms, funds,
trains, and directs terror proxies, including the Taliban."  Compl. ¶ 33.  The U.S. Government
agrees with Plaintiffs' claim.  *See* Press Release, U.S. Dep't of Treasury, *Treasury Designates
the IRGC under Terrorism Authority and Targets IRGC and Military Supporters under Counter-
Proliferation Authority* (Oct. 13, 2017), https://www.treasury.gov/press-center/press-
releases/Pages/sm0177.aspx ("The Qods Force, a branch of the Islamic Revolutionary Guard
Corps . . . provides material support to the Taliban . . . The Qods Force is the Iranian regime's
primary instrument for providing lethal support to the Taliban.").  So does the Court.

*Military Supporters under Counter-Proliferation Authority* (Oct. 13, 2017),

https://www.treasury.gov/press-center/press-releases/Pages/sm0177.aspx.  These designations

have never been lifted.  Compl. ¶ 4.

Plaintiffs who overcome these threshold showings must then show that their claims fit

within the narrow waiver of sovereign immunity in 28 U.S.C. § 1605A(a)(1).  The waiver

contains five requirements:

> [1] money damages are sought against a foreign state [2] for
> personal injury or death [3] that was caused by [4] an act of torture,
> extrajudicial killing, aircraft sabotage, hostage taking, or the
> provision of material support or resources for such an act if such
> act or provision of material support or resources is [5] engaged in
> by an official, employee, or agent of such foreign state while
> acting within the scope of his or her office, employment, or
> agency.

28 U.S.C. § 1605A(a)(1).  The Complaint establishes the first two requirements:  Plaintiffs seek

money damages, Compl. ¶ 127, for the decedents' deaths and the suffering of their surviving

family members, *id.* ¶ 119.  The Court's analysis thus focuses on the latter three requirements.

*The Park Palace Hotel Attack and the Intercontinental Hotel Attack constituted*

*extrajudicial killings.*  "[T]he terms 'torture' and 'extrajudicial killing' have the meaning given

those terms in section 3 of the Torture Victim Protection Act of 1991."  28 U.S.C.

§ 1605A(h)(7).  The Torture Victim Protection Act (TVPA) defines an extrajudicial killing as "a

deliberated killing not authorized by a previous judgment pronounced by a regularly constituted

court affording all the judicial guarantees which are recognized as indispensable by civilized

peoples."  Pub. L. No. 102-256, § 3(a), 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350 note).

"[T]his definition contains three elements: (1) a killing; (2) that is deliberated; and (3) is not

authorized by a previous judgment pronounced by a regularly constituted court."  *Owens*, 864

F.3d at 770.

Plaintiffs' claims satisfy the first part of the definition because terrorists murdered Paula, Glenn, and Abdullah.  Their claims also satisfy the "deliberated" prong because the attacks were "undertaken with studied consideration and purpose."  *Id.* (cleaned up).  The Park Palace Hotel Attack was carried by a single gunman, Edris, but he was assisted in planning and preparation by Abdul Wakil and Ghulam Aziz.   Gartenstein-Ross Rep. at 42.  Both were Haqqani network operatives, and Aziz had obtained work with a Paris-based foreign aid agency as a "cover" for his Haqqani network activities.  *Id.*  When arrested after the attack, Aziz confessed to obtaining a false USAID identification card and a map of the hotel, both of which he provided to his contact in the Haqqani network.  *Id.* at 47.  And according to a statement from the Taliban afterward, the attack had been coordinated to coincide with "an important meeting attended by important people from many invading countries, especially Americans."  *Id.* at 44.

The Intercontinental Hotel Attack was also premeditated.  Three of the attackers entered through a gate that required pre-clearance, suggesting employees inside the hotel helped usher the attackers inside.  *Id.* at 50.  Two of the attackers had been staying at the hotel for days and had access to special codes allowing them to open locked doors and reach different parts of the hotel.  *Id.* at 50–51.  A Taliban claim of responsibility after the attack referenced a "plan" and stated that the attackers were targeting Americans and members of the Kabul government.  *Id.* at 53.  The Taliban even claimed it had postponed the attack by a week because of a wedding at the hotel scheduled for the day first planned for the attack.  *Id.*  When they learned that Americans and members of the Kabul government would be in the hotel the next week, the Taliban exploited the opportunity.  *Id.*

Plaintiffs also satisfy the third prong of the "extrajudicial killing" definition.  This prong requires them to show that the terrorists killed the decedents "without due process."  *Han Kim*,

774 F.3d at 1050. There is no question that these acts of terrorism lacked the traditional

protections of due process. Thus, Plaintiffs prove the victims died because of an extrajudicial

killing.

*Iran and the IRGC provided the Taliban and the Haqqani network with "material*

*support" to carry out the attacks.* Recall the resources Iran and the IRGC supplied to the

Taliban and the Haqqani network. *See* Section II.B. This support included "safe haven, training,

financing, weapons, and high-level support for more than a decade" from the senior Iranian

government officials. Gartenstein-Ross Rep. at 30. Plaintiffs have thus provided evidence

"satisfactory to the court," 28 U.S.C. § 1608(e), that Iran and the IRGC materially supported the

Taliban and the Haqqani network and that this support came from an "agent of such foreign state

while acting within the scope of his or her office, employment, or agency," *id.* § 1605A(a)(1).

*The injuries and deaths were "caused by" Iran and the IRGC's material support to the*

*Taliban and the Haqqani network.* The FSIA requires Plaintiffs to show proximate cause.

*Owens*, 864 F.3d at 798. "Proximate cause requires some reasonable connection between the act

or omission of the defendant and the damage which the plaintiff has suffered." *Id.* at 794. To

establish a "reasonable connection," Plaintiffs must show both that "the defendant's actions

[were] a substantial factor in the sequence of events that led to [their] injury" and that their injury

"must have been reasonably foreseeable or anticipated as a natural consequence of the

defendant's conduct." *Id.* (cleaned up).

Dr. Gartenstein-Ross concludes that "the Taliban would [have been] a less lethal and

effective fighting force without Iranian support." Gartenstein-Ross Rep. at 41. He identifies

multiple ways Iran contributed to the attacks. *See supra* Sections II.C and II.D. True, Dr.

Gartenstein-Ross admits that he cannot "precisely determine the full impact of Iran's support for

the Taliban."  Gartenstein-Ross Rep. at 41.  And he does not tie the provision of specific support

from Iran and the IRGC to the two hotel attacks.  "But establishing that type of close nexus is

unnecessary, because financial support and material aid are fungible."  *Schwartz*, 2020 WL

7042842, at \*14.  The FSIA does not require "careful bookkeeping."  *Id.*  "[I]t is enough for

Plaintiffs to have shown that Iran's financial and military aid to [the Taliban] played a significant

role in aiding its operational capacity."  *Id.*  Finally, both the Taliban and Iran "have

acknowledged Iran's substantial impact" on the Taliban's ability to carry out terrorist attacks.

Gartenstein-Ross Rep. at 41.  The Court is persuaded that Iran and the IRGC were key to the two

hotel attacks.

 The Court finds that these attacks caused reasonably foreseeable suffering.  The Taliban

and the Haqqani network had a long history of planning attacks in and around Kabul—Dr.

Gartenstein-Ross counted 32 separate attacks launched by the Taliban or the Haqqani network in

Kabul from January 2008 to January 2018, not including the two hotel attacks at issue.  *Id.* at 18–

22.  So Iran could not have provided the support it did without an awareness of how its support

would be used.  *Id.* at 18–23.

 For all these reasons, the Court finds that Iran has no right to sovereign immunity and

that this case falls within the Court's subject-matter jurisdiction.  *See* 28 U.S.C. §§

1330(a), 1605A(a)(1).

### B. Personal Jurisdiction

 Next up is personal jurisdiction.  "Personal jurisdiction over a foreign state shall exist as

to every claim for relief over which the district courts have jurisdiction under subsection (a)

where service has been made under section 1608 of this title."  28 U.S.C. § 1330(b).  Subsection

(a) provides the Court with subject matter jurisdiction.  Thus, personal jurisdiction exists

wherever the Court has subject matter jurisdiction and a plaintiff has effected service as required in 28 U.S.C. § 1608.

Section 1608 "provides four methods of service in descending order of preference." *Barot v. Emb. of the Repub. of Zambia*, 785 F.3d 26, 27 (D.C. Cir. 2015). The first is "by delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the foreign state or political subdivision." 28 U.S.C. § 1608(a)(1). The second is "by delivery of a copy of the summons and complaint in accordance with an applicable international convention on service of judicial documents." *Id.* § 1608(a)(2). Next, a plaintiff can effect service "by sending a copy of the summons and complaint and a notice of suit . . . by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned." *Id.* § 1608(a)(3). And finally, if none of the first three methods works, a plaintiff can serve the documents through the Department of State. *Id.* § 1608(a)(4).

The first two methods for effecting service were unavailable to Plaintiffs. No "special arrangement" governs service of process between the United States and Iran, and Iran is not party to an international convention on service of judicial documents. *See Salzman v. Islamic Repub. of Iran*, 2019 WL 4673761, at *15 (D.D.C. Sept. 15, 2019) (cleaned up). Plaintiffs therefore tried to effect service under § 1608(a)(3) by requesting the Clerk of the Court to mail the summonses and Complaint to Defendants via Postal Service. *See* Status Rep. as to Serv. of Proc. at 1, ECF No. 19. Plaintiffs received no return receipts nor were the packages returned to them as undeliverable, so they could not determine whether service succeeded. *Id.* Plaintiffs then requested the State Department to begin service under § 1608(a)(4). Status Rep. as to Serv.

of Proc. at 1, ECF No. 22.  The State Department reported that Iran was served on September 2, 2020 and that the IRGC was served on November 1, 2020.  *Id.*

Because the Court has subject matter jurisdiction and Plaintiffs properly served Defendants, the Court has personal jurisdiction over Defendants.

### C.        Plaintiffs Have Properly Alleged Causes of Action

The FSIA provides plaintiffs with a private cause of action.   *See* 28 U.S.C. § 1605A(c). This cause of action holds foreign state sponsors of terrorism and their employees or agents liable for "personal injury or death" to nationals of the United States.  *Id.*  "This cause of action is available to Plaintiffs because they are nationals of the United States and, given the overlap between the elements of this cause of action and the terrorism exception to foreign sovereign immunity," the availability of this claim has already been determined by the Court's subject matter jurisdiction analysis.  *See Foley v. Syrian Arab Repub.*, 249 F. Supp. 3d 186, 205 (D.D.C. 2017).

But although the FSIA provides a private cause of action, it does not "provide the substantive basis for plaintiffs' claims."  *Ewan v. Islamic Repub. of Iran*, 466 F. Supp. 3d 236, 245 (D.D.C. 2020).  Plaintiffs need to "prove a theory of liability which justifies holding the defendants culpable for the injuries that the plaintiffs allege to have suffered."  *Oveissi v. Islamic Repub. of Iran*, 879 F. Supp. 2d 44, 53–54 (D.D.C. 2012) (cleaned up).  Claims based on the FSIA are "federal questions," but this does not "authorize the federal courts to fashion a complete body of federal law."  *Bettis v. Islamic Repub. of Iran*, 315 F.3d 325, 333 (D.C. Cir. 2003).  Courts should "rely on well-established statements of common law, found in state reporters, the Restatement of Torts, and other respected treatises, in determining damages under § 1605A(c)."  *Fraenkel v. Islamic Repub. of Iran, et al.*, 892 F.3d 348, 353 (D.C. Cir. 2018).

Two theories of liability apply here.  For Paula, Glenn, and Abdullah's estates, wrongful

death is the applicable theory of liability.  *See* Compl. ¶ 121 (claims of the estates); *Est. of*

*Hirshfeld v. Islamic Repub. of Iran*, 330 F. Supp. 3d 107, 139 (D.D.C. 2018) ("A decedent's

heirs at law, acting through the decedent's estate, may bring a wrongful death action

under section 1605A(c) to seek compensation for economic losses which result from decedent's

premature death.") (cleaned up).  "Plaintiffs may recover for wrongful death upon establishing

that Iran caused [decedents'] death[s]."  *Est. of Hirshfeld*, 330 F. Supp. 3d at 139.  Because the

Court has already determined that Plaintiffs have submitted satisfactory evidence showing that

the decedents' deaths were extrajudicial killings caused by the Taliban and the Haqqani network

with support from Iran and the IRGC, Plaintiffs have satisfactorily pled a wrongful death theory

of liability.

The individual family members bring claims of solatium.  *See* Compl. ¶ 121 (individual

Plaintiffs' claims for "extreme mental and emotional anguish" and "solatium").  Solatium is "the

mental anguish, bereavement and grief that those with a close personal relationship to a decedent

experience as the result of the decedent's death, as well as the harm caused by the loss of the

decedent's society and comfort."  *Est. of Hirshfeld*, 330 F. Supp. 3d at 140 (cleaned up).  Under

the FSIA, solatium claims are indistinguishable from claims of intentional infliction of emotional

distress (IIED).  *See Valore v. Islamic Repub. of Iran*, 700 F. Supp. 2d 52, 85 (D.D.C. 2010).

Courts have applied the Restatement (Second) of Torts to these claims.  *See, e.g.*, *Abedini v.*

*Gov't of Islamic Repub. of Iran*, 422 F. Supp. 3d 118, 133 (D.D.C. 2019); *Est. of Hirshfeld*, 330

F. Supp. 3d at 140.

The Restatement sets out four requirements for an IIED claim:  Defendants must have (1)

engaged in extreme and outrageous conduct, (2) which was directed at persons other than

plaintiffs, (3) which intentionally or recklessly caused severe emotional distress, (4) to plaintiffs' immediate family members who were present when such conduct occurred. Restatement (Second) of Torts § 46. Plaintiffs meet all four requirements. The first and third requirements are met because "acts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress." *Est. of Hirshfeld*, 330 F. Supp. 3d at 141–42 (cleaned up). The second requirement is met because the conduct was directed at the decedents, not Plaintiffs. The fourth requirement is met because Plaintiffs are immediate family members of the decedents, and when the decedents died in a terrorist attack, Plaintiffs need not have been physically present. *See Abedini*, 422 F. Supp. 3d 133; *Est. of Hirshfeld*, 330 F. Supp. 3d at 141.

Plaintiffs have thus established Iran and the IRGC's liability under the federal private right of action for their solatium claims.

### D.      Individual Damages

The Court moves next to damages. "To obtain damages for a[] FSIA claim, a plaintiff must prove that the consequences of the defendants' acts were reasonably certain to occur, and he must prove the amount of damages by a reasonable estimate." *Abedini*, 422 F. Supp. 3d at 136 (cleaned up). Recall that death and emotional suffering were a foreseeable result of Iran and the IRGC's actions. *See supra* Section IV.A. The Court therefore proceeds to determining whether each Plaintiff's claim for damages is supported by a "reasonable estimate." *Abedini*, 422 F. Supp. 3d at 136.

In assessing the appropriate damages to award, the Court consults *Estate of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229 (D.D.C. 2006). Many judges in this district have

adopted the amounts awarded to the plaintiffs in *Heiser* as a baseline from which variances are applied case-by-case. *See, e.g.*, *Est. of Steinberg v. Islamic Repub. of Iran*, No. 17-CV-1910 (RCL), 2019 WL 6117722, at *9 (D.D.C. Nov. 18, 2019); *Braun v. Islamic Repub. of Iran*, 228 F. Supp. 3d 64, 85 (D.D.C. 2017); *Thuneibat v. Syrian Arab Repub.*, 167 F. Supp. 3d 22, 51 (D.D.C. 2016).  But although *Heiser* is "a useful reference point," it is "not binding precedent." *Fraenkel*, 892 F.3d at 351.  The Court therefore treats *Heiser* as a guide, not a rule.

    *The Estate of Paula Kantor*.  Paula was a citizen at the time of her death and her estate therefore may bring a claim for wrongful death under § 1605A(c).  Paula's Estate seeks damages for her personal injury and suffering.  *See* Pls.' Mem. in Supp. of Mot. for Default Judgment at 28 ("Pls.' Mem."), ECF No. 27-1.  Dr. Mallak determined that the gunshot to Paula's face produced "unfathomable suffering."  Mallak Decl. at 6.  He estimated that she "survived several hours with excruciating pain" before succumbing to a separate shot to her liver.  *Id.* at 6.

    Paula's Estate seeks $5 million for her pain and suffering plus an upward adjustment. Pls.' Mem. at 28.  But that amount is generally reserved for victims who survive attacks and experience prolonged pain and suffering.  *Heiser*, 466 F. Supp. at 277; *see also Kaplan v. Hezbollah*, 213 F. Supp. 3d 27, 35 (D.D.C. 2016) ("[W]hen assessing damages for surviving victims of terrorist activities . . . [c]alculating damages begins with the baseline assumption that persons suffering injuries in terrorist attacks are entitled to $5 million in damages.") (cleaned up).  Plaintiffs justify their claim for $5 million by appealing to *Wultz v. Islamic Republic of Iran*, 864 F. Supp. 2d 24 (D.D.C. 2012).

    But although *Wultz* establishes a "baseline assumption that persons suffering substantial injuries in terrorist attacks are entitled to $5 million in compensatory damages," it then explains that courts "typically award[] $1 million to a victim who survives a few minutes to a few hours

after [the attack]." *Id.* at 37–38.  In other words, a $1 million pain-and-suffering award is typically given to the estates of victims who quickly succumb to their injuries, and $5 million is more common for victims who survive the attacks and must live with ongoing pain and suffering.  Other decisions in this district agree.  *See, e.g.*, *Doe A-1 v. Democratic People's Repub. of Korea*, No. 18-CV-0252 (DLF), 2021 WL 723257, at *7 (D.D.C. Feb. 24, 2021) (awarding $1 million for a period of pain and suffering between a few minutes and a few hours); *Braun*, 228 F. Supp. 3d at 83 (awarding $1 million to the estate of an infant who survived for two hours after a terrorist attack); *Stern v. Islamic Repub. of Iran*, 271 F. Supp. 2d 286, 300 (D.D.C. 2003) (awarding $1 million to the estate of a woman who "suffered several minutes of extreme pain and suffering before succumbing to her injuries").

Because Paula survived "several hours" after the attack, the Court will award her estate $1 million.  Mallak Decl. at 6.  The Court declines to award the requested upward adjustment, *see* Pls.' Mem. at 29, because although Paula's suffering was no doubt terrible, it was not substantially different from the suffering of other victims who have received the *Heiser* baseline. The Court makes this award consistent with *Heiser*, while recognizing that *Heiser* is not binding.

Paula's Estate also seeks economic loss damages.  *Id.* at 29.  Section 1605A(c) provides that foreign state-sponsors of terrorism are liable to victims for economic losses stemming from injuries or death sustained because of the foreign state's conduct.  28 U.S.C. § 1605A(c); *see also Valore*, 700 F. Supp. 2d at 78 ("A wrongful-death action . . . may be brought through the estate of the decedent[] for economic losses which result from a decedent's premature death.") (cleaned up).

Chad Staller and Stephen Dripps of the Center for Forensic Economic Studies prepared an economic loss report for Paula.  Exp. Rep. of Staller and Dripps (Paula Kantor), ECF No. 27-

6; *see also Reed v. Islamic Repub. of Iran*, 845 F. Supp. 2d 204, 214 (D.D.C. 2012) ("The report of a forensic economist may provide a reasonable basis for determining the amount of economic damages in an FSIA case.").  Staller and Dripps relied on Paula's 2011, 2012, and 2015 tax returns; her 2013 W-2 wage and tax statement; her resume; and Anthony Kantor's declaration, among other documents.  Exp. Rep. of Staller and Dripps (Paula Kantor) at 2.

At the time of her death, Paula was 46 years-old and worked as a social scientist at the Centro Internacional de Mejoramiento de Maiz Y Trigo (CIMMT), a position she had held since 2015.  *Id.* at 3.  Between 2011 and 2013, her wages varied between $107,000 and $117,000.  *Id.* Staller and Dripps used the employment contract in place at the time of her death to determine her "base of annual lost earnings."  *Id.* at 4.  They calculated this amount as $110,500.  *Id.*  Her statistical worklife expectancy was to age 67.6.  *Id.*  After accounting for her estimated taxes, personal maintenance expenditures, and fringe benefits, Staller and Dripps estimated the present value of Paula's total economic loss at $1,694,185.  *Id.* at 6.  The Court finds Staller and Dripps's estimate to be well substantiated and carefully calculated and will award Paula's Estate $1,694,185 in economic loss damages.

*Paula's Family*.  Anthony Kantor, Paula's father; Barbara Kantor, Paula's mother; Laura Strylund, Paula's sister; and Anthony "Tony" Kantor, Paula's brother, all seek solatium damages.  Under the *Heiser* framework, a spouse of a decedent receives $8 million, a child receives $5 million, a parent receives $5 million, and a sibling receives $2.5 million.  *Heiser*, 466 F. Supp. 2d at 269.  Although many judges in this district adhere to the *Heiser* framework in awarding solatium damages, that "does not mean . . . that the Court is bound by the framework under all circumstances—or, indeed, that the just award should be the same in every case." *Salzman*, 2019 WL 4673761, at *17.  More, the *Heiser* numbers "are not set in stone" and the

Court "may award greater amounts in cases with aggravating circumstances" or "may depart downward in amount where the relationship between the claimant and the decedent is more attenuated." *Murphy v. Islamic Repub. of Iran*, 740 F. Supp. 2d 51, 79 (D.D.C. 2010) (cleaned up).

When courts award enhancements to family members, they generally do so because of "evidence establishing an especially close relationship between the plaintiff and decedent, particularly in comparison to the normal interactions to be expected given the familial relationship; medical proof of severe pain, grief or suffering on behalf of the claimant; and circumstances surrounding the terrorist attack which made the suffering particularly more acute or agonizing." *Oveissi v. Islamic Repub. of Iran*, 768 F. Supp. 2d 16, 26–27 (D.D.C. 2011). Downward departures are less common, but at least one court made a downward departure when awarding damages to plaintiffs whose injuries were less severe than other plaintiffs in the same case. *See Salzman*, 2019 WL 4673761, at *17 (awarding 80% of the *Heiser* baseline to plaintiffs whose family member suffered injuries that, "although severe, were not as grave" as other victims in the same case).

Relying on this framework, the Court turns first to Anthony, Paula's father. Anthony reports he had a "very close relationship" with Paula. Decl. of Anthony Kantor ¶ 15, ECF No. 27-9. He was "so proud of her accomplishments." *Id.* Even though she traveled a lot for work, Paula "always made time for her family" and "would frequently come back to stay . . . usually for two to three weeks at a time" with Anthony and his wife. *Id.* She was "attentive" to her family's needs, and once when Anthony had surgery, Paula "came home from overseas to help take care of [him] and the house." *Id.* ¶ 16.

When Anthony received the news that Paula had died, he was "shocked and totally devastated." *Id.* ¶ 18. "Everything that followed from that moment was a blur." *Id.* ¶ 19. He lost his appetite and lost 15-20 pounds. *Id.* ¶ 20. He struggles to sleep, and any time he sees a photo of Paula in the house it "causes [him] to break into tears uncontrollably." *Id.* He wants to hold onto the memory of Paula but finds it hard to do so, and sometimes he has to "push her memory out of [his] mind, and resist the urge to think about her every time [he] see[s] her picture." *Id.* Still, he often finds himself "visualizing Paula's last moments, imagining what she was thinking and feeling as she [lay] wounded and bleeding after being shot so many times." *Id.* ¶ 21. He is left with "anxiety, stress and a very empty feeling that [he] cannot do anything about" as well as "unbearable pain." *Id.* ¶ 23.

Anthony seeks $5 million plus "a significant upward adjustment . . . for the unbearable personal loss" he suffers. Pls.' Mem. at 35. The Court will award Anthony the $5 million *Heiser* baseline but declines to award an upward departure. The Court recognizes Anthony's terrible suffering and the close relationship that he had with Paula. But the *Heiser* baseline accounts for this type of suffering and is designed to compensate a parent for it.

When courts award upward departures, they usually do so because of an unusual circumstance beyond the ordinary anguish that results from losing a family member. For example, in *Thuneibat*, the court awarded a 25% upward departure to a mother who was present at the terrorist attack and saw her daughter "carried out of the ballroom into an ambulance." *Thuneibat*, 167 F. Supp. 2d at 51. In another case, the court awarded a 25% enhancement because the plaintiff had "turned to self-destructive behavior to cope with his pain over his sister's death." *Baker v. Socialist People's Libyan Arab Jamahirya*, 775 F. Supp. 2d 48, 83 (D.D.C. 2011). Without these extraordinary circumstances, courts generally adhere to the *Heiser*

framework.  *See, e.g.*, *Roth v. Islamic Repub. of Iran*, 78 F. Supp. 3d 379, 405 (D.D.C. 2015) (denying an enhancement because the evidence did not "demonstrate an unusual degree of mental anguish that would warrant an increased or decreased damages award").  So too here.

The Court moves next to Barbara.  Barbara describes Paula as "a wonderful daughter" with whom she had "a very close relationship."  Decl. of Barbara Cantor ¶ 7, ECF No. 27-11.  She was "proud of her accomplishments" and appreciated that Paula "frequently [came] back to stay" with the family despite her travels.  *Id.*  Paula was "thoughtful, and always remembered to call on holidays and birthdays."  *Id.* ¶ 9.  When Barbara heard about Paula's death, she was "shocked and totally devastated" that Paula "had been murdered in cold blood."  *Id.* ¶ 11.  Barbara feels "absolutely horrible" that she could not be with Paula when she died.  *Id.* ¶ 13.  She cries herself to sleep and says that there "is a hole in my heart that is always bleeding."  *Id.*  Barbara tries to keep up with her activities "as that is the only way I find myself able to move forward," but "Paula is still always in the back of my mind and colors everything I do."  *Id.*

Barbara seeks $5 million and an upward adjustment for "the unbearable personal loss" she suffered.  Pls.' Mem. at 37.  The Court finds that Barbara's suffering is like her husband's and therefore will award her $5 million.  The Court will not award an enhancement to Barbara for the same reasons it did not award an enhancement to him.

Laura Strylund seeks solatium damages for "a most severe and unconscionable level of mental anguish, bereavement, and unbearable grief."  *Id.* at 38.  Paula and Laura "had an extremely close sisterhood," and when Laura's children were born, "Paula took a job teaching at the University of Wisconsin-Madison to be close" to Laura's home.  Decl. of Laura Strylund ¶ 5, ECF No. 27-12.  Paula was so close to Laura's family that she listed Laura's kids as her

beneficiaries on her retirement accounts.  *Id.*  When Paula left her teaching job and began

frequent international travel, the sisters often met up in places all around the world.  *Id.* ¶ 6.

Paula's death had an immense effect on Laura.  In the months after the attack, Laura

"suffered from depression . . . erratic behavior and crying at the drop of a hat."  *Id.* ¶ 13.  She

"cannot read or talk about the incident without feeling this awful pain in [her] chest and needing

to try to control [herself] from shaking."  *Id.* ¶ 12.  The attack "distracts [her] from work, and

keeps [her] up at night."  *Id.*  When she travels on her own, Laura is "extra sensitive and

careful."  *Id.* ¶ 13.  She also has substantial anxiety around her children, especially her daughter,

Lindsey, who is teaching in Paris, where several terrorist attacks have occurred.  *Id.* ¶ 14.

Siblings receive $2.5 million for solatium damages under the *Heiser* framework.

*Steinberg*, 2019 WL 6117722, at *9.  The Court will award Laura $2.5 million for her emotional

pain and suffering.  The Court will not award an upward adjustment because Laura's suffering,

although terrible, does not "demonstrate an unusual degree of mental anguish that would warrant

an increased or decreased damages award."  *Id.*  Laura and Paula no longer were in the same

household or otherwise had such a significant tie that would distinguish them from the typical,

loving, adult siblings.

Tony, Paula's brother, also seeks solatium damages.  Pls.' Mem. at 41.  Tony suffers

"unbearable grief as a result of his sister's murder and tragic death."  *Id.*  They had a "close

brother-sister relationship," and growing up he considered Paula "the genius of the family . . . the

virtuous one . . . [and] a great person to be around."  Decl. of Anthony John Kantor ¶ 6, ECF No.

27-13.  Because he, Laura, and Paula all had May birthdays, every year growing up they

celebrated one big birthday together.  *Id.*  He was fascinated by her stories of her travels abroad,

and he always loved hearing about them when she visited.  *Id.* ¶ 7.

After Paula's death, Tony's parents and sister told him Paula looked up to him, which surprised him because he always thought of Paula as the smart one in the family. *Id.* ¶ 8. After the attack, he told his supervisor at work about Paula, but she did not seem to care. *Id.* ¶ 5. Tony quit his job and gained thirty pounds. *Id.* ¶ 12. He started hitting himself with a closed fist, "hard enough to cause . . . real pain." *Id.* Because of this emotional pain and suffering, the Court will award Tony $2.5 million in solatium damages but declines an upward adjustment for the same reasons it declined an upward adjustment for Laura. The Court has considered the evidence of self-destructive behavior here, *cf. Baker*, 775 F. Supp. 2d at 83, and nonetheless finds that Tony's experience is not sufficiently different from that of most adults who lose a sibling in a terrorist attack to justify an upward adjustment.

*The Estate of Glenn Selig.* Glenn's Estate seeks both pain and suffering and economic loss damages. Dr. Mallak's autopsy of Glenn's wounds show that he suffered multiple shots on two separate occasions. Mallak Decl. at 7. The terrorists first shot Glenn in his right arm, twice on the right side of his pelvis, and twice to the right thigh. *Id.* Although extremely painful, these injuries were not immediately life-threatening. *Id.* The terrorists later returned and shot Glenn twice in the head, killing him instantly. *Id.* Dr. Mallak could not say how long Glenn was alive before the terrorists returned, but he was confident that "Glenn was alive [after he was shot the first time] and consciously endured extreme pain and suffering during the attack." *Id.* At most, Glenn suffered for about twelve hours because the attack began in the evening and stretched into the early morning of the next day. *See* Gartenstein-Ross Rep. at 41. The Court will therefore award $1 million for pain and suffering that lasts between several minutes and several hours. *See Wultz*, 864 F. Supp. 2d at 37–38. The Court declines the requested enhancement for the same reason it declined one to Paula's Estate.

Glenn's Estate also seeks economic loss damages.  Pls.' Mem. at 43.  Staller and Dripps prepared a report estimating Glenn's economic loss.  Exp. Rep. of Staller and Dripps (Glen L. Selig), ECF No. 27-5.  They relied on his tax returns from 2014–2018 and calculated his statistical worklife expectancy as 65.6.  *Id.* at 3–4.  Because this age is lower than the 67-year-old Social Security retirement age, Staller and Dripps prepared two separate estimates, one for each retirement age.  After accounting for earnings growth, taxes, personal maintenance expenditures, and household services, they determined the present value of Glenn's economic loss ranged from $2,393,773 to $2,574,836, depending on his retirement age. *Id.* at 7–8. The Court finds Staller and Dripps's report to be well supported and further determines that given Glenn's apparent entrepreneurial drive and spirit, he likely would have worked until at least age 67.  Thus, the Court will award the upper range of the economic loss, $2,574,836.

*The Selig Family*.  Glenn is survived by his wife, Charyn Selig, and his two children, Drew Selig and J.S. (a minor).

Charyn and Glenn married in 2000 and remained together for over 17 years before Glenn's death.  Decl. of Charyn Selig (Charyn Decl.) ¶ 3, ECF No. 28-2.  Charyn was a teacher when they met but quit to be a stay-at-home mom after they got married.  *Id.* ¶ 9.  Charyn describes Glenn as the "cornerstone of the family," the "fun" parent, who did everything with "abundance."  *Id.* ¶ 10–11.  He was a doting parent who wanted to read to his kids every night, even when he was busy, and dreamed of passing his business down to his children when he retired.  *Id.* ¶ 13–15.  Glenn was also a pillar of the community and served as the president of the family's synagogue.  *Id.* ¶ 17.  One of the qualities Charyn loved most about him was "the quality of his character"—"[h]e would rearrange his entire day to help someone."  *Id.* ¶ 8.

Charyn has "serious memory gaps" from the day she found out Glenn had been killed and had to tell her two children. *Id.* ¶ 25. Because Glenn was a former local television news anchor and had been president of his synagogue, many people in the community knew him. Charyn had to tell people over and over that terrorists murdered her husband. *Id.* ¶ 26. She felt depressed and overwhelmed and had to be put on a prescription for depression and anxiety. *Id.* ¶ 28. She lost weight and some of her hair. *Id.* ¶ 30. She began drinking and had to see a therapist. *Id.* ¶ 30–31. She joined a group grief counseling program, and every time she shared her story, the group agreed it was the worst. *Id.* ¶ 31. Glenn's death deeply impacted his children, and that has been especially hard for Charyn. Reflecting on the attack, Charyn stated: "[The terrorists] did not just kill Glenn. They killed me. They killed our kids. We had to become something we are not. I am very scared that I will spend the rest of my life feeling so utterly alone." *Id.* ¶ 43.

Charyn seeks $8 million and a "significant upward adjustment." Pls.' Mem. at 49. The Court will award Charyn the $8 million *Heiser* baseline but declines an upward adjustment. The Court does not doubt the depth of Charyn's suffering and acknowledges that the "death of a spouse is undoubtedly one of the worst experiences in a person's life." *Stansell v. Repub. of Cuba*, 217 F. Supp. 3d 320, 347 (D.D.C. 2016). But Charyn presented no evidence of a unique circumstance that differentiates her suffering from the pain most spouses endure when they lose the one they love, especially in a terrorist attack. *Compare Acosta v. The Islamic Repub. of Iran*, 574 F. Supp. 2d 15, 30 (D.D.C. 2008) (awarding $8 million to a wife whose husband was assassinated by a terrorist but was not herself present at the assassination), *with Belkin v. Islamic Repub. of Iran*, 667 F. Supp. 2d 8, 23–24 (D.D.C. 2009) ("The Court believes, however, that this plaintiff in particular is entitled to this higher award [of $10 million] due to the extreme shock he

experienced when he had to view his wife's severely disfigured body shortly after the bombing occurred.").

The Court moves next to Glenn's daughter, Drew.  Glenn and Drew had "a very special relationship" from the moment she was born.  Charyn Decl. ¶ 13.  Charyn describes Glenn as the "oxygen" in Drew's life.  *Id.*  He had a "special way with Drew" and he was the one she always wanted to talk to when she was discouraged.  *Id.* ¶ 14.  Every year, Drew and Glenn went to a father-daughter dance, and Drew has saved a corsage from one of those dances.  *Id.*

Before Glenn's death, Drew was thriving in a demanding academic program, and she wanted to be a neuropsychologist or neuropsychiatrist when she grew up.  *Id.* ¶ 35.   Now she is failing in school and her teachers doubt her ability to graduate.  *Id.* ¶ 37.  She wants to live in a safe "compound" with her mother and brother for the rest of their lives.  *Id.*

Drew's treating psychologist, Dr. Theresa Picciocchi, submitted a statement with her professional assessment of the impact Glenn's death has had on Drew.  Decl. of Dr. Teresa M. Picciocchi (Picciocchi Decl.), ECF No. 28-6.  Dr. Picciocchi states that Drew has twice been involuntarily committed for mental health reasons under Florida's Baker Act.  *Id.* ¶ 7.  On a separate occasion, Drew spent three days in the hospital after threatening to kill herself.  *Id.* ¶ 8.  Drew underwent an intensive, 5-day-a-week, outpatient mental health treatment program for six weeks.  *Id.* ¶ 9.  She has also undergone transcranial magnetic stimulation.  *Id.*

When Dr. Picciocchi began working with Drew, she was having three to four panic attacks a week.  *Id.* ¶ 10.  Dr. Picciocchi stated these attacks were the most significant she had ever seen.  *Id.*  One lasted about an hour; Dr. Picciocchi was unable to calm her down and was concerned Drew could not breathe.  *Id.*  Three years after the death of her father, Drew continues to suffer one or two attacks per week.  *Id.* ¶ 11.  Dr. Picciocchi believes that Drew is a naturally

sensitive person and this predisposition "made Drew more vulnerable to the emotional and mental trauma inflicted on her by the sudden loss of her father, and the knowledge that her father had died violently in a terrorist attack." *Id.* ¶ 13. Dr. Picciocchi has diagnosed Drew with persistent complex bereavement disorder, post-traumatic stress disorder, generalized anxiety disorder, panic disorder, and bipolar disorder type II. *Id.* ¶ 18. There is "no record of Drew having these debilitating symptoms before her father's murder," but now Drew "is not able to function independently or live by herself" and "[i]f it were not for her mother, she would have to live in a long-term care facility." *Id.* ¶¶ 19, 22. Dr. Picciocchi is "not optimistic that Drew will be able to attend and complete college. She is experiencing great difficulty simply completing [high] school." *Id.* ¶ 22.

Drew's former high school counselor, Lesley Morter, also submitted a statement. She writes that before Glenn's death, Drew was "an excellent student with excellent grades." Decl. of Lesley Morter ¶ 8, ECF No. 28-8. But after Glenn's death, Drew "was no longer able to be academically successful at our school." *Id.* ¶ 16. She transferred to a new school to be with her brother, but as soon as she started classes there, she "suffered from extreme anxiety." Decl. of Dr. Kristine Bennett ¶ 9, ECF No. 28-7. After failing in four of her five academic classes, she transferred to another school. *Id.* ¶ 17. It took two months before Drew would enter the school building by herself. Decl. of Ben Pomales, ECF No. 28-4, ¶ 9. Despite the school maintaining a safe space for her where she can be alone, *id.* ¶ 11, Drew continues to have trouble interacting with other students and experiences anxiety attacks so severe that she sometimes scratches her arms and legs to the point of bleeding, *id.* ¶ 16. The principal at her new school believes that Drew "wants very much to succeed" but he struggles to envision Drew attending college or working productively in employment in her current condition. *Id.* ¶ 18–19.

Drew seeks a "significant upward adjustment to the baseline" of $5 million for the children of decedents. Pls'. Mem. at 58. Because of the severity of Drew's distress and trauma, the Court finds such an upward adjustment is merited and will award Drew a 25% adjustment for a total of $6.25 million in solatium damages. In making this adjustment, the Court notes that Drew still lives in the family home and depended on Glenn for financial, emotional, and spiritual support, unlike adult children. She has lost an important source of guidance, correction, and love at a time when she still desperately needs it. *Accord Thuneibat*, 167 F. Supp. 3d 22 at 52–53 (awarding a 25% upward adjustment to two siblings, aged 6 and 12, whose sister had died in a terrorist attack, causing "uniquely acute suffering" and harming their development given the "tender age at which the traumatic event occurred").

Drew also seeks damages for her inability to work and the lifelong care she says she needs because of her father's death. Pls.' Mem. at 59. Staller and Dripps prepared an estimate of Drew's lost earnings and lifelong care costs based on many documents, including school records, declarations of her care providers, and a life care plan prepared by BalaCare. *Id.* Exp. Rep. of Staller and Dripps (Drew Selig) at 2, ECF No. 27-8. At the time of the Report, Drew had a worklife expectancy between 62.3 and 67 years, so Staller and Dripps provided a range for her economic loss. *Id.* at 3. They assumed that, without the incident, Drew would have earned a bachelor's degree. *Id.* at 4. They also assumed that because of Glenn's death, Drew is unlikely to "work[] productively in employment." *Id.* Relying on the lifecare plan produced by BalaCare, Staller and Dripps produced two estimates of Drew's lifelong care needs depending on whether Drew could receive home care or would need to live in a supportive living facility. *Id.* at 5. They estimated that Drew's total economic loss, assuming home care, ranges from

$6,583,175 to $7,002,607; assuming supportive living, her total economic loss ranges from $7,677,707 to $8,097,139. *Id.* at 8.

Other than the decedents' estates, Drew is the only plaintiff who seeks economic loss damages. Drew's situation differs substantially from the decedents. Paula, Glenn, and Abdullah were all adults who had established work histories, making the estimation of their economic loss reasonably certain. *See Panahi v. Islamic Repub. of Iran*, No. CV 19-0006 (ABJ), 2020 WL 6591425, at *11 (D.D.C. Nov. 10, 2020) ("In order to determine the amount, the plaintiff must merely provide a *reasonable estimate* supported by competent evidence.") (cleaned up) (emphasis added).

But Drew is still in high school. And although she planned to attend college and had career goals, young adults of Drew's age often change their plans. Plaintiffs submit no evidence that courts in this district ordinarily provide lifelong economic loss damages and care costs to someone as young as Drew. The Court's own investigation uncovered very few instances of this type of award. And even when these types of damages have been awarded, they show indicia of reliability that is lacking here. *See, e.g.*, *Reed*, 845 F. Supp. 2d at 214 (awarding over $2 million in economic loss damages for "diminished earning capacity" to a plaintiff who was 6 years-old at the time of his father's kidnapping by terrorists where the kidnapping had occurred about 26 years earlier, giving the court a substantial record of how the kidnapping affected the plaintiff). The Court cannot find Drew's ability to provide for herself is unalterably foreclosed on this record. More, the Court has awarded Drew a 25% enhancement in solatium damages given the depth of her suffering. To be sure, these two types of damages are distinct, but the reality is that Drew is already receiving compensation specifically for the intense grief her father's death has caused.

J.S., Glenn's minor son, also seeks solatium damages.  J.S. was very close to his father, often going to the office with him and pretending to work as an employee.  Charyn Decl. ¶ 15.  Glenn dreamed of one day passing his business down to his children, and given J.S.'s interests, it likely would have gone to him.  *Id.*  J.S. has responded to the grief of losing his father by "put[ting] his nose to the grindstone."  *Id.* ¶ 38.  He has continued in school, but Charyn worries that "when his pain and grief finally come out, he will have a huge setback."  *Id.*  She also worries that she is so busy taking care of Drew that J.S. feels ignored.  *Id.* ¶ 40.  He has "pulled away" and gone "inside of himself."  *Id.* ¶ 38.  He has told Charyn that his anxiety is a 20 on a scale of 1 to 10.  *Id.* ¶ 40.  Charyn believes he is "trying to be our rock, and that breaks [her] heart."  *Id.* ¶ 39.

J.S. seeks a significant upward adjustment from the $5 million baseline typically awarded to decedents' children.  Pls.' Mem. at 61.  Given J.S.'s young age and the substantial impact his father's death has had on him, the Court finds a 25% upward adjustment, for a total of $6.25 million in solatium damages, is appropriate.  *See Thuneibat*, 167 F. Supp. 3d 22 at 53.  Like Drew, J.S. has lost an irreplaceable provider, guide, and nurturer at a critical point in his young life.  While his emotional manifestations do not compare to Drew's, he will be without his father for a greater part of his formative childhood years.

*Estate of Abdullah Waheed*.  Abdullah's Estate seeks both pain and suffering and economic loss damages.  Unlike Paula and Glenn, Abdullah did not suffer physical injury before his death.  But he was aware he was in danger and did fear for his life before his death.  Abdullah's wife, Alya, states she received a call from him in which he told her that the hotel was under attack, he heard gunshots, and he thought terrorists were inside the hotel.  Alya Decl. ¶ 18.  Courts consider the "extreme fear and distress a victim experiences knowing his death is

imminent." *Fritz v. Islamic Repub. of Iran*, 324 F. Supp. 3d 54, 60; *see also Baker*, 775 F. Supp. 2d at 81–82 ("Courts have been influenced not only by the length of time that the victim endured physical suffering, but by the victim's mental anguish stemming from the knowledge that death was imminent.").

Abdullah's Estate seeks $5 million "with such upward adjustment as the Court may deem appropriate." Pls.' Mem. at 62. As the Court has already explained, $1 million is more appropriate for a decedent who suffered from several minutes to several hours. And because the Court has a duty to "ensure that individuals with similar injuries receive similar awards," *Valore*, 700 F. Supp. 2d at 84, the Court will not award the same amount to Abdullah as it awarded to Paula and Glenn because both Paula and Glenn suffered unimaginable physical pain. Although Abdullah likely endured incredible fear knowing that he might die, he did not have the added burden of physical suffering. Thus, the court will adjust the $1 million pain and suffering award down by 25% to $750,000. *See Salzman*, 2019 WL 4673761 at *17 (awarding 80% of the *Heiser* baseline for losses that "differ[ed] in degree").

To support Abdullah's claim for economic loss damages, the Estate submitted a report prepared by Staller and Dripps. Exp. Rep. of Staller and Dripps (Abdullah Waheed), ECF No. 27-7. In preparing the report, they relied on the Complaint; a 2011 1099-Misc form; tax returns from 2009, 2012, 2013, and 2017; January and October 2017 salary sheets; the declaration of Alya Waheed; and an economic questionnaire. Between 2009 and 2017, Abdullah's annual income ranged from $30,640 to $257,163. *Id.* at 3. His statistical worklife expectancy was 68.5. *Id.* at 4. Staller and Dripps assumed that, from 2022 forward, his annual income would be $103,937—the average of his available reported earnings. *Id.* Accounting for taxes, personal maintenance expenditures, and fringe benefits, Staller and Dripps estimated the present value of

Abdullah's total economic loss at $1,253,606.  *Id.* at 6.  The Court finds Staller and Dripps estimate is well supported and will award this amount to Abdullah's Estate.

*Abdullah's Family*.  Abdullah's wife, Alya, and his three children, Amanullah, Mina, and Meelod, seek solatium damages.

Alya and Abdullah met in Kabul when they were both working for the Ministry of Information and Culture.  Alya Decl. ¶ 10.  Early in their relationship, Abdullah gave Alya a book of love poems, including a poem he had written himself.  *Id.* ¶ 11.  According to Alya, "[f]rom the first day of our relationship until the day of his death, he was always romantic."  *Id.* The couple's close bond helped them endure the difficulty of fleeing Kabul when the Taliban seized the city in the late 1990s.  *Id.* ¶ 12.  The family fled to Pakistan, and, in 2001, obtained refugee visas for the United States.  *Id.* ¶ 13.  They settled in Philadelphia, where Abdullah, who had been a senior Afghan official, became a minimum wage worker at a 7-Eleven.  *Id.* ¶ 14. Abdullah eventually became a translator for the U.S. Army in Afghanistan and, later, an official in the new Ashraf Ghani Administration in Afghanistan.  *Id.* ¶¶ 15–16.  But he wanted to be closer to his family and was in Kabul to speak to President Ghani about securing a posting to the United Nations in New York when he died.  *Id.* ¶ 17.

After Alya received the call from Abdullah that the hotel was under attack, she "could not sleep or eat" and "walked around the house all day and night."  *Id.* ¶ 19.  She tried to get more information from relatives in Kabul, but no one could tell her anything about Abdullah.  *Id.*  The next day, Alya's daughter received a call that he had been killed.  *Id.* ¶ 20.  Alya was "[i]n complete shock and disarray" and decided to fly to Kabul immediately.  *Id.*  When she arrived there, no one had any information, and Alya "felt as though [her] entire world was crumbling down."  *Id.*  She tried to sleep but could not.  *Id.*  At his funeral, she was "miserable in every

way." *Id.* ¶ 23.  The "violent way Abdullah died made [her] ill." *Id.* ¶ 24.  Now, whenever she

hears a story about Abdullah's death, her body shakes. *Id.* ¶ 26.  Seeing fire on television upsets

her and reminds her of the attack. *Id.*  She worries about the safety of her children all the time,

and it disrupts her sleeping. *Id.*  She has a "chronic, severe pain in [her] stomach." *Id.* ¶ 28.

Alya seeks $8 million in solatium damages and an upward adjustment. Pls.' Mem. at

67. The Court will award her the $8 million *Heiser* baseline but declines an upward adjustment

for the same reason it declined an upward adjustment to Charyn.

Amanullah "Aman" Waheed also seeks solatium damages. *Id.* at 70.  As Abdullah's

oldest son, Aman and Abdullah had a "deep bond."  Decl. of Amanullah Waheed ¶ 8, ECF No.

28-13.  Abdullah had "a major influence" on Aman's decision to become a businessman. *Id.* ¶ 9.

Aman felt he could "speak with him about anything" and states he "has never had another

relationship as close." *Id.* ¶ 11.

Aman found out about his father's death from the news. *Id.* ¶ 14.  He tried to get

confirmation of his father's death from his mother, but she did not answer her phone. *Id.*

Following the attack, Aman felt he needed to take off time from school, but he "did not want to

take on debt to obtain [his] degree or delay entering the workforce since doing so could harm

[his] family financially." *Id.*  He feels "intense pressure to be a provider as the oldest son" and

states that "[e]very decision [he has] made since [his] father's death is based on [his] mother's

and siblings' best interests." *Id.* ¶ 19.  He lives with his mother so he can comfort her, *id.*,

because she is "100% not the same person" she was before Abdullah's death, *id.* ¶ 18.  Aman has

gained 50 pounds because of the pressure and feels like he has "sunken into a bog." *Id.* ¶ 20.  He

struggles with "trusting others and even telling acquaintances, co-workers, and friends more

about [him]self." *Id.* ¶ 23.

Aman seeks $5 million, the *Heiser* baseline for children of decedents, and an upward adjustment.  The Court will award the $5 million baseline but declines to award the adjustment. The Court recognizes the unbearable grief and immense pressure Aman suffers, but unlike some of the other Plaintiffs who are children of one of the decedents, Aman was not a minor living at home at the time of the attack.  Children who are living with their parents are likely to feel the sting of loss more harshly.  Other courts in this district have recognized the importance of enhancing the award for plaintiffs who lose relatives at a young age, *see Oveissi*, 768 F. Supp. 2d at 29, and given the Court's responsibility to "ensure that individuals with similar injuries receive similar awards," *Valore*, 700 F. Supp. 2d at 85, the Court declines to award Aman the same amount it awards the youthful Plaintiffs.

The Court moves next to Mina Waheed, Abdullah's only daughter.  Mina describes her father as "an amazing man" and she is "so proud" that he persevered even though "[w]hat he lived through in his life was enough to destroy most people."  Decl. of Mina Waheed ¶ 14, ECF No. 28-12.  Abdullah was Mina's "best friend in the world" and was "very in tune" with who she was, what she was doing in school, what her interests were, and who her friends were.  *Id.* ¶ 15.

Mina found out about the attack when her mother called her at work and told her to come home as soon as she could.  *Id.* ¶ 6.  When Mina got home, her mother was "hysterical" and Mina tried to calm her down and stay strong.  *Id.*  But by the next morning, when they still had no news of Abdullah, Mina began falling apart.  *Id.* ¶ 8.  Eventually she received a phone call from the Afghan Ambassador to the United States telling her that her father had been killed.  *Id.* ¶ 8.  Mina's mother left for Kabul the next day and told her to look after her brothers, but not to tell them about their father's death.  *Id.* ¶¶ 10–11.  When alone in the shower or the car, Mina would cry and scream for hours.  *Id.* ¶ 11.  She met with her college advisor and adjusted her

college schedule to lessen her load.  *Id.*  She has been engaged for two years, but she had always imagined her father being with her at her wedding and "cannot imagine taking the next step now."  *Id.* ¶ 16.

Mina seeks the $5 million *Heiser* baseline and an upward adjustment.  Pls.' Mem. at 73. The Court will award Mina $5 million in solatium damages, but because she was not a minor at the time of the accident and provides no other extraordinary justifications, it declines to award an upward adjustment.

Finally, the Court turns to Meelod Waheed, Abdullah's youngest son.  Even though Abdullah traveled a lot for work, "he would always try to stay in touch and be there" for Meelod. Decl. of Meelod Waheed ¶ 7, ECF No. 28-14.  Meelod fondly remembers how Abdullah set aside weekends for family time, and that some of their favorite things to do together were to go to the mall, the park, and to Washington, D.C.  *Id.*  Abdullah taught Meelod how to do many things, including how to play basketball, how to ride a bike, how to drive, and how to shave.  *Id.* ¶ 9.

On the day of the terrorist attack, Meelod could tell something was wrong because his mother seemed "on edge."  *Id.* ¶ 10.  The next day he saw she had her bags packed to go to Kabul, but she would not tell him what was going on.  *Id.* ¶ 11.  A few days later, Mina told Meelod their father had been injured.  *Id.*  Meelod then googled his father and found news reports of his death.  *Id.*  He was devastated, and his grieving interfered with his academic work. *Id.* ¶ 15.  His grade in calculus slipped from an A to a D in one quarter.  *Id.*  He had always wanted to go to a prestigious university because his father had preached the importance of a good education, but now Meelood is worried about his family's financial situation.  *Id.* ¶ 18.  He chose to stay at home and enroll at community college instead.  But he felt bad when he saw his friends

going to the universities of their dreams with the emotional and financial support of their parents. *Id.* Meelod feels that he has lost a part of himself—a part of his own personality. *Id.* ¶ 23.

Meelod seeks the $5 million *Heiser* baseline and an upward adjustment. Pls.' Mem. at 77. Because Meelod was a minor at the time of the attack, Decl. of Meelod Waheed ¶ 3, and because courts have recognized the particularly devastating effect that the loss of a parent can have on minors, *see Oveissi*, 768 F. Supp. 2d at 29, the Court will award Meelod a 25% upward adjustment for a total of $6.25 million in solatium damages.

\* \* \*

In making these awards, the Court does not minimize or denigrate the pain and suffering each Plaintiff has endured. No one should experience the trauma that the Plaintiffs and decedents here undoubtedly experienced. The Court's awards are driven by a recognition that most—if not all—people eligible for *Heiser*-type compensation have endured the unimaginable, and that fine distinctions in awards based on outward manifestations of grief may unintentionally slight those whose grief is no less real but is more internalized. So, fully satisfied that each Plaintiff is well entitled to *Heiser*-style awards based on an individualized analysis of the record, the Court declines to further graduate awards except as noted above.

### E.    Punitive Damages and Costs

The plaintiffs also seek punitive damages, which apply not to compensative victims but to "punish outrageous behavior and deter such outrageous conduct in the future." *Kim v. Dem. People's Repub. of Korea*, 87 F. Supp. 3d 286, 290 (cleaned up). Four factors are relevant in deciding the level of punitive damages appropriate in a given case: "(1) the character of the defendants' act, (2) the nature and extent of harm to the plaintiffs that the defendants caused or

intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants." *Steinberg*, 2019 WL 6117722, at *9 (cleaned up).

These factors support an award of punitive damages in this case. Iran's acts were heinous. Their acts were intended to—and did—cause unconscionable pain and suffering. There is a need for deterrence because, time and again, courts in this district have been confronted with families shattered by Iran-backed terrorists.

Courts have derived four methods for calculating punitive damages. The first is to "multiply the foreign state's annual expenditures on terrorism by a factor between three and five." *Braun*, 228 F. Supp. 3d at 87 (cleaned up). This approach may lead to billions of dollars in punitive damages and is generally reserved for conduct that is "more outrageous" and leads to "more tragic" outcomes than the typical terrorist attack. *Thuneibat*, 167 F. Supp. 3d at 54. For example, in *Valore* a court awarded plaintiffs $1 billion in punitive damages for the suicide bombing of the Marine barracks in Beirut, Lebanon, which killed 241 American servicemen. *Valore*, 700 F. Supp. 2d at 57, 87–90.

A second approach is to award each family of a decedent $150 million in punitive damages. *See, e.g.*, *Est. of Steinberg*, 2019 WL 6117722, at *10; *Est. of Hirshfeld*, 330 F. Supp. 3d at 150; *Gates v. Syrian Arab Repub.*, 580 F. Supp. 2d 53, 75 (D.D.C. 2008). This approach follows the Supreme Court's guidance that punitive damages should be "reasonably predictable in its severity, so that . . . [a] bad man can look ahead with some ability to know what the stakes are in choosing one course of action or another." *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 502 (2008) (cleaned up).

Third, some courts in this district have calculated the total compensatory damages awarded for a victim and then multiplied that award "by a factor between one and five." *Fritz*,

324 F. Supp. 3d at 65 (cleaned up).  Courts choose the value of the multiplier based on the severity and reprehensibility of the attack.  *See id*; *see also Gill v. Islamic Repub. of Iran*, 249 F. Supp. 3d 88, 106 (D.D.C. 2017) (finding "no exceptional circumstances" and using "a multiplier of three").

Finally, some courts reject the preceding approaches because they lead to punitive damages awards that exceed compensatory damages.  For example, in *Christie v. Islamic Republic of Iran*, the Court rejected the "flat-award method" because although it purported to "respect the guidepost of treating comparable cases comparably, [it] has in practice elevated superficial similarities over meaningful ones."  *Christie v. Islamic Repub. of Iran*, 2020 WL 3606273, \*28 (D.D.C. July 2, 2020).  And it rejected multiplier approaches because they "would yield an excessive award."  *Id.*  The court favored instead a punitive damages award that matched compensatory damages.  *Id.*  The court noted that, although this number was lower than what either the flat-award method or the multiplier approaches would yield, there was a "lack of any evidence that high awards have successfully deterred Iran."  *Id.* at \*29 (cleaned up); *see also Blank v. Islamic Repub. of Iran*, No. CV 19-3645 (BAH), 2021 WL 3021450, at \*13 (D.D.C. July 17, 2021) (awarding punitive damages equal to compensatory damages); *Panahi*, 2020 WL 6591425, at \*12 (same).

Plaintiffs ask for $1 billion in punitive damages.  Compl. ¶ 126.  But they do not provide an estimate of Iran's wealth or its annual expenditures on terrorism.  The Court therefore declines to employ the first approach that awards an amount in punitive damages equal to a multiple of the defendant's annual expenditures on terrorism.  The Court also rejects the third approach that awards a multiple of compensatory damages.  A minority of judges in this jurisdiction follow this approach, and one court found it appropriate only in "a special

circumstance." *Abedini*, 422 F. Supp. 3d at *142.  More, Plaintiffs do not ask the Court to award punitive damages this way.

The second approach has the advantage of being "reasonably predictable in its severity." *Bodoff v. Islamic Repub. of Iran*, 907 F. Supp. 2d 93, 106 (D.D.C. 2012).  But judges in this district have criticized this approach for its inflexibility.  *See, e.g.*, *Christie*, 2020 WL 3606273 at *22 ("[The flat-award method] trades discretion for predictability[.]"); *Abedini*, 422 F. Supp. 3d at 142 ("[The flat-award method] limits a judge's discretion to tailor a punitive award appropriate to the magnitude of the underlying injury[.]").

For this reason, several judges have rejected it.  *See, e.g.*, *Hekmati v. Islamic Republic of Iran*, 278 F. Supp. 3d 145, 167 (D.D.C. 2017); *Flanagan v. Islamic Republic of Iran*, 87 F. Supp. 3d 93, 124–25 (D.D.C. 2015); *Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57, 73 (D.D.C. 2015).  And although it is true that the flat-award approach leads to large awards that would deter an ordinary actor, Iran already faces billions in punitive damages awards.  *See Christie*, 2020 WL 3606273 at *29.  "Adding hundreds of millions of dollars" to the outstanding judgments against Iran "is unlikely to have a meaningful deterrent effect."  *Id.*

The fourth approach has the merit of following Supreme Court precedent on punitive damages.  True, much of this precedent "is rooted in the Due Process Clause, and foreign states and their agents are not persons protected by the Fifth Amendment's Due Process Clause."  *Id.* at *27 (cleaned up).  But due process principles are still "instructive, insofar as they embody general concerns for fairness and consistency."  *Flanagan*, 87 F. Supp. 3d at 126 n.37.  And this approach meets the four objectives of punitive damages.  *See Kim*, 87 F. Supp. 3d at 290.

An amount of punitive damages equal to compensatory damages—$68,022,627—is commensurate with the character of Defendants' acts and the nature and extent of the harm

caused.  This case is not like those involving hundreds of decedents murdered in a bombing.

*See, e.g.*, *Valore*, 700 F. Supp. at 57, 89–90 (awarding $1 billion in punitive damages for the

deaths of 241 American servicemen in the bombing of the Marine barracks in Beirut, Lebanon).

The deaths here, while no less tragic, were fewer in number.  Awarding damages in this amount

"will hopefully deter defendants from continuing to sponsor terrorist activities."  *Opati v.*

*Republic of Sudan*, 60 F. Supp. 3d 68, 82 (D.D.C. 2014) (awarding punitive damages equal to

compensatory damages).  And although there are no recent estimates of Iran's total annual

expenditures on terrorism, the evidence recounted here persuades the Court that Iran can pay

punitive damages in this amount.  *See Hekmati*, 278 F. Supp. 3d 145, 167 (D.D.C. 2017)

(discussing "the staleness of the evidence" relating to Iran's fiscal support for terrorism).

 The Court therefore awards punitive damages of $68,022,627, to be apportioned among

Plaintiffs according to their compensatory damages.  *Accord Blank*, 2021 WL 3021450, at *13

(apportioning punitive damages according to compensatory damages); *Christie*, 2020 WL

3606273, at *29 (same).

 *Prejudgment Interest, Post-Judgment Interest, and Inflation*.  Plaintiffs seek

"prejudgment interest and post-judgment interest as calculated at the maximum rate allowable by

law" as well as "an adjustment for inflation to counteract the erosive effect of inflation on

damages precedents established in historical judicial decisions."  Compl. ¶ 127(c) and (d).

 First, prejudgment interest.  "[W]hether pre-judgment interest is to be awarded is subject

to the discretion of the court and equitable considerations."  *Motion Picture Ass'n of Am., Inc. v.*

*Oman*, 969 F.2d 1154, 1157 (D.C. Cir. 1992).  "[T]he overarching tide of persuasive

precedent . . . plainly weighs against awarding prejudgment interest."  *Akins v. Islamic Republic*

*of Iran*, No. CV 17-675 (BAH), 2021 WL 3021445, at *11 (D.D.C. July 16, 2021).  This is

because "[w]hen an award without pre-judgment interest fully compensates a plaintiff, an award of pre-judgment interest no longer has the intended compensatory purpose and should be denied." *Price v. Socialist People's Libyan Arab Jamahiriya*, 384 F. Supp. 2d 120, 135 (D.D.C. 2005); *see also Doe A-1*, 2021 WL 723257, at *9 ("Because the Court has determined that $3.35 million in *today's dollars* fully compensates the crew members and their estates for their time spent in captivity, prejudgment interest is unnecessary to compensate victims for the lost time value of money."). The Court has carefully considered the pain and suffering of the decedents and each Plaintiff, and its awards are intended to be fully compensatory. Prejudgment interest is therefore improper.

Next, post-judgment interest. The federal post-judgment interest statute provides that "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court." 28 U.S.C. § 1961(a). Interest "shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield[.]" *Id.* The statute also provides that "[i]nterest shall be computed daily to the date of payment . . . and shall be compounded annually." *Id.* § 1961(b). "[A]n award of post-judgment interest under this statute is mandatory, not discretionary." *Doe A-1*, 2021 WL 723257, at *9; *see also Flanagan*, 87 F. Supp. 3d at *127 (citing 28 U.S.C. § 1961(a) in awarding "post-judgment interest at the statutory rate"); *Baker*, 775 F. Supp. 2d at 87 (D.D.C. 2011) (awarding "any applicable post-judgment interest allowed by law"). The Court will therefore award post-judgment interest at the statutory rate.

Finally, inflation. The Court is sympathetic to Plaintiffs' arguments that *Heiser* is a historical precedent and its baselines have eroded in real value over time. But Plaintiffs cite no authority for the proposition that these baselines should be updated; indeed, Plaintiffs urge the

adoption of the *Heiser* framework throughout the Complaint.  *See, e.g.*, Pls.' Mem. at 31–32, 35, 37, 58, 61.  Because Plaintiffs present no "well-established common law principles or a clear directive from this Circuit" concerning the application of inflation to FSIA damages, the Court "declines to smuggle in what amounts to an update to the *Heiser* framework."  *Barry v. Islamic Repub. of Iran*, 437 F. Supp. 3d 15, 62 (D.D.C. 2020).

*Costs, Expenses, and Fees*.  The last category of damages Plaintiffs' seek is "costs, disbursements, reimbursement of expenses, and allowance of reasonable fees for their counsel and experts."  Compl. ¶ 127(e).  Plaintiffs cite no basis for the award of these fees.  *See Kinyua v. Republic of Sudan*, 466 F. Supp. 3d 1, 13 (D.D.C. 2020) ("[T]he Court is not aware of any statutory or other basis for the award of attorney's fees[.]").  More, "plaintiffs have not provided any information regarding the fees and costs sought."  *Aceto v. Islamic Republic of Iran*, No. CV 19-464 (BAH), 2020 WL 619925, at *23 (D.D.C. Feb. 7, 2020) (denying plaintiffs' request for "reasonable costs and expenses" because "plaintiffs have not provided any information regarding the fees and costs sought") (cleaned up).  The Court therefore declines to award any fees or expenses.

## V.   CONCLUSION

For all these reasons, the Plaintiffs' Motion for Default Judgment will be granted in part and denied in part.  A separate Order will issue.


Dated: November 22, 2021                         _____
                                                 TREVOR N. McFADDEN, U.S.D.J.